## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

SHIRLEY L. SMITH,            :

                           :

             Plaintiff,         :     CIVIL NO. 2002-227 (STT)

                           :

          v.                :

                           :

VIRGIN ISLANDS PORT    :

AUTHORITY, et al.,        :

                           :

            Defendants.    :

## MEMORANDUM

Giles, J.                                      August 29, 2008

## I.  INTRODUCTION

Before the court is Defendants Virgin Islands Port Authority ("VIPA") and VIPA Governing Board's (hereinafter "Governing Board") Motion to Dismiss or, In the Alternative, Motion for Summary Judgment (Doc. Nos. 171 & 172) regarding Plaintiff Shirley L. Smith's claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., as asserted in Count VII of Plaintiff's Second Amended Complaint.  Also before the court is pro se Plaintiff's Cross Motion for Partial Summary Judgment (Doc. No. 151) with respect to the following of her claims: pursuant to the FMLA (Count VII); for breach of contract (Count I); pursuant to the Virgin Islands Donated Leave Program, 3 V.I.C. § 583b, (Count V); and for intentional discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., (Count IV).  Defendants filed a Reply and Motion to Strike Plaintiff's Cross Motion for Partial Summary Judgment (Doc. No. 173).

Defendants' Motion to Strike Plaintiff's Cross Motion for Partial Summary Judgment is

DENIED.  Plaintiff's cross-motion for summary judgment with respect to her claims for intentional discrimination and retaliation in violation of Title VII (Count IV) is addressed in a separate memorandum opinion and order on Plaintiff's Title VII claims, and is DENIED therein.

In her cross-motion for summary judgment, Plaintiff devotes only one sentence to arguing her 3 V.I.C. § 583b claim, (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 71), and only a few short paragraphs to arguing her breach of contract claim, (id. at ¶ 72).  In their reply, Defendants only address Plaintiff's FMLA claims and do not address any of Plaintiff's other claims asserted in her cross-motion for summary judgment.  (See Defs.' Reply to Pl.'s Opp. to Def.'s Mot. for Summ. J. on FMLA Claims and Mot. to Strike Pl.'s Cross Mot. for Partial Summ. J. (Doc. No. 173) (hereinafter "Defs.' Reply") ¶¶ 23-25.)  The court therefore finds that Plaintiff's summary judgment arguments as to her 3 V.I.C. § 583b and breach of contract claims have been insufficiently presented and argued by Plaintiff and insufficiently briefed by the parties, depriving the court of an adequate basis upon which to consider them and render a disposition.  Plaintiff's cross-motion for summary judgment with respect to her breach of contract claim (Count I) and Title 3 V.I.C. § 583b claim (Count V) is therefore DENIED WITHOUT PREJUDICE to motion refiling and full briefing on those claims only.

Thus, Plaintiff's FMLA claim (Count VII) is the sole claim remaining before the court on the above motions.  The issues raised by the motions and determined by the court are: (1) whether VIPA is an eligible employer under the FMLA or whether VIPA is entitled to Eleventh Amendment immunity and is not subject to suit under the FMLA; and (2) if immunity does not exist, whether Plaintiff is an eligible employee under the FMLA.

Defendants' Motion to Dismiss or, In the Alternative, Motion for Summary Judgment

regarding Plaintiff's FMLA claims and Plaintiff's Cross Motion for Partial Summary Judgment

with respect to her FMLA claims are both DENIED for the following reasons.  In sum,

Defendants are part of the Government of the U.S. Virgin Islands, which is a federal

instrumentality, and therefore not protected by Eleventh Amendment immunity.  Genuine issues

of material fact exist as to whether Plaintiff is an eligible employee under the FMLA.


## II.  DEFENDANTS' MOTION TO DISMISS

### A.      Jurisdiction and Standard Of Review.

This court has subject matter jurisdiction over Plaintiff's FMLA claims pursuant to 28

U.S.C. § 1331.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "'accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief.'"  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v.

Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (stating that this statement of the

Rule 12(b)(6) standard remains acceptable following the U.S. Supreme Court's decision in Bell

Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)).  To withstand a motion to dismiss under

Rule 12(b)(6), "'[f]actual allegations must be enough to raise a right to relief above the

speculative level." Id. at 234 (quoting Twombly, 127 S. Ct. at 1965).  Thus, "'stating . . . a claim

requires a complaint with enough factual matter (taken as true) to suggest' the required element."

Id. (quoting Twombly, 127 S. Ct. at 1965); see Wilkerson v. New Media Tech. Charter Sch., Inc.,

522 F.3d 315, 322 (3d Cir. 2008) (following Phillips).  This standard "simply calls for enough

facts to raise a reasonable expectation that discovery will reveal evidence of the necessary

element." Phillips, 515 F.3d at 234 (quoting Twombly, 127 S. Ct. at 1965) (quotations omitted).

When deciding a motion to dismiss under Rule 12(b)(6), a court may properly consider

the factual allegations contained in the complaint, exhibits attached thereto, documents

referenced therein, matters of public record, and undisputedly authentic documents attached as

exhibits to the defendant's motion to dismiss if the plaintiff's claims are based on those

documents. Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d

Cir. 1993), cert. denied, 510 U.S. 1042 (1994).


### B.     Relevant Procedural History

Plaintiff filed her original complaint on December 19, 2002, asserting multiple counts

against VIPA, the VIPA Governing Board, and three individual defendants: Gordon A. Finch, the

Executive Director of VIPA at the time of the alleged violations, David Mapp, the Assistant

Executive Director of VIPA, and Darlan Brin, VIPA's Executive Director.  (Compl. (Doc. No.

1).)  Plaintiff filed her First Amended Complaint on February 21, 2003.  (1st Am. Compl. (Doc.

No. 19).)  On August 5, 2003, Plaintiff filed a Motion for Leave to File a Second Amended

Complaint against the same defendants.  (Pl.'s Mot. for Leave to File a 2d Am. Compl. (Doc. No.

77).)

On January 2, 2005, Judge Thomas K. Moore, who then presided over the case, entered a

Memorandum and Order on Defendants' motion to dismiss Plaintiff's First Amended Complaint.

(Mem. & Order, Jan. 2, 2005 (Doc. Nos. 131 & 132)); Smith v. Virgin Islands Port Auth., Civ.

No. 2002-227, 2005 U.S. Dist. LEXIS 56 (D.V.I. Jan. 2, 2005) (Moore, J.).  Judge Moore denied

Defendants' motion to dismiss Plaintiff's FMLA claim as to Defendant VIPA, but granted the motion to dismiss Plaintiff's FMLA claim as to the individual defendants. Smith, 2005 U.S. Dist. LEXIS 56, at *33-39.

On May 18, 2005, Magistrate Judge Geoffrey W. Barnard, who then managed the case, granted Plaintiff's motion for leave to file a Second Amended Complaint.[1] (Order, May 18, 2005 (Doc. No. 156).) On June 1, 2005, Plaintiff filed four motions for reconsideration of the court's January 2, 2005, Order, which had dismissed several of the claims in her First Amended Complaint, in addition to her motion for reconsideration filed March 7, 2005. (Doc. Nos. 143, 163-66.)

On August 28, 2006, this court denied all of Plaintiff's Motions for Reconsideration and reiterated and adopted the rulings contained in the January 2, 2005 Order. (Order, Aug. 28, 2006 (Doc. No. 303).) The court ruled that any claims asserted by Plaintiff in her Second Amended Complaint that had been asserted in her First Amended Complaint and dismissed by the January 2, 2005 Order, likewise were disallowed and dismissed from Plaintiff's Second Amended Complaint. (Id.)

---

[1]   Plaintiff's Second Amended Complaint is docketed with her Motion for Leave to File. (See 2d Am. Compl. (Doc. No. 77).) Upon granting Plaintiff's Motion for Leave to File a Second Amended Complaint, Judge Barnard ordered Plaintiff to clarify her claims asserted or withdrawn. There is no indication in the record of any such clarification by Plaintiff of her claims. Nor was her Second Amended Complaint entered on the docket after her Motion for Leave to File was granted. The court therefore references the Second Amended Complaint attached to her Motion for Leave to File (Doc. No. 77).

**C.      Discussion.**

Defendants raise two arguments in support of their motion to dismiss Plaintiff's FMLA claims.  First, Defendants argue that Plaintiff fails to allege sufficient facts in her Second Amended Complaint to state a claim under the FMLA.  (Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. (Doc. No. 172) (hereinafter "Defs.' Mem.") 11-12.)  They argue that Plaintiff has failed to plead that she is an eligible employee or that VIPA is an eligible employer under the FMLA.  Second, Defendants argue that Plaintiff's FMLA claims should be dismissed because VIPA is an arm of the state and is entitled to Eleventh Amendment immunity from suit under the FMLA.  (Id. at 12; Defs.' Reply ¶¶ 12-22.)

These arguments were previously addressed and rejected by Judge Moore.  Smith, 2005 U.S. Dist. LEXIS 56, at *33-39 (denying Defendants' motion to dismiss Plaintiff's FMLA claim as to the governmental entities, but granting the motion to dismiss Plaintiff's FMLA claim as to the individual public agency defendants).  Although Judge Moore's opinion concerned Plaintiff's First Amended Complaint, the court has adopted it with respect to Plaintiff's Second Amended Complaint.  (Order, Aug. 28, 2006 (Doc. No. 303).)  Therefore, the court will not belabor these points, but will address them briefly for clarification purposes.

Judge Moore interpreted Plaintiff's complaint as alleging that "VIPA failed to adhere to the FMLA's requirements in denying her initial [FMLA] request [and] . . . to follow the dictates of 29 U.S.C. § 2613 in requesting proof of her ailments."  Smith, 2005 U.S. Dist. LEXIS 56, at *34-35.  Judge Moore found that pro se Plaintiff had alleged "minimum facts" sufficient to support her FMLA claims.  Id. at *38.  However, Judge Moore, and this court by adoption,

dismissed Plaintiff's FMLA claims as to the individual defendants.[2]  Id. at *39.  Moreover, the

Governing Board is VIPA.  To treat it otherwise would be to allow the claim to go forward

against individual members of the Board.  Accordingly, Plaintiff may only assert her FMLA

claim against Defendant VIPA.

Specifically addressing the arguments now raised by Defendants, Judge Moore noted the

following:

> [T]here is no question that VIPA qualifies as an "employer" under
> the FMLA.  FMLA defines employer as including "any 'public
> agency' as defined in section 3(x) of the Fair Labor Standards Act
> of 1938 (29 U.S.C. 203(x))."  29 U.S.C. § 2611.  Section 3(x) of
> the Fair Labor Standards Act of 1938 defines "public agency" as
> meaning the Government of the United States; the government of a
> State or political subdivision thereof; any agency of the United
> States (including the United States Postal Service and Postal Rate
> Commission), a State, or a political subdivision of a State; or any
> interstate governmental agency.  29 U.S.C. § 203(x).  This broad
> definition includes VIPA.
>
> Similarly, the plaintiff has sufficiently alleged facts to qualify as an
> eligible employee under FMLA.  Under FMLA, an eligible
> employee is "an employee who has been employed for at least
> twelve months by the employer with respect to whom the leave is

---

[2]  The court notes that, although individual private officer liability exists under the
FMLA, the circuit courts are split as to whether individual public officer liability exists under the
FMLA, and the Third Circuit has not addressed the issue.  Compare Mitchell v. Chapman, 343
F.3d 811, 832 (6th Cir. 2003) (finding that a public official is not an employer for purposes of the
FMLA when sued in his or her individual capacity), and Wascura v. Carver, 169 F.3d 683, 687
(11th Cir. 1999) (same), with Modica v. Taylor, 465 F.3d 174, 187 (5th Cir. 2006) (finding that
an individual public officer may be liable as an employer under the FMLA), and Darby v. Bratch,
287 F.3d 673, 681 (8th Cir. 2002) (same).  This court adheres to Judge Moore's holding on the
issue.  See Smith, 2005 U.S. Dist. LEXIS 56, at *39; but see Hewett v. Willingboro Bd. of Educ.,
421 F. Supp. 2d 814, 819 n.6, 821 (D.N.J. 2006) (disagreeing with Judge Moore's holding in
Smith on this issue and concluding that the FMLA allows for individual public officer liability);
see also Hayduk v. City of Johnstown, Civ. No. 3:2005-294, 2008 U.S. Dist. LEXIS 50463, at
*110-15 (W.D. Pa. June 30, 2008) (finding that individual public officers are subject to suit
under the FMLA).

> requested" and who has logged at least 1,250 hours of service with
> the employer during the previous twelve month period.  29 U.S.C.
> § 2611(2) (A).  Smith began working for VIPA sometime in April,
> 1999, and VIPA has not claimed she failed to work at least 1,250
> hours during the twelve months before filing for FMLA leave.

Id. at *35 n.9.

Although Defendants now argue that Plaintiff has failed to work at least 1,250 hours, this

issue is a question of fact that extends beyond the parameters of Plaintiff's Second Amended

Complaint and is appropriate for disposition on summary judgment.  In her Second Amended

Complaint, Plaintiff alleges that she began working for VIPA on April 12, 1999 and that she

"met all the criteria" under the FMLA.  (Pl.'s 2d Am. Compl. ¶¶ 6, 90.)  On the face of Plaintiff's

Second Amended Complaint, pro se Plaintiff alleges sufficient facts "to raise a reasonable

expectation that discovery will reveal evidence" that she is an eligible employee under the

FMLA.  See Phillips, 515 F.3d at 234.

Judge Moore also directly addressed Defendants' second argument that VIPA is not a

qualified employer and is entitled to immunity under the FMLA.  Smith, 2005 U.S. Dist. LEXIS

56, at *35 n.9.  In arguing that VIPA is entitled to Eleventh Amendment immunity under the

FMLA, Defendants presuppose that the Government of the U.S. Virgin Islands is considered a

state for Eleventh Amendment immunity purposes.  Defendants fundamentally misunderstand

Judge Moore's holding that the Government of the Virgin Islands is a federal instrumentality and

that VIPA, as a "component" or "alter ego" of the Virgin Islands, is a federal instrumentality.  Id.

at *28-33, 35 n.9.

It is obvious that the immunity bases and analyses are different for state and federal

entities.  As a jurisdictional matter, the United States, as well as its federal government agencies

and officials acting in their official capacity, are immune from suit unless Congress has expressly and unequivocally waived sovereign immunity.  Lehman v. Nakshian, 453 U.S. 156, 160-61 (1981); United States v. Mitchell, 445 U.S. 535, 538 (1980) ("It is elementary that '[the] United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" (citation omitted)).  Under the Eleventh Amendment, a state is immune from suit in federal courts, in suits brought by a plaintiff other than the United States or another state, if that state has not consented to suit, unless Congress expressly abrogates the state's immunity and, in doing so, acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment.  Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721 (2003); Chittister v. Dep't of Cmty. and Econ. Dev., 226 F.3d 223, 226 (3d Cir. 2000).  An entity found to be "an arm or alter ego of the state" is similarly subject to the Eleventh Amendment immunity analysis.  Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).

In the present case, the application of an immunity analysis for a federal entity versus that for a state entity may result in diametrically opposed outcomes with respect to Plaintiff's FMLA claims, which she brings solely under the FMLA's self-care provision, 29 U.S.C. § 2612(a)(1)(D).  The United States is not immune from suit under the FMLA.  See Smith, 2005 U.S. Dist. LEXIS 56, at *35 n.9 (noting that the definition of "employer" under the FMLA, 29 U.S.C. § 2611, as informed by the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(x), expressly includes the Government of the United States and any agency of the United States); see, e.g., Harrell v. United States Postal Service, 445 F.3d 913 (7th Cir. 2006) (analyzing FMLA

claims against the U.S. Postal Service, a federal agency).  Thus, if the Virgin Islands were a federal instrumentality and VIPA its alter ego, Defendants would be subject to suit under the FMLA.

On the other hand, district courts in the Third Circuit generally follow the rule that states are immune from suits brought under the self-care provision of the FMLA because Congress, although it had expressed unequivocally its intent to abrogate states' immunity, did not act pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment in abrogating states' immunity as to that provision.  See Hibbs, 538 U.S. at 724, 740 (concluding that Congress validly abrogated states' immunity with respect to the family-care provision of the FMLA, 29 U.S.C. § 2612(a)(1)(c), but not addressing other FMLA provisions, including the self-care provision); Febres, 445 F.3d at 237 n.12 (declining to reach whether Congress has abrogated the state's immunity under the FMLA's self-care provision); Chittister, 226 F.3d at 225 (holding that Congress did not validly abrogate the states' Eleventh Amendment immunity when enacting FMLA provisions generally), abrogated in part by Hibbs, 538 U.S. at 724, 740; Walker v. Dep't of Military & Veterans Affairs, 2:08cv267, 2008 U.S. Dist. LEXIS 46577, at *6-8 (W.D. Pa. June 12, 2008) (finding that Hibbs does not extend to the FMLA's self-care provision and that state sovereign immunity bars such claims); Wampler v. Pennsylvania, 508 F. Supp. 2d 416, 420-22 (M.D. Pa. 2007) (continuing to follow the rule in Chittister with respect to the FMLA's self-care provision); Haybarger v. Lawrence County Adult Prob. & Parole, Civ. No. 06-862, 2007 U.S. Dist. LEXIS 18314, at *7-8 (W.D. Pa. Mar. 14, 2007) (same); Savage v. New Jersey, Civ. No. 05-2047, 2007 U.S. Dist. LEXIS 13002, at *10-15 (D.N.J. Feb. 23, 2007) (citing Toeller v. Wis. Dep't of Corr., 461 F.3d 871, 879-80 (7th Cir. 2006); Touvell v. Ohio Dep't of Mental

Retardation & Developmental Disabilities, 422 F.3d 392, 405 (6th Cir. 2005); Brockman v.

Wyoming Dep't of Family Servs., 342 F.3d 1159, 1165 (10th Cir. 2003)) (finding that Hibbs did

not overturn the holding in Chittister that the FMLA's self-care provision cannot be enforced

against states in federal court and noting that the Tenth, Seventh, and Sixth Circuits have held the

same post-Hibbs); see also Lizzi v. Washington Metro. Area Transit Auth., 862 A.2d 1017,

1023-25 (Md. 2004) (finding that the Fourth Circuit's prior rule that the FMLA's self-care

provision was not a valid abrogation of state sovereign immunity was not disturbed by Hibbs).

Thus, if the Virgin Islands were akin to a state and VIPA were an arm of the state, Defendants

would be immune from suit under the self-care provision of the FMLA.

There is no clear consensus among the courts as to the status of the Virgin Islands as that

of a state or a federal instrumentality for immunity purposes.  Some courts appear to hold that the

Government of the Virgin Islands is analogous to a state and therefore protected by Eleventh

Amendment immunity.  See Harris v. Boreham, 233 F.2d 110, 113-16 (3d Cir. 1956) (concluding

that the Government of the Municipality of St. Thomas and St. John was distinct from the

Government of the United States and therefore not a "federal agency" within the meaning of the

Federal Tort Claims Act); United States v. Canel, 569 F. Supp. 926, 928, 19 V.I. 295 (D.V.I.

1982) (O'Brien, J.) (citing Harris, 233 F.2d at 114-16) (accepting that the Government of the

Virgin Islands "is not the United States Government [or] a federal agency or department"); Eddy

v. Virgin Islands Water & Power Auth., 955 F. Supp. 468, 476 & n.8, 35 V.I. 441 (D.V.I. 1997)

(Moore, C.J.) (treating the Virgin Islands as a state in a case brought under 42 U.S.C. § 1983);

Jackson v. West Indian Co., 944 F. Supp. 423, 425-29, 429 n. 6, 35 V.I. 269 (D.V.I. 1996)

(Moore, C.J.) (concluding in an anti-trust case that "the more appropriate immunity doctrine

[applicable to the Virgin Islands] is the one applicable to state governments and state governmental entities rather than the immunity doctrine applied to federal instrumentalities" and that the "Virgin Islands is more analogous to a state government than to an appendage of the federal government," and interpreting Third Circuit precedent in Harris, 233 F.2d 110, as holding that the Virgin Islands is not a "federal agency"); but see United States v. Gov't of the Virgin Islands, 363 F.3d 276, 287 n.5 (3d Cir. 2004) (noting that neither Harris, 233 F.2d at 114-16, nor Jackson, 944 F. Supp. at 429 n. 6, directly speak to whether the Virgin Islands possesses Eleventh Amendment sovereign immunity; discounting Jackson as "a non-binding district court case in which the Court simply declared that 'the Government of the Virgin Islands has an autonomy similar to that of a state, including such attributes as sovereign immunity'"; and circumscribing Harris as merely establishing that by the Organic Act of June 22, 1936, Congress conferred certain attributes of sovereignty to the two municipalities then constituting the Virgin Islands).

In contrast, some courts appear to hold that the Government of the Virgin Islands is a federal instrumentality and therefore Eleventh Amendment immunity does not apply.  See Smith, 2005 U.S. Dist. LEXIS 56, at *28-33, 35 n.9 (Moore, J.) (holding that the Government of the Virgin Islands and VIPA, as its "alter ego," are federal instrumentalities); Sea Air Shuttle Corp. v. Virgin Islands Port Auth., 782 F. Supp. 1070, 1072-75 (D.V.I. 1991) (Huyett, J.) (concluding in an anti-trust case that the Government of the Virgin Islands and VIPA were federal instrumentalities and therefore immune from suit, but finding in the alternative that even if state action immunity applied, VIPA would still be immune from anti-trust scrutiny); see also Esso Virgin Islands, Inc. v. Gov't of the U.S. Virgin Islands, Civ. No. 2004-175, 2008 U.S. Dist.

LEXIS 49943, at *20-21 n.7 (D.V.I. June 30, 2008) (Gomez, C.J.) (citing United States v. Gov't of the Virgin Islands, 363 F.3d at 286-87; Sunken Treasure v. Unidentified, Wrecked, & Abandoned Vessel, 857 F. Supp. 1129, 1134 n.10, 30 V.I. 274 (D.V.I. 1994) (noting that the Virgin Islands is "not shielded by the Eleventh Amendment"); Tonder v. M/V The "Burkholder", 630 F. Supp. 691, 693, 22 V.I. 231 (D.V.I. 1986) ("[I]t appears that Congress did not intend that the Eleventh Amendment apply to the Virgin Islands.")) (noting in a case brought under 42 U.S.C. § 1983 that neither the Third Circuit nor the District Court for the District of the Virgin Islands has recognized that Eleventh Amendment immunity applies to the Virgin Islands and citing cases for this proposition).

The Third Circuit has not resolved the issue of the Virgin Islands' status for immunity purposes.  See United States v. Gov't of the Virgin Islands, 363 F.3d at 286-87 & n.5 (declining to reach whether the Virgin Islands possesses Eleventh Amendment immunity).

Nor have courts agreed as to whether VIPA is alter ego of the Virgin Islands, under either the state or federal immunity analysis.  Compare Ballentine v. Virgin Islands Port Auth., 955 F. Supp. 480, 483-85, 35 V.I. 472 (D.V.I. 1997) (Brotman, J.) (concluding in a Section 1983 case that VIPA was not an arm of the state for Eleventh Amendment immunity purposes), and Virgin Islands Port Auth. v. Balfour Beatty, Inc., Civ. No. 1994/0004, 1994 U.S. Dist. LEXIS 10021, at *3-8, 30 V.I. 289 (D.V.I. July 15, 1994) (Brotman, J.) (concluding that VIPA was not an alter ego of the Government of the Virgin Islands), with Smith, 2005 U.S. Dist. LEXIS 56, at *28-29 (citing Eddy, 955 F. Supp. at 477; Codrington v. Virgin Islands Port Auth., 911 F. Supp. 907, 912-13, 33 V.I. 245 (D.V.I. 1996) (Moore, C.J.)) (interpreting prior case law and statutes that established VIPA, and concluding that VIPA is part of the Government of the Virgin Islands).

Nevertheless, this court follows the conclusions of law previously established in this case by Judge Moore.  Judge Moore correctly held that the Government of the Virgin Islands is a federal instrumentality and not entitled to Eleventh Amendment immunity.  See Smith, 2005 U.S. Dist. LEXIS 56, at *30-33; cf. Esso, 2008 U.S. Dist. LEXIS 49943, at *20-21 n. 7. Likewise, Judge Moore correctly held that VIPA is an alter ego of the Government of the Virgin Islands.[3]  See Smith, 2005 U.S. Dist. LEXIS 56, at *28-30.

_____

[3]  Although the Government of the Virgin Islands is a federal instrumentality, the analysis in determining whether an entity is an arm of the state may be helpful in determining whether an entity is an alter ego of a federal instrumentality.  In determining whether an entity is an arm of the state, courts consider three factors: "(1) whether payment of the judgment would come from the state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity has."  Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006) (citing Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc)).  Equal weight is accorded to all three factors.  Id.  However, in close cases, the first factor, whether payment of the judgment would come from the state, may tip the scale.  Id. at 229-30.

The statutory framework establishing VIPA demonstrates that VIPA is an alter ego of the Government of the Virgin Islands, which is a federal instrumentality.  As to the first factor, Judge Moore correctly found that any judgment would ultimately be paid by the public.  See Smith, 2005 U.S. Dist. LEXIS 56, at *29.  Public money may be expended by VIPA.  29 V.I.C. § 531(a). Money to pay any judgment would come from VIPA, but VIPA is exempt from levy and execution of any judgment.  29 V.I.C. § 556(a).  Thus, in essence, the Legislature and Governor control the treasury of VIPA.  However, even if this first factor did not weigh in favor of VIPA as an alter ego of the Government of the Virgin Islands, it is outweighed by the second and third factors, which weigh in favor of VIPA as an alter ego of the Government of the Virgin Islands.

In assessing the second factor, courts examine how the establishing statute treats the entity generally, whether the entity can sue or be sued in its own right, whether the entity is separately incorporated, and whether it is immune from taxation.  Febres, 445 F.3d at 230.  VIPA can sue and be sued in its own right, 29 V.I.C. § 543(4), and is separately incorporated, 29 V.I.C. § 541(e).  However, VIPA is established by law as "a public corporation and autonomous governmental instrumentality for the Government of the United States Virgin Islands," 29 V.I.C. § 541(a), whose powers are "proper governmental functions," 29 V.I.C. § 531(a), and serve "public purposes," 29 V.I.C. § 556(b).  By law, therefore, VIPA is an instrumentality of the Government of the Virgin Islands.  VIPA is also exempt from all taxes of the U.S. Virgin Islands. 29 V.I.C. § 556(b).  These considerations weigh in favor of VIPA as an alter ego of the Government of the Virgin Islands.

Third, although VIPA is by statute an "autonomous governmental instrumentality" with a "legal existence" separate from the Government of the Virgin Islands and with its own "debts,

As a federal instrumentality, VIPA is not entitled to any immunity.  See id. at *35 n.9.

Therefore, Defendants' motion to dismiss Plaintiff's FMLA claim is denied.

### III.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A.    Factual Background.**

The following relevant facts are undisputed, unless otherwise noted.  On April 12, 1999,

VIPA hired Plaintiff as a public information officer.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 15;

Defs.' Mem. ¶ 5.)  Prior to working for VIPA, Plaintiff claims to have been diagnosed with a

condition called dysphonia, but was apparently not suffering from this condition at the time she

commenced her employment.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. F, Letter from Dr.

---

obligations, contract, bonds, [etc.]," the Government of the Virgin Islands exercises significant control over it.  See 29 V.I.C. §§ 541(a), (e).  Although the public has delegated to VIPA the authority to have a treasury, VIPA's powers are limited with respect to that which the public would otherwise have in its coffers.  VIPA may not sell, assign, mortgage, or otherwise dispose of any real property or acquire any property through condemnation without the Legislature and Governor's approval.  29 V.I.C. §§ 543(6), (7); cf. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 549 (3d Cir. 2007) (finding that the entity's inability to acquire or transfer real estate without governmental approval demonstrated a lack of autonomy).  VIPA cannot sell, mortgage, pledge, or assign any real property, which had been transferred to VIPA by the Government of the Virgin Islands, without the approval of the Governor and Legislature.  29 V.I.C. § 561(2)(c).  VIPA cannot get involved in bond activity for construction unless authorized by the Legislature.  29 V.I.C. § 551(a).  There are restrictions on loans and indebtedness, requiring approval of the Governor and Legislature.  29 V.I.C. § 561(d).

Moreover, the Government exercises significant control over the composition of VIPA's Governing Board, which must include the "Commissioner of Tourism, the Attorney General, the Commissioner of Public Works, and the Chairman of the Economic Development Authority, and five other persons appointed by the Governor with the advice and consent of the Legislature."  29 V.I.C. § 541(a); see Febres, 445 F.3d at 231 (finding that government appointment of board members weighs slightly in favor of alter ego status); Peters v. Delaware River Port Auth., 16 F.3d 1346, 1351-52 (3d Cir. 1994) (same).  On balance, for immunity purposes, the court concludes that VIPA is an alter ego if the Government of the Virgin Islands consistent with VIPA's stated purpose.  See 29 V.I.C. §§ 531, 541(a).

Natasha Mirza, Mar. 25, 1999.)  However, during her employment with VIPA, Plaintiff alleges

that she suffered a relapse of spasmodic dysphonia,[4] which caused her to lose her voice for

extended periods, as well as a relapse of connective tissue disorder.

Plaintiff's absences from work are discussed in detail below and can be grouped into

three periods: (1) from November 29, 2000 to April 23, 2001, for roughly four months and three

weeks, during which time Plaintiff used her accrued compensatory time, sick leave, and annual

leave; (2) from May 17, 2001 to June 21, 2001, for just over a month, during which time Plaintiff

was suspended; and (3) from July 19, 2001 to June 3, 2002, for roughly ten months and two

weeks, during which time Plaintiff was suspended for part of that period and took sick leave,

unpaid leave, a leave of absence, and FMLA leave for the remainder of that period.

As of June 14, 2000, Plaintiff had accrued 425.5 hours of compensatory time.  (Pl.'s

Cross-Mot. for Partial Summ. J. ¶ 21, Ex. C; Defs.' Reply ¶ 8.)  On November 29, 2000, Plaintiff

used her compensatory time and began her absence from work, which she projected would end

on January 23, 2001.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 22, Ex. C.)  While she was using

her compensatory time, on December 31, 2000, Plaintiff claims that she suffered her first relapse

of spasmodic dysphonia, and lost her voice for about three months.  (Pl.'s Cross-Mot. for Partial

Summ. J. ¶ 22; Pl.'s 2d Am. Compl. ¶ 23; see Defs.' Mem. ¶ 7.)  On January 23, 2001, Plaintiff

took her accrued sick leave and annual leave.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 23; Pl.'s

---

[4]  The Merck Manual defines spasmodic dysphonia as follows:
> Spasmodic dysphonia (vocal cord spasms) is intermittent spasm of
> laryngeal muscles that causes an abnormal voice.  Cause is
> unknown, but usually spasmodic dysphonia follows a URI, a
> period of excessive voice use, or occupational or emotional stress.

Merck Manual 837 (18th Ed. 2006).

2d Am. Compl. ¶ 23; see Defs.' Mem. ¶ 7.)

There is an unaddressed note dated January 22, 2001 from Plaintiff's on-island doctor, Dr. Ira A. Buchalter, M.D., stating that Plaintiff had sinusitis and hoarseness and could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Buchalter, Jan. 22, 2001.)  On January 26, 2001, Gordon A. Finch, the Executive Director of VIPA at the time, acknowledged receipt of this note.  (Defs.' Written Supplement to Oral Args. (Doc. No. 328) ¶ 4(e), Ex. 1.)

On February 21, 2001, Dr. Buchalter sent a letter to Finch stating that Plaintiff was being treated by him for "sinusitis and hoarseness (muscle tension dysphonia)," that he recommended she see a specialist off-island, and that Plaintiff could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Buchalter to Finch, Feb. 21, 2001.)

On March 24, 2001, Plaintiff informed Finch that she would be undergoing evaluation at the Wake Forest University Voice Clinic in North Carolina for her voice condition and requested to participate in VIPA's Donated Leave Program, which Finch granted.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 23, Ex. J., Letter from Plaintiff to Finch, Mar. 24, 2001; Defs.' Written Supplement to Oral Args. ¶ 4(f), Ex. 5.)  From about March 25 to 28, 2001, Plaintiff was treated at the Center for Voice Disorders of Wake Forest University in North Carolina for "bilateral vocal fold paresis and laryngopharyngeal reflux."[5]  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J.,

---

[5]  In the record, there also is an unaddressed letter dated April 26, 2001 from Dr. Paul G. Sutej, at Wake Forest School of Medicine, confirming that Plaintiff was his patient and needed to see him in several months for follow-up.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Sutej, Apr. 26, 2001.)  There is no indication in the record whether this letter was given to VIPA.

two unaddressed Letters from Dr. James A. Koufman, Mar. 28, 2001.)

On April 23, 2001, Plaintiff returned to work.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 23; see Defs.' Mem. ¶ 7.)

On or about May 15, 2001, Plaintiff was involved in a physical confrontation with Barbara Donastorg, Finch's executive secretary.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 25, Ex. G.)  On or about May 17, 2001, Plaintiff was suspended without pay for thirty days, until June 21, 2001, for refusing to participate in an administrative inquiry related to the aforementioned confrontation.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. G.)

On June 25, 2001, Plaintiff participated in an administrative hearing regarding the above incident.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 26, Ex. H.)  After the hearing, Finch concluded that Plaintiff initiated the physical altercation with Donastorg, although Plaintiff contends that Donastorg initiated the physical altercation.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 25-26, Ex. H, Inter-Office Mem. from Finch, June 29, 2001.)  On July 12, 2001, VIPA suspended Plaintiff for her alleged role in the altercation for thirty days without pay, from July 23, 2001 to August 21, 2001.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 26, Ex. H, Letter from Finch to Plaintiff, July 12, 2001.)

On or about July 16, 2001, Plaintiff claims that she suffered a second relapse of spasmodic dysphonia and a first relapse of another pre-existing condition, connective tissue disorder.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 27; see Defs.' Mem. ¶ 8.)  She claims that she lost her voice for about thirteen and a half months, until August 30, 2002.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 29.)  She claims that, on or about July 19, 2001, she went on sick leave.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 27-28.)  On July 19, 2001, Plaintiff claims that she submitted

a medical certification from Dr. Buchalter, stating that she had "muscle tension dysphonia (loss

of voice)" and would be unable to return to work until she was "fully recovered."  (Pl.'s Cross-

Mot. for Partial Summ. J. ¶ 28, Ex. J, Certification from Dr. Buchalter, July 19, 2001.)

On August 21, 2001, when Plaintiff's earned sick leave expired and her suspension

period ended, and again on August 27, 2001, Plaintiff re-applied for VIPA's Donated Leave

Program, re-submitted the July 19, 2001 medical certification from Dr. Buchalter, and informed

Finch of her need to obtain off-island medical treatment.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶

28, Ex. J, Letters from Ronald E. Russell, Esq. to Finch, Aug. 21, 2001 & Aug. 27, 2001; Defs.'

Written Supplement to Oral Args. ¶ 4(g), Ex. 6, 7.)  Plaintiff claimed that her condition was

beyond the expertise of her on-island doctor and required off-island evaluation and treatment by

a specialist.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 28.)

On August 29, 2001, Finch denied Plaintiff's request for donated sick leave because the

medical certification provided did not provide for the anticipated duration of Plaintiff's claimed

disability and did not indicate whether the claimed disability resulted from a serious medical

condition, as required by Section 2.26A of the VIPA Personnel Rules and Regulations.[6]  (Pl.'s

Cross-Mot. for Partial Summ. J. ¶ 28, Ex. J, Letter from Finch to Russell, Aug. 29, 2001; Defs.'

---

[6] Section 2.26A governs VIPA's Donated Leave Program.  (See Pl.'s Cross-Mot. for
Partial Summ. J., Ex. D at 17-20, VIPA Personnel Rules and Regulations.)  Section 2.26A(A)
provides that a VIPA employee is eligible to receive donated sick or annual leave if the employee
has worked continuously for VIPA for one year, "is suffering from a serious health condition or
injury which is expected to require a prolonged absence from work by the employer," and "has
exhausted all accrued sick, annual and administrative leave and compensatory time off."  Section
2.26A(C)(1) provides that the employee submit "a medical verification from a physician
concerning the nature and anticipated duration of the disability resulting from serious health
condition or injury."  Section 2.26A(D)(1) provides that a "leave recipient shall receive not more
than 180 sick days or annual days, or any combination thereof, no part of which may be applied
retroactively."

Written Supplement to Oral Args. ¶ 4(h), Ex. 8.)  Finch also denied her donated leave request because the donor leave forms she provided were inapplicable to the period of illness beginning August 22, 2001.  (Id.)

Plaintiff claims that she took unpaid leave from August 29, 2001 to May 31, 2002.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 7.)  She claims she became eligible for FMLA leave on August 29, 2001, when her unpaid leave allegedly commenced.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 9.)  Defendants dispute that Plaintiff became eligible for FMLA on this date and contend that she did not work 1,250 hours in the preceding twelve months, which Plaintiff disputes.

On September 5 and 7, 2001, Plaintiff informed Finch that Dr. Buchalter was away on vacation and not available to provide a further medical certification, and provided Finch with new donor leave forms.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 28, Ex. J, Letter from Plaintiff to Finch, Sept. 5, 2001, Letter from Russell to Finch, Sept. 7, 2001; Defs.' Written Supplement to Oral Args. ¶ 4(I), Ex. 9.)  On September 27, 2001, Anival Vasquez, Jr., a Disability Representative at the Social Security Administration, wrote to Finch, verifying that Plaintiff had been found to be disabled under the Social Security regulations and that she was still disabled. (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Vasquez to Finch, Sept. 27, 2001.)

On October 8, 2001, Dr. Buchalter submitted a letter to Finch verifying that Plaintiff continued to suffer from muscle tension dysphonia, which he described as "a serious health condition which results in loss of voice."  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 28, Ex. J, Letter from Buchalter to Finch, Oct. 8, 2001.)  Dr. Buchalter stated that he again referred Plaintiff to off-island specialists, that there had been no improvement in her voice since he examined her on July 19, 2001, and that "[t]he duration of her illness is unknown, and she will not be able to

perform any work that requires communicative ability until her voice returns." (Id.)

On October 31, 2001, Don C. Mills, Legal Counsel for VIPA, informed Plaintiff that her request for donated sick leave was denied. (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 28, Ex. J, Letter from Mills to Russell, Oct. 31, 2001; Defs.' Written Supplement to Oral Args. ¶ 4(j), Ex. 9.) In his letter, Mills stated that Dr. Buchalter's October 8, 2001 letter did not indicate that Plaintiff's condition required a prolonged absence from work, as required by Section 2.26A(A)(2). (Id.) He stated that Plaintiff could be accommodated so that she could perform work activities of a "non-communicative nature." (Id.) He also stated that any donated leave could not be applied retroactively, pursuant to Section 2.26A(D)(1). (Id.)

On November 6, 2001, Plaintiff formally requested leave under the FMLA, stating in a letter to Finch that she was "requesting unpaid leave for a period of 12 workweeks under the Family and Medical Leave Act of 1993," retroactive to November 2, 2001. (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 31, Ex. J, Letter from Russell to Finch, Nov. 6, 2001 (emphasis removed); Defs.' Mem. ¶ 9; Defs.' Written Supplement to Oral Args. ¶ 4(k), Ex. 10.) Defendants argue that Plaintiff's FMLA leave commencement date was November 6, 2001, although Plaintiff argues that she became eligible for FMLA leave on August 29, 2001, when her earned leave period ended and her unpaid leave period began. (See Defs.' Mem. 9-10; Pl.'s Cross Mot. for Partial Summ. J. ¶ 9.) Defendants contend that she did not work 1,250 hours in the preceding twelve months, which Plaintiff disputes.

On November 30, 2001, Mills informed Plaintiff that, on November 28, 2001, VIPA's Governing Board voted to grant Plaintiff a leave of absence for twelve weeks. (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 31, Ex. J, Letter from Mills to Russell, Nov. 30, 2001; Defs.' Mem. ¶ 10,

Ex. 1; Defs.' Written Supplement to Oral Args. ¶ 4(l), Ex. 11.)  He informed Plaintiff, however, that her FMLA leave request was denied because "there was no indication that the employee's absence for the period of time requested was necessitated by a serious medical condition."  (Id.)

On January 2, 2002, Plaintiff submitted a second formal request for FMLA leave.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 33, Ex. J, Letter from Plaintiff to Finch, Jan. 2, 2002; Defs.' Written Supplement to Oral Args. ¶ 4(o), Ex. 13.)  She notified Finch that she had an appointment with specialists at Johns Hopkins Hospital in Baltimore, Maryland on January 25, 2002, and included documentation confirming this.  (Id.)

On January 9, 2002, Mills notified Plaintiff that her leave of absence would be extended to cover her travel to Baltimore and return.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Mills to Plaintiff, Jan. 9, 2002; Defs.' Mem. ¶ 11, Ex. 2; Defs.' Written Supplement to Oral Args. ¶ 4(p), Ex. 14.)  The leave of absence was extended until Friday, January 25, 2002.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Mills to Plaintiff, Jan. 16, 2002; Defs.' Mem., Ex. 3.)  On January 14, 2002, Plaintiff wrote to Mills, reiterating her requests for paid donated sick leave under the Donated Leave Program and twelve weeks of unpaid leave under the FMLA.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Plaintiff to Mills, Jan. 14, 2002;  Defs.' Written Supplement to Oral Args. ¶ 4(q), Ex. 15.)

On January 16, 2002, Mills informed Plaintiff that Finch granted her request for FMLA leave.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 33, Ex. J, Letter from Mills to Plaintiff, Jan. 16, 2002; Defs.' Mem. ¶ 12, Ex. 3;  Defs.' Written Supplement to Oral Args. ¶ 4(r).)  The FMLA leave commenced on Monday, January 28, 2002.  (Id.)  Mills advised Plaintiff that her FMLA leave was for a period up to twelve weeks, and that she would "need to keep the Executive

Director apprised of the status of your situation as it relates to required or necessary time off for evaluation and/or treatment." (Id.) Defendants maintain that despite granting her FMLA leave, she was not entitled to FMLA leave because she was not an eligible employee, which Plaintiff disputes. (See Defs.' Mem. ¶ 13; Defs.' Reply ¶ 21.)

On February 25, 2002, Plaintiff provided Finch with an update on her medical evaluation and treatment for spasmodic dysphonia and undifferentiated connective tissue disorder. (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Plaintiff to Finch, Feb. 25, 2002.) She attached a letter, dated January 30, 2002, from Dr. Paul W. Flint, M.D., an otolaryngologist at Johns Hopkins. (Id.; Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Flint, Jan. 30, 2002.) Dr. Flint stated that Plaintiff had spasmodic dysphonia, which he characterized as a "longstanding voice disorder . . . manifested by a strained voice quality, which fluctuates in severity and at times, may in fact be normal." (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Flint, Jan. 30, 2002.) He described the recommended treatment as botulinum toxin ("botox") injections to the laryngeal muscles, which required follow up at three to six month intervals. (Id.)

On March 26, 2002, Plaintiff informed Finch that her treatment at Johns Hopkins was not successful, her voice had not returned, and that she had another appointment with Dr. Flint on April 3, 2002. (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Plaintiff to Finch, Mar. 26, 2002.) On April 18, 2002, Dr. Flint informed Finch that Plaintiff's treatment was ongoing and that "she is disabled with respect to her voice indefinitely." (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Flint to Finch, Apr. 18, 2002.) On April 29, 2002, Plaintiff requested that Finch grant her additional leave from work and stated that she was unclear as to

when her FMLA leave expired because VIPA had not provided her with this date.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Plaintiff to Finch, Apr. 29, 2002.)

On May 6, 2002, Finch notified Plaintiff that her FMLA leave had already expired on April 19, 2002, and required her to report to work no later than June 3, 2002.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Finch to Plaintiff, May 6, 2002.)  On May 21, 2002, Plaintiff informed Finch that her treatment was not effective and that further treatment at Johns Hopkins was required, but that she would return to work if accommodations were made for her voice disability.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Plaintiff to Finch, May 21, 2002.)  She attached a letter from Dr. Don R. Martin, M.D., a rheumatologist at Johns Hopkins, which stated that Plaintiff had been evaluated for undifferentiated connective tissue disease and that she was "medically fit to return to work, though schedule flexibility will be required based upon the activity of her underlying disease."  (Id.; Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letter from Martin, May 9, 2002.)

On June 3, 2002, Plaintiff apparently returned to work.  (See 2d Am. Compl. ¶ 26.)  On December 19, 2002, Plaintiff filed the present lawsuit.  On January 24, 2003, Plaintiff resigned from VIPA.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 34.)

**B.    Standard Of Review.**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).  On cross-motions for summary judgment, the standard of review does not change.  Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Each moving party must independently show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Id.; see Fed. R. Civ. P. 56.

## C.   Discussion.

The FMLA was enacted to "balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1); Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004).  Plaintiff brings her FMLA claim under the self-care provision of the FMLA, which provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

The FMLA requires only unpaid leave.  Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721, 739 (2003) (citing 29 U.S.C. § 2612(a)(1)); see 29 U.S.C. §§ 2612(c) &(d).

Plaintiff claims that Defendants interfered with her rights under the FMLA.[7]  The FMLA prohibits "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any rights provided under the [FMLA]."  29 U.S.C. § 2615(a).  Under the Department of Labor's corresponding regulations,[8] interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

For an interference claim, the plaintiff bears the burden of proof to "show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from

---

[7]  Claims for retaliation may also be brought under the FMLA pursuant to 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave.  Although Plaintiff includes retaliation claims in her Second Amended Complaint and claims that Defendants "intentionally discriminated" against her in denying her FMLA leave, (2d Am. Compl. ¶ 90), such claims exclusively relate to retaliation in violation of Title VII.  (See, e.g., 2d Am. Compl. ¶ 75 ("The Defendants retaliated and intentionally discriminated against me for complaining about the hostile work environment and disparate treatment by denying me benefits that I was entitled to such as donated sick leave, and Family and Medical Leave.").)  Plaintiff does not claim that Defendants retaliated against her for invoking her right to FMLA leave, but rather that they retaliated against her for making Title VII-related complaints by denying her FMLA and other leave.  (See, e.g., Pl.'s Cross Mot. for Partial Summ. J. ¶ 17-19 ("When I complained about the disparate treatment and hostile work environment, the Defendants retaliated against me by denying me certain terms, privileges and benefits of employment that I was entitled to and that were freely given to other employees."); id. at ¶ 44.)  Therefore, the court considers only Plaintiff's claims for interference.

[8]  The court may properly rely on the Department of Labor's regulations promulgated pursuant to the FMLA.  See 29 U.S.C. § 2654 (directing the Secretary of Labor to issue regulations "necessary to carry out the FMLA"); Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002).  The court gives considerable weight to the Secretary's judgment that a particular regulation fits within the FMLA's statutory framework, see United States v. O'Hagan, 521 U.S. 642, 673 (1997), and neither party here challenges any of these regulations as "arbitrary, capricious, or manifestly contrary" to the statute, id. (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1988)).

obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 389, 401 (3d Cir.

2007).  Because an interference "action is not about discrimination; it is about whether the

employer provided its employees the entitlements guaranteed by the FMLA," the plaintiff is not

required to prove intentional misconduct.  Parker v. Hahnemann University Hospital, 234 F.

Supp. 2d 478, 483 (D.N.J. 2002); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.

2005); Williams v. Shenango, Inc., 986 F. Supp. 309, 317 (W.D. Pa. 1997) (finding that "a claim

under 29 U.S.C. § 2615(a)(1) is governed by a strict liability standard").  "The plaintiff must

show that '(1) he was an eligible employee under the FMLA, (2) defendant is an employer

subject to the requirements of the FMLA, (3) he was entitled to leave under the FMLA, (4) he

gave notice to the defendant of his intention to take FMLA leave, and (5) the defendant denied

him benefits to which he was entitled under the FMLA.'"  Kerns v. Drexel Univ., Civ. No. 06-

5575, 2008 U.S. Dist. LEXIS 57358, at *34 (E.D. Pa. July 24, 2008) (citation omitted).  For

cases brought under the self-care provision, to establish eligibility for leave under the FMLA, a

plaintiff must show that his absences were caused by one or more serious health conditions.[9]  29

---

[9]  The FMLA defines "serious health condition" as "an illness, injury, impairment, or
physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or
residential medical care facility; or (B) continuing treatment by a health care provider."  29
U.S.C. § 2611(11).  The corresponding regulations provide detailed guidance for what constitutes
"inpatient care in a hospital, hospice, or residential medical care facility," see 29 C.F.R. §
825.114(a)(1), which is seemingly inapplicable here, and what constitutes "continuing treatment
by a health care provider," see 29 C.F.R. § 825.114(a)(2).  As to the latter, the regulations
provide in relevant part:

> A serious health condition involving continuing treatment by a
> health care provider includes any one or more of the following:
>
> (i)      A period of incapacity (i.e., inability to work, attend school
>          or perform other regular daily activities due to the serious
>          health condition, treatment therefor, or recovery therefrom)
>          of more than three consecutive calendar days, and any
>          subsequent treatment or period of incapacity relating to the

U.S.C. § 2612(a)(1)(D).

A plaintiff may also show interference "if he is able to establish that [the employer's]

failure to advise [him of his FMLA rights] rendered him unable to exercise that right in a

---

same condition, that also involves:

(A)    Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B)    Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. . . .

(iii)    Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A)    Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B)    Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C)    May cause episodic rather than a continuing period of incapacity . . . .

(iv)    A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee . . . must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. . . .

(v)    Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment . . . .

29 C.F.R. § 825.114(a)(2).

meaningful way, thereby causing *injury*." Conoshenti, 364 F.3d at 143 (emphasis added).  A mere violation of the FMLA by itself does not entitle a plaintiff to damages.  Id.; see 29 U.S.C. § 2617(a).  The FMLA does not provide relief "unless the employee has been *prejudiced* by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' . . . for other monetary losses sustained 'as a direct result of the violation,' . . . and for 'appropriate' equitable relief, including employment, reinstatement, and promotion." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (U.S. 2002) (quoting 29 U.S.C. § 2617(a)(1)) (emphasis added).  The FMLA does not permit recovery for emotional distress or pain and suffering.  Lloyd v. Wyoming Valley Health Care Sys., 994 F. Supp. 288, 291 (M.D. Pa. 1998); see Coleman v. Potomac Elec. Power Co., 281 F. Supp. 2d 250, 254 (D.D.C. 2003).  Thus, the plaintiff bears the burden to show that any interference caused him "*actual economic injury*, which is defined as (1) lost 'wages, salary, employment benefits, or other compensation'; *or* (2) costs incurred by the employee due to the employer's refusal to grant leave up to 'a sum equal to *12 weeks* of wages or salary.'"  Hayduk v. City of Johnstown, Civ. No. 3:2005-294, 2008 U.S. Dist. LEXIS 50463, at *133-134 (W.D. Pa. June 30, 2008) (quoting 29 U.S.C. § 2617(a)(1)(A)(i)) (emphasis added).  Additionally, an employee may be entitled to liquidated damages, doubling any award, unless the employer shown to have violated the FMLA proves that it acted in good faith.  29 U.S.C. § 2617(a)(1)(A)(iii).

Although Defendants ultimately granted Plaintiff twelve weeks of unpaid FMLA leave, Plaintiff claims that Defendants interfered with her rights under the FMLA by initially denying her first two requests for FMLA leave on November 30, 2001 and January 9, 2002.  (2d Am. Compl. ¶ 90; see Pl.'s Cross-Mot. for Partial Summ. J. ¶ 70(1).)  Specifically, Plaintiff claims

that Defendants interfered with her rights under the FMLA, not only by denying her FMLA leave, but also by: failing to post information about the FMLA in a prominent area of the workplace as required by 29 C.F.R. § 825.300(a); failing to include information about the FMLA in VIPA's employment handbook as required by 29 C.F.R. § 825.301(a)(1); failing to inform her with written notice of FMLA requirements and obligations within two days of her FMLA request as required by 29 C.F.R. § 825.301(b), (c); and keeping her medical documents in her personnel file rather than a separate confidential file as required by 29 C.F.R. § 825.500(g).[10]  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 70.)

She further claims that Defendants interfered with her rights under the FMLA by denying her donated sick leave under VIPA's Donated Leave Program and the Virgin Islands Donated Leave Act, 3 V.I.C. § 583b, which she argues are more generous employer leave policies than that provided by the FMLA and therefore that Defendants were obligated to offer donated leave to her first.  (2d Am. Compl. ¶ 91; see Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 37-39, 70(6).) Under the corresponding regulations, "[a]n employer must observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA." 29 C.F.R. § 825.700(a).  Further, "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." Id.

Plaintiff argues that Defendants' alleged interference, namely Defendants' alleged refusal to provide her with donated leave, caused her severe financial hardship, delayed her medical care, and forced her to take about ten months unpaid leave.  (Pl.'s Resp. to Defs.' Written Supplement

---

[10]  Plaintiff includes other claims that are generally duplicative of those listed.

to Oral Args. (Doc. No. 335) ¶¶ 24-25.)  She argues that she went without medical care for about six months because she could not afford to travel off-island to be evaluated and treated by specialists.  (Id.)  She does not specifically address how Defendants' other alleged interferences with her FMLA rights caused her injury, if any.  Nor has Plaintiff quantified, either in her Complaint or briefings, any actual, out-of-pocket economic injury caused by any alleged unlawful interference.  The court does not reach these arguments regarding interference because, as discussed below, genuine issues of material fact exist as to whether Plaintiff is an eligible employee.

In their motion for summary judgment, Defendants' sole argument remaining before the court is that Plaintiff is not an eligible employee under the FMLA because she did not work for 1,250 hours during the twelve months preceding the commencement of FMLA leave.  See 29 U.S.C. § 2611(2)(A).

Under the FMLA, an eligible employee is an employee who has been employed: "(I) for at least 12 months by the employer with respect to whom leave is requested under section 2612; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).  "The determination of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months . . . must be made as of the date leave commences."  29 C.F.R. § 825.110(d).

Defendant first argues that Plaintiff's FMLA leave commenced on November 6, 2001, when she first formally requested FMLA leave.  Defendant asserts that during the twelve-month

period preceding November 6, 2001, Plaintiff did not work the requisite hours.[11]  (Defs.' Mem.

9-10.)  Defendant argues that her numerous absences during this period, including sick leave,

donated leave, holidays, two suspensions, and other leave, cannot be used in calculating the

1,250 hours worked requirement.

Defendant next argues that Plaintiff did not work the requisite hours even under the

earlier date of August 27, 2001, as the alternative date for commencement of the hours worked

calculation.  (Defs.' Mem. 9.)  Although it is unclear how Defendants have produced this date,

Plaintiff claims she became eligible for FMLA leave on August 29, 2001, apparently when her

earned leave period ended and her unpaid leave period began, and Defendants may be referring to

this date.  (See Pl.'s Cross Mot. for Partial Summ. J. ¶¶ 9, 35.)  They argue that, given Plaintiff's

lengthy absences and suspension periods, she does not meet the hours worked requirement for

the twelve months preceding for both leave commencement dates proffered, August 27 and/or

29, 2001 and November 6, 2001.

Plaintiff argues that she is an eligible employee under the FMLA and that she became

eligible for FMLA leave on August 29, 2001.  (Pl.'s Cross Mot. for Partial Summ. J. ¶¶ 9, 35.)

She counters that VIPA did not maintain an accurate record of the hours that she worked, and

thus cannot prove that she did not work the requisite 1,250 hours in the twelve months preceding

---

[11]  Defendants argue that during the twelve-month period preceding November 6, 2001 Plaintiff worked only 57 percent of her time, and was on leave 37 percent of the time.  (Defs.' Mem. 9-10.)  In addition, Defendants argue that Plaintiff was on suspension for 5 percent of her time worked and on holiday or administrative leave for the remaining 1 percent of her time.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. M.)  The court notes that Defendants' percentage figures appear to be calculated based on the entirety of Plaintiff's work history at VIPA, from April 1999 to January 2003, and not, as Defendants assert, on the twelve-month period preceding November 6, 2001.  (See id.)

commencement of her leave.  (Pl.'s Cross Mot. for Partial Summ. J. ¶ 13.)

Thus, to determine the threshold issue before the court as to whether Plaintiff is an eligible employee under the FMLA, the court must determine: (1) what is the date of the commencement of Plaintiff's FMLA leave, which entails a determination as to when Plaintiff provided legally sufficient notice, if any, of her need to take FMLA leave, and (2) whether Plaintiff worked the requisite 1,250 hours in the twelve months preceding the commencement of leave.  The court concludes that genuine issues of material fact exist as to both issues.  Because genuine issues of material fact exist as to the threshold question of whether Plaintiff is an eligible employee, the court does not reach whether any of Defendants's conduct constitutes unlawful interference under the FMLA.  These are issues of fact for a jury to determine.

### 1.      Commencement Of Plaintiff's FMLA Leave.

#### a.      The Notice Requirement.

Before taking FMLA leave, an employee must provide at least thirty days advance notice to the employer before leave commences, if the leave is foreseeable.  See 29 C.F.R. § 825.302(a).  But if the need for leave is not foreseeable, "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a); see 29 U.S.C. § 2612(e)(2)(B).

Although the "precise content of the notice given" and whether a defendant's conduct constituted prohibited interference, where disputed, are issues for the trier of fact to resolve, it is for the court to determine whether any notice was legally sufficient.  See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 389, 402-03 (3d Cir. 2007).  In providing notice under the

FMLA, written or verbal notification is sufficient, and "the employee need not use any magic words" or "expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.302(c); <u>Sarnowski</u>, 510 F.3d at 402 (emphasizing the liberal construction of sufficient notice under the FMLA).  Rather, the employee need only "state a qualifying reason for the needed leave."  29 C.F.R. § 825.208(a)(2).

"The critical question is how the information conveyed to the employer is reasonably interpreted."  <u>Sarnowski</u>, 510 F.3d at 402.  Thus, "[a]n employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA" if the employee provides "his employer with enough information to show that he *may* need FMLA leave."  <u>Id.</u> at 402-03 (quoting <u>Woods v. DaimlerChrysler Corp.</u>, 409 F.3d 984, 990 (8th Cir. 2005)).  Courts generally find notice to be deficient when the "employee failed to convey the reason for needing leave."  <u>Id.</u> at 403.

If the employer "determines that it requires more information to determine whether FMLA leave is being requested, the burden shifts to the employer to investigate further."  <u>Peter v. Lincoln Technical Inst., Inc.</u>, 255 F. Supp. 2d 417, 441 (E.D. Pa. 2002).  The employer "should make a preliminary designation," notify the employee, and "request such additional information from the employee's doctor or other reputable source as may be necessary to confirm the employee's entitlement."  29 C.F.R. § 825.208(e)(2).

Under the FMLA, the employer is permitted to require that a health care provider certify support for the requested FMLA leave.  29 U.S.C. § 2613(a).  The certification is legally sufficient if it states:

(1)     the date on which the serious health condition commenced;

(2)     the probable duration of the condition;

(3)     the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . .

(4)(B)  for purposes of leave under section 102(a)(1)(D) [29 U.S.C. § 2612(a)(1)(D)], a statement that the employee is unable to perform the functions of the position of the employee;

(5)     in the case of certification for intermittent leave, or leave on a reduced leave schedule, for planned medical treatment, the dates on which such treatment is expected to be given and the duration of such treatment;

(6)     in the case of certification for intermittent leave, or leave on a reduced leave schedule, under section 102(a)(1)(D) [29 U.S.C. § 2612(a)(1)(D)], a statement of the medical necessity for the intermittent leave or leave on a reduced leave schedule, and the expected duration of the intermittent leave or reduced leave schedule . . . .

29 U.S.C. § 2613(b).[12]

"If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider."  29 C.F.R. §825.307(a); see 29 C.F.R. § 825.306(b).  However, if an employee submits an incomplete certification, "[t]he employer shall advise [the] employee . . . and provide the employee a reasonable opportunity to cure any deficiency."  29 C.F.R. § 825.305(d).

If the certification is complete, but the employer has reason to doubt its validity, "the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified under subsection (b) for such leave."  29 U.S.C. § 2613(c).  An employee has a minimum of fifteen days after a request by the employer to provide a certification of the medical condition by a health provider, unless it is not practicable to provide it within fifteen

---

[12]  It is unclear whether Plaintiff at any point sought intermittent leave, so the requirements for such are briefly mentioned here.

days despite the employee's best efforts.  29 C.F.R. § 825.305(b).  If the second opinion differs from the first, the employer may require a third opinion at the employer's expense, which opinion is final and binding.  29 U.S.C. § 2613(d).  "Pending receipt of the second (or third) medical opinion, the employee is provisionally entitled to the benefits of the [FMLA]."  29 C.F.R. § 825.307(a)(2).

Once an employee has provided sufficient notice of the need for FMLA leave to the employer, the employer must "within one or two business days if feasible" provide the employee with a "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations."  29 C.F.R. § 825.301(b), (c).  This written notice is in addition to the notice provisions under 29 U.S.C. § 2619(a), requiring the employer to "post and keep posted, in conspicuous places" a summary of the FMLA's "pertinent provisions," see Ragsdale, 535 U.S. at 88, and, under 29 C.F.R. § 825.301(a)(1), include information about the FMLA in any employment handbook.[13]

Plaintiff argues that, under the Department of Labor's regulations, if an employer fails to require a certification, request to cure a deficiency in an incomplete certification, provide written notice to the employee, or affirmatively notify the employee of her ineligibility, the employer has waived any argument regarding the employee's FMLA eligibility.  (See Pl.'s Cross-Mot. for

---

[13]  Regarding the notice provisions under 29 U.S.C. § 2619(a) and 29 C.F.R. § 825.301(a)(1), Defendants, in arguing that the FMLA does not apply to VIPA, which argument the court has addressed above with respect to the motion to dismiss, concede that "FMLA benefits were not included in the VIPA handbook" and "no information about FMLA was posted in the VIPA workplace."  (Defs.' Reply ¶ 21; see Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 49-50, 52.)  The court need not reach whether Defendants' apparent failure to comply with the notice requirements under 29 U.S.C. § 2619(a) constitutes unlawful interference because it addresses only the threshold issue of whether Plaintiff is an eligible employee and finds that genuine issues of material fact exist as to this threshold issue.

Partial Summ. J. ¶¶ 42, 51-53, 68 (citing 29 C.F.R. § 825.110(d) ("If the employer fails to advise the employee whether the employee is eligible prior to the date the requested leave is to commence, the employee will be deemed eligible."))); see also 29 C.F.R. § 825.301(f) ("If an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice.").

However, there is no such waiver, because 29 C.F.R. § 825.110(d) has been declared invalid by courts, and such a reading of 29 C.F.R. § 825.301(f) would not comport with the clear eligibility requirements under the FMLA.  See, e.g., Woodford v. Cmty. Action of Greene County, 268 F.3d 51, 57 (2d Cir. 2001) (holding that 29 C.F.R. § 825.110(d) "exceeds agency rulemaking powers by making eligible under the FMLA employees who do not meet the statute's clear eligibility requirements"); Brungart v. Bell South Telecomm., Inc., 231 F.3d 791, 796-97 (11th Cir. 2000) (holding that 29 C.F.R. § 825.110(d) is invalid and stating "[t]here is no ambiguity in the statute concerning eligibility for family medical leave, no gap to be filled"); Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 582 (7th Cir. 2000) (holding that 29 C.F.R. § 825.110(d) is invalid because the "statutory text is perfectly clear" that the "right of family leave is conferred only on employees who have worked at least 1,250 hours in the previous 12 months"); Boyd v. City of Phila., Civ. No. 06-1524, 2007 U.S. Dist. LEXIS 21209, at *4-5 (E.D. Pa. 2007) (predicting that the Third Circuit would similarly find 29 C.F.R. § 825.110(d) invalid); see also Downey v. Strain, 510 F.3d 534, 540 (5th Cir. 2007) (agreeing that a "court could not implement § 825.301(f) if the consequence of doing so [would be] to afford [the plaintiff] an FMLA remedy to which he was not otherwise entitled" (quoting Lubke v. City of Arlington, 455

37 of 48

F.3d 489, 497-98 (5th Cir. 2006))); <u>Hayduk v. City of Johnstown</u>, Civ. No. 3:2005-294, 2008

U.S. Dist. LEXIS 50463, at *52-53 (W.D. Pa. June 30, 2008) (finding that under 29 C.F.R. §

825.301(f) "an employer who fails to demand certification is [not] thereafter barred from

disputing whether an employee had a serious medical condition" because the language in the

regulation regarding certification is permissive and forcing employers to invoke every FMLA

mechanism would be unduly burdensome).  To reiterate, in a case in which an employer has

allegedly failed to provide notice of an employee's rights under the FMLA, the issue of

determining an employee's eligibility is distinct from determining whether the failure to provide

such notice constitutes prohibited interference under the FMLA.  <u>See</u> <u>Conoshenti v. Pub. Serv.</u>

<u>Elec. & Gas Co.</u>, 364 F.3d 135, 143 (3d Cir. 2004) (holding that a plaintiff may show

interference "if he is able to establish that [the employer's] failure to advise [him of his FMLA

rights] rendered him unable to exercise that right in a meaningful way, thereby causing *injury*"

(emphasis added)).


    b.    **Application.**

    The determination of when Plaintiff's FMLA leave would have commenced turns in part

on when Plaintiff provided legally sufficient notice, if any, of her need to take FMLA leave.

Thus, the court asks when, if at all, Plaintiff provided Defendants with enough information to

show that she *may* have needed FMLA leave.  <u>See</u> <u>Sarnowski</u>, 510 F.3d at 402-03 (citation

omitted).

    The parties dispute whether Plaintiff's leave commenced on August 29, 2001 or on

November 6, 2001.  From a plain reading of the undisputed facts, however, it appears that

Plaintiff may have given notice of her need for FMLA leave as early as January 22, 2001 and/or February 21, 2001.  The court considers each date in turn.

On January 23, 2001, after allegedly suffering a first relapse of spasmodic dysphonia and exhausting her compensatory leave, Plaintiff began using her accrued annual and sick leave.  On January 26, 2001, VIPA's then Executive Director, Finch, acknowledged receipt of a January 22, 2001 note from Dr. Buchalter stating that Plaintiff had sinusitis and hoarseness and could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Buchalter, Jan. 22, 2001; Defs.' Written Supplement to Oral Args. ¶ 4(e), Ex. 1.)  Then, on February 21, 2001, Plaintiff's doctor, Dr. Buchalter, sent Finch a letter stating that he was treating Plaintiff for "sinusitis and hoarseness (muscle tension dysphonia)," that he recommended she see an off-island specialist, and that she could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot. for Summ. J., Ex. J, Letter from Buchalter to Finch, Feb. 21, 2001.)

The court finds that these two letters from Dr. Buchalter were legally sufficient to put Defendants on notice that Plaintiff *may* have needed FMLA leave.  See Sarnowski, 510 F.3d at 402-03.  Although Plaintiff did not mention the FMLA or provide the exact duration of the leave, this is not required for notice.  See id. at 402.  Plaintiff had a history of dysphonia and had already begun using her sick leave at the time.  Although Plaintiff did not directly ask for leave, this was clearly implied in her action of submitting Dr. Buchalter's letters to VIPA and therein explaining why her leave was necessary.  In specifying that Plaintiff needed to see an off-island specialist and could not return to work until her hoarseness resolved, Dr. Buchalter signaled that Plaintiff's medical condition was more serious than the average winter sore throat and/or lost

voice, and that Plaintiff's absence from work due to her medical condition might be extended and long-term.  This was sufficient to put Defendants on notice and shift the burden to them to determine if indeed Plaintiff qualified for FMLA leave, by asking for a medical certification and, if necessary, a second or third opinion from a doctor.  See, e.g., 29 C.F.R. § 825.208(e)(2).

The court also finds that Plaintiff provided legally sufficient notice of her need to take FMLA leave as of August 29, 2001, when she claims she became eligible for FMLA leave and her unpaid leave allegedly commenced.  At that point, Plaintiff had already sought off-island treatment in March 2001 for "bilateral vocal fold paresis and laryngopharyngeal reflux," had returned to work on April 23, 2001, and subsequently claimed to suffer a second relapse of spasmodic dysphonia.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, two unaddressed Letters from Koufman, Mar. 28, 2001.)  On August 21 and 27, 2001, Plaintiff asked Finch for donated leave, told him that she needed to go off-island again for treatment, and submitted a July 19, 2001 medical certification from Dr. Buchalter, which stated that she had "muscle tension dysphonia (loss of voice)" and that she could not return to work until she was "fully recovered." (Pl.'s Cross-Mot. for Partial Summ. J., Ex. J, Letters from Russell to Finch, Aug. 21, 2001 & Aug. 27, 2001.)  That her medical condition required evaluation and treatment by an off-island specialist because doctors on-island apparently lacked expertise, and might entail an extended absence, especially in light of her prior extended absence for the same medical reason, was sufficient to put Defendants on notice at that point that she may have needed FMLA leave.

This conclusion is supported by Defendants' own conduct.  On August 29, 2001, Finch found that the medical certification she provided was incomplete because it did not indicate the anticipated duration of her illness and whether it was a serious medical condition.  (Pl.'s Cross-

Mot. for Partial Summ. J., Ex J, Letter from Finch to Russell, Aug. 29, 2001.)  Although the parties dispute whether this response was in compliance with the FMLA or constituted interference, it at least signaled that Defendants had been placed on notice and were attempting to determine if Plaintiff qualified for FMLA leave.  As to whether Plaintiff qualified for FMLA leave and whether Finch's August 29, 2001 response constituted interference, there are disputed issues of material fact as to: the precise content of the notice given; whether the medical certification Plaintiff provided was complete; whether the certification accurately conveyed the anticipated duration of her medical condition; whether Dr. Buchalter's later October 8, 2001 certification cured any incompleteness in the prior certification; whether Plaintiff's claimed disability was a serious medical condition as required by the FMLA; whether, if required, Defendants provided Plaintiff with adequate notice of her rights under the FMLA; and whether Plaintiff was in fact injured by any interference, if found.

Finally, on November 6, 2001, the date that Defendants claim her FMLA leave commenced, Plaintiff asked VIPA for twelve weeks of FMLA leave due to what she described as a "rare" and "serious" illness that had rendered her unable to speak for three months.  (See Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Russell to Finch, Nov. 6, 2001.)  Plaintiff's November 6, 2001 formal request for FMLA leave explicitly put Defendants on notice that she was seeking FMLA leave and shifted the burden to them to determine if Plaintiff qualified for FMLA leave, by asking for a complete medical certification and, if necessary, a second or third opinion from a doctor.  (Id.)

Again, Defendants' actions demonstrate that they had in fact been put on notice, because they subsequently attempted to determine if she was eligible for FMLA leave.  On November 30,

2001, VIPA denied her FMLA leave request because it found she did not have a serious medical condition, but granted her instead a twelve-week leave of absence.  (See Pl.'s Cross-Mot. for Partial Summ. J., Ex. J., Letter from Mills to Russell, Nov. 30, 2001.)  As to whether Plaintiff qualified for FMLA leave and whether this November 30, 2001 response constituted interference, there are disputed issues of material fact as to: the precise content of the notice given; whether any medical certification Plaintiff provided was complete; whether her claimed disability was a serious medical condition as required by the FMLA; whether, if required, Defendants provided Plaintiff with adequate notice of her rights under the FMLA; and whether Plaintiff was in fact injured by any interference, if found.

The court has determined that Plaintiff provided legally sufficient notice that she may have needed to take FMLA leave as early as January 22, 2001 and/or February 21, 2001, as well as, as of August 29, 2001 and January 6, 2001.  As noted above, however, disputed issues of material fact remain as to whether Plaintiff was eligible for FMLA leave on any of the dates on which she provided such notice.  Thus, it is for the trier of fact to determine, from the dates on which Plaintiff provided legally sufficient notice, which date, if any, Plaintiff's FMLA leave would have commenced.

**2.     Whether Plaintiff Worked 1,250 Hours In The Preceding Twelve-Months.**

The FMLA provides that "hours of service" must be determined by the legal standards established under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, et seq., and by regulations created pursuant to that act to determine "hours of work" for payment of overtime compensation.  29 U.S.C. § 2611(2)(c).  The FLSA specifies that "payments made for occasional

periods when no work is performed due to vacation, holiday, illness . . . and other similar causes"
are not considered compensation for "hours of employment."  29 U.S.C. § 207(e)(2).

Where leave is taken intermittently pursuant to 29 U.S.C. § 2612(b)(1) and 29 C.F.R. §
825.203(a), a plaintiff must establish eligibility as to the first absence, but not for every absence
thereafter.  See, e.g., Barron v. Runyon, 11 F. Supp. 2d 676, 681 (E.D. Va. 1998) ("[T]he
employer could not deny the employee continued intermittent FMLA leave based on his failure to
work the requisite number of hours if the only reason the employee fell below the minimum-
hours requirement was because he took leave to which he was statutorily entitled; to deny such
leave would directly contravene the language of [29 U.S.C.] § 2612(b)(1).").

It is the employer's burden to establish that the employee did not work the required 1,250
hours in the preceding twelve-month period.  29 C.F.R. § 825.110(c).  If "an employer does not
maintain an accurate record of hours worked by an employee, . . . the employer has the burden of
showing that the employee has not worked the requisite hours."  Id.; see Corcino v. Banco
Popular de Puerto Rico, 200 F. Supp. 2d 507, 511 (D.V.I. 2002).

The court examines whether Defendants have shown that Plaintiff failed to work the
requisite 1,250 hours in the twelve-month periods preceding, respectively, January 22, 2001
and/or February 21, 2001, August 29, 2001, and January 6, 2001.

As of January 22, 2001 and/or February 21, 2001, Defendants payroll records reflect that
Plaintiff worked, respectively, roughly 1,454 regular hours (between the encompassing pay
periods of January 16, 2000 and January 27, 2001) and 1,302 regular hours (between the
encompassing pay periods of February 13, 2000 and February 24, 2001) in the approximately
preceding twelve-month period.  (Pl.'s Cross-Mot. for Partial Summ. J., Ex. M.)  It is clear that

Plaintiff accrued enough compensatory time in the relevant twelve-month period preceding January 22, 2001 and/or February 21, 2001 to meet the 1,250 hours worked requirement. Thus, if the fact finder determines that Plaintiff's leave commenced on January 22, 2001 and/or February 21, 2001, Plaintiff has established that she is an eligible employee under the FMLA.

The court next examines whether Plaintiff worked the requisite 1,250 hours in the twelve-month periods preceding August 29, 2001. Defendants' records indicate that in the approximately preceding twelve-month period, from the encompassing pay periods of August 27, 2000 to September 8, 2001, Plaintiff worked 708 regular hours. (Defs.' Mem., Ex. 4; Pl.'s Cross-Mot. for Partial Summ. J., Ex. M.) Plaintiff contends that Defendants' records do not indicate the actual amount of time worked or her compensatory and overtime worked, which, if properly accounted for, would show that she worked at least 1,250 hours. (Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 57, 60-65.)

Section 2.22(C) of the VIPA Personnel Rules and Regulations provides that management employees not eligible for overtime are entitled to "compensatory leave at the rate of one hour for every hour they work." (See Pl.'s Cross-Mot. for Partial Summ. J., Ex. D at 14, VIPA Personnel Rules and Regulations.) Thus, compensatory leave, at the time it is earned or accrued, is equivalent to hours worked and counts toward FMLA hours of employment. The time period when compensatory leave is actually taken, however, does not reflect when the hours were actually worked and cannot be counted toward FMLA hours of employment. See 29 U.S.C. § 207(e)(2). Although Plaintiff argues that Defendants' records did not track her overtime, it would appear that Plaintiff was not eligible to receive overtime, according to Section 2.22(C), because it is undisputed that she was entitled to receive compensatory leave, precluding any

receipt of overtime.

Defendants' records are deficient in that they only track when compensatory leave was used, not when it accrued or the amount of earned compensatory leave.  (See Defs.' Mem., Ex. 4; Pl.'s Cross-Mot. for Partial Summ. J., Ex. M.)  Plaintiff claims that Defendants' records do not reflect the compensatory leave she earned or when she earned it.  She cites to an instance in 2000 in which she had to work around the clock for a "Seatrade" convention in Miami, and for which she was not credited for hours worked as earned compensatory time.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 63.)  Plaintiff does not claim, however, that this instance occurred within the relevant twelve-month period preceding August 29, 2001, and there is no indication that it did. Plaintiff's vague and generalized assertions, unsupported by evidence, that Defendants' records do not reflect her actual earned compensatory leave when it accrued, during the relevant twelve-month period, may generally create an issue of fact as to whether she worked the 1,250 hours, but ultimately are insufficient to show that she earned the 542 hours in compensatory leave necessary to meet the 1,250 hour requirement.

Although Defendants' records show that Plaintiff used a total of 552 hours of compensatory time during her work at VIPA, it is undisputed that Plaintiff earned 425 hours in compensatory leave prior to June 14, 2000, which she completely used between November 29, 2000 and January 23, 2001.  However, the undisputed 425 hours of earned compensatory time were accrued prior to the relevant twelve-month period preceding August 29, 2001 and cannot be counted toward any hours worked during this period.  Even assuming that Plaintiff accrued during the relevant twelve-month period the remaining 127 hours of compensatory time, which she subsequently used, Plaintiff would still only have worked roughly 835 hours.

Plaintiff argues that her two suspension periods, beginning in May 2001 and in July 2001, totaling about sixty days, should be counted toward her hours worked because Defendants suspended her in retaliation for complaining about the alleged hostile work environment and disparate treatment.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 65.)  Regardless of the reason for her suspension, her suspension periods cannot be counted as hours worked.  See 29 U.S.C. § 207(e)(2).

Plaintiff also raises two instances in which she worked for VIPA while on leave but claims this work is not reflected in Defendants' records.  First, she contends that, while on compensatory leave, she attended an employee training seminar in Washington, D.C. from December 6 to 8, 2000.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 61.)  Second, she contends that, while on compensatory and sick leave, she did work in the office and from home for the Seatrade Cruise Shipping Convention from January 20 to 26, 2001.  (Pl.'s Cross-Mot. for Partial Summ. J. ¶ 62, Ex. O.)  Even assuming that Plaintiff worked for twenty-four hours a day for these ten days, Plaintiff still could not show that she worked 1,250 hours.

The court concludes that even though Defendants' records do not appear to be accurate, inasmuch as they do not track earned compensatory leave when it is accrued and allegedly do not reflect work performed while on leave, Defendants nevertheless have demonstrated that Plaintiff did not work 1,250 hours in the twelve month period preceding August 29, 2001.  See 29 C.F.R. § 825.110(c).  Thus, if the fact finder determines that Plaintiff's leave commenced on August 29, 2001, Defendant has established that she is not an eligible employee under the FMLA.

Finally, the court examines whether Plaintiff worked the requisite 1,250 hours in the twelve-month periods preceding November 6, 2001.  Defendants' records indicate that in the

approximately preceding twelve-month period, from the encompassing pay periods of November 5, 2000 to November 17, 2001, Plaintiff worked 364 regular hours. (Defs.' Mem., Ex. 4; Pl.'s Cross-Mot. for Partial Summ. J., Ex. M.) Again, Plaintiff contends that Defendants' records do not indicate the actual amount of time worked or her compensatory and overtime worked. (Pl.'s Cross-Mot. for Partial Summ. J. ¶¶ 57, 60-65.) Giving Plaintiff every benefit of the doubt, for the same reasons as stated above, Plaintiff simply cannot show that she worked the 886 hours that she claims are unaccounted for in Defendants' records. Despite the above-stated deficiencies in their records, Defendants nevertheless have demonstrated that Plaintiff did not work 1,250 hours in the twelve month period preceding November 6, 2001. See 29 C.F.R. § 825.110(c). Thus, if the fact finder determines that Plaintiff's leave commenced on November 6, 2001, Defendant has established that she is not an eligible employee under the FMLA.

Notwithstanding the court's conclusions, if a fact finder determines that Plaintiff's FMLA leave commenced on a date earlier than August 29, 2001 and November 6, 2001, and that Plaintiff requested and was entitled to intermittent leave, Plaintiff's failure to work the requisite number of hours as of August 29, 2001 and November 6, 2001, would not necessarily prevent her from being deemed an eligible employee under the FMLA. See Barron, 11 F. Supp. 2d at 681 (holding that where leave is taken intermittently, a plaintiff must establish eligibility as to the first absence, but not for every absence thereafter).

Disputed issues of material fact remain for jury determination as to when Plaintiff's FMLA leave would have commenced, whether she was an eligible employee, and, if so, whether Defendant's conduct constituted unlawful interference that prejudiced Plaintiff.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' and Plaintiff's cross-motions for summary judgment on Plaintiff's FMLA claim are DENIED.  An appropriate Order follows.