## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

SHIRLEY SMITH,          :

                    :

        Plaintiff,      :

                    :

        v.             :      CIVIL NO. 2002–227 (STT)

                    :

VIRGIN ISLANDS PORT    :

AUTHORITY, et al.,       :

                    :

        Defendants   :

---

## MEMORANDUM

Giles, J.                                         August 29, 2008

       Before the court is Defendants Virgin Islands Port Authority ("VIPA") and Virgin Islands Port Authority Governing Board's ("Governing Board") Motion for Partial Summary Judgment as to Plaintiff's Claims of Sexual Harassment, Hostile Work Environment and Constructive Discharge (Doc. No. 267), Defendants' Memorandum of Fact and Law in support thereof (Doc. No. 262), pro se Plaintiff Shirley L. Smith's Response in opposition thereto (Doc. No. 245), Defendants' Reply (Doc. No. 254), Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. No. 151), Defendants' Written Supplement to Oral Arguments on September 18-20, 2006 on Defense Motions of Summary Judgment and/or Partial Summary Judgment (Doc. No. 328), Plaintiff's Response to Defendants' Written Supplement to Oral Arguments (Doc. No. 335), Plaintiff's Court-Allowed Supplemental Pleas on Plaintiff's Retaliation Claim (Doc. No. 336), and Defendants' Response to Court-Allowed Supplemental Pleas on Plaintiff's Retaliation Claim (Doc. No. 345).  Defendants' Motion for Partial Summary Judgment is granted and Plaintiff's

Cross-Motion is denied for the reasons that follow.

**Relevant Procedural History**

Plaintiff filed her original complaint on December 19, 2002, asserting multiple counts against VIPA, the VIPA Governing Board, and three individual defendants. (Compl. (Doc. No. 1).) Plaintiff filed her First Amended Complaint on February 21, 2003. (1ˢᵗ Am. Compl. (Doc. No. 19).) Although difficult to decipher, the First Amended Complaint contained at least one claim of violation of Title VII of the Civil Rights Act of 1964. (Id.) On January 2, 2005, Judge Thomas K. Moore, who then presided over the case, entered a Memorandum and Order on Defendants' motion to dismiss Plaintiff's First Amended Complaint. (Mem. & Order, Jan. 2, 2005 (Doc. Nos. 131 & 132)); Smith v. Virgin Islands Port Auth., Civ. No. 2002-227, 2005 WL 15459 (D.V.I. Jan. 2, 2005) (Moore, J.). Judge Moore held that Plaintiff had alleged facts sufficient to plead a viable cause of action for violation of Title VII by VIPA but not by the individual defendants. The Title VII claims against the individuals were dismissed. Smith, 2005 WL 15459, at *5-6. The court finds that the Governing Board is VIPA. To treat it otherwise would be to allow Plaintiff's Title VII claims to go forward against individual members of the Governing Board. Accordingly, Plaintiff may only assert her Title VII claims against Defendant VIPA. Because the pleadings were filed as if VIPA and the Governing Board were separate defendants, the court will continue to refer to the pleadings of the Defendants, plural.

On May 18, 2005, Magistrate Judge Geoffrey Barnard, who then managed the case, granted Plaintiff's motion for leave to file a Second Amended Complaint. (Order, May 18, 2005

(Doc. No. 156).)[1]  On June 1, 2005, Plaintiff filed five motions for reconsideration of the court's January 2, 2005, Order that had dismissed several of the claims in her First Amended Complaint. (Pl.'s Mots. for Recons. (Doc. Nos. 143, 163-66).)  On August 28, 2006, the court denied Plaintiff's Motions for Reconsideration and reiterated and adopted the rulings contained in Judge Moore's January 2, 2005, Order.  (Order, Aug. 28, 2006 (Doc. No. 303).)  The court ruled that any claims asserted by Plaintiff in her Second Amended Complaint that had been asserted in her First Amended Complaint and dismissed by the January 2, 2005, Order, likewise were disallowed and dismissed from Plaintiff's Second Amended Complaint.  (Id.)

In filings by both Plaintiff and Defendants, the parties incorrectly state that the court's January 2, 2005, Order dismissed Plaintiff's claims of retaliation and intentional discrimination. That Order clearly states that Plaintiff's Title VII claims against VIPA survived the Motion to Dismiss.  The Order dismissed Plaintiff's retaliation and intentional discrimination claims only insofar as they were duplicative of the contract and pay claims asserted in Count I of Plaintiff's First Amended Complaint.  Smith, 2005 WL 15459, at *6 ("These paragraphs show the plaintiff's allegations of discrimination and retaliation relate to VIPA's adoption of a pay plan that did not assign her position the income she feels she deserved.")[2]  Therefore, pending before

---

[1]  Plaintiff's Second Amended Complaint is docketed with her Motion for Leave to File. (See 2d Am. Compl. (Doc. No. 77).)

[2]  Despite Judge Moore's conclusion that Count IV of the First Amended Complaint cited no federal or local statute, Smith, 2005 WL 15459, at *6, this court observes that one of the paragraphs under Count IV in Plaintiff's First Amended Complaint alleges that "it is obvious that Mr. Finch's refusal to grant me donated sick leave was done in retaliation for my complaints to the board of disparate treatment by him and other staff members and of sexual harassment."  (1st Am. Compl. ¶ 78.)

the court are all the Title VII claims present in Plaintiff's Second Amended Complaint as to VIPA, only.

## Summary of Relevant Factual Allegations

Plaintiff was hired and began her tenure as VIPA's public information officer on April 12, 1999. (2d Am. Compl. ¶ 6.) She alleges that she "was subjected to unwelcome and repeated incidents of sexual harassment, which resulted in a hostile work environment" and that she "was also subjected to disparate treatment, abuse, blatant disrespect, attempts to sabotage my work and constant provocation." (Id. ¶ 16.) She further alleges that her "complaints about disparate treatment and the hostile work environment resulted in retaliation." (Id. ¶ 17.) She alleges that "Defendants' indifference to my complaints and failure to take immediate and remedial action to address my grievances had a trickle[ ] down effect, in that, I was ostracized and mistreated by several coworkers and the harassment was allowed to continue up until my last day of employment." (Id.) She alleges that the stress of her work caused her to suffer relapses of her rare medical disorder. (Id. ¶¶ 22, 24.)

Plaintiff's alleged incidents of sexual harassment.

Plaintiff alleges that she was "subjected to unwelcome salacious remarks and advances" from two former members of the Governing Board, Sidney Lee and Hector Peguero, from VIPA Police Chief Oneal Moolenaar, and from VIPA Planner and, later, Executive Director Darlan Brin. (Id. ¶ 41.)

A.     Sidney Lee

Plaintiff alleges that on June 5, 1999, Mr. Lee, who at the time was a member of the

VIPA Governing Board, asked her if she kissed boys and attempted to kiss her.  (2d Am. Compl. ¶ 43.)[3]  She stated that she was unnerved by the incident and thought it was disrespectful.  (Defs.' Supplement, Ex. 25, Smith Dep. Vol. II at 32-33.)  She alleges that a few days later she reported the incident to her supervisor, Executive Director Gordon Finch,[4] and that Mr. Finch spoke to Mr. Lee and told him to "cease and desist."  (2d Am. Compl. ¶ 44; Defs.' Supplement, Ex. 25, Smith Dep. Vol. II at 35-37.)  She alleges that Mr. Finch failed to follow VIPA's sexual harassment procedure following her report about Mr. Lee.  (Defs.' Mem., Ex. 5, Statement in Support of Charges to the EEOC, Jan. 17, 2002 (hereinafter "EEOC Statement"), at 13.)

Plaintiff alleges that, subsequently, Mr. Lee continued to act inappropriately by calling her in her office, telling her she was pretty or cute, and, on one occasion, showing her a news article with photographs of people hugging and kissing and saying it reminded him of the two of them. (2d Am. Compl. ¶ 44; Defs.' Supplement, Ex. 25, Smith Dep. Vol. II at 37-39.)  Plaintiff never reported any of the subsequent alleged conduct, including the news article incident, to Mr. Finch or any other VIPA official.  (Defs.' Mem., Ex. 19, Smith Dep. Vol. II at 42.)

B.    Hector Peguero

Plaintiff alleges that Mr. Peguero, a member of the VIPA Governing Board at the time,

---

[3] Mr. Lee was a private member of the Governing Board from April 28, 1998, through April 27, 2001.  (Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. as to Pl.'s Claims of Sexual Harassment, Hostile Work Env't and Constructive Discharge (Doc. No. 245) (hereinafter "Pl.'s Opp'n"), Ex. R., Resp. to Interrog. No. 4.)

[4] Mr. Finch was Executive Director of VIPA when Plaintiff commenced her employment there, and he served in that position through December 2002.  (Mem. of Fact and Law in Supp. of Defs.' Mot. for Partial Summ. J. as to Pl.'s Claims of Sexual Harassment, Hostile Work Env't and Constructive Discharge 2 (Doc. No. 262) (hereinafter "Defs.' Mem.").)

sexually harassed her between July 1999 and October 2000.  (2d Am. Compl. ¶¶ 45-48.)[5]  She

alleges that Mr. Peguero constantly "came onto her" and asked her out.  (Defs.' Written

Supplement to Oral Arguments on September 18-20, 2006 on Defense Motions of Summary

Judgment and/or Partial Summary Judgment (Doc. No. 328) (hereinafter "Defs.' Supplement"),

Ex. 30, Smith Dep. Vol. II at 50.)  She also alleges that Mr. Peguero said that he could make

things happen for her if she responded favorably to his advances.  (Pl.'s Opp'n ¶ 36; Defs.'

Supplement, Ex. 31, Smith Dep. Vol. II at 74-75, 79.)

Plaintiff alleges that her resistance to Mr. Peguero and Mr. Lee's sexual advances

affected her opportunities for advancement and salary increases at VIPA.  (2d Am. Compl. ¶ 49.)

C.      Chief Oneal Moolenaar

Plaintiff alleges that on September 5, 2000, Chief Moolenaar asked her to lunch after a

safety and security meeting and that he gave her the impression that he was interested in her.

(Defs.' Supplement, Ex. 36, Smith Dep. Vol. II at 79, 82.)  She alleges that, on the same day, he

went to her office around 5:00 p.m. and asked her to go out with him for either a drink or dinner,

and that on at least one subsequent occasion he told her that he was crazy about her.  (Id. at 80-

83.)  She also alleges that, sometime between September and November 2000, she called Chief

Moolenaar about a work situation and he said he wanted to get to know her better and asked

when they could get together or go out.  (Id. at 85-86.)  She alleges that she did not report the

incidents to Mr. Finch promptly because, at the time, she was annoyed and irritated by Mr.

Moolenaar but did not feel threatened by him.  (Id. at 83-84.)

Plaintiff alleges that, after a May 15, 2001, incident between her and a female coworker,

_____

[5] Mr. Peguero was a private member of the Governing Board from April 28, 1998,
through April 27, 2001.  (Pl.'s Opp'n, Ex. R., Resp. to Interrog. No. 4.)

"it came to [her] attention that Chief Moolenaar had tampered with [a] witness" during the investigation. (Id. at 84.) She states that she could not understand why he would do that, so she let Mr. Finch know that Chief Moolenaar may have had a grudge against her. (Id.)

D.     Darlan Brin

Plaintiff alleges that she and Mr. Brin were friends and socialized outside of work during the period when he was the Planner at VIPA. (Defs.' Supplement, Ex. 22, Smith Dep. Vol. II at 87-90.) She alleges that they did not have a romantic relationship but that Mr. Brin supported her pursuit of various legal claims against VIPA and offered to give her money to retain an attorney. (Id.)

Plaintiff alleges that, during this period of friendship, Mr. Brin telephoned her at home at inappropriately late hours and that he once showed up at her home unannounced and left a heart-shaped pen holder at the door a week after Valentine's Day. (Id. at 90-97.) She also alleges that the one time they went out to dinner, he held her and tried to kiss her. (Id. at 98, 100.)

Plaintiff alleges that at her home one night between April and June 2001, she had a conversation with Mr. Brin during which he told her he was interested in an intimate relationship with her and she responded that she wanted only a friendship with him. (Id. at 102-05.) She alleges that he never made a physical or sexual advance toward her after that occasion but that he continued to initiate frequent conversations of a sexual nature with her and other colleagues. (Id. at 106-07, 111-12.) She alleges, though, that after their conversation in her home in the April to June 2001 time frame, Mr. Brin appeared distant from her, passing by her office without saying anything and not even inquiring about her health after a period of sick leave. (Id. at 108-11.)

Plaintiff does not allege the dates of any other alleged acts of a sexual nature by Mr. Brin.

She did not report his conduct to any VIPA officials until her last day of work at VIPA on January 24, 2003.  (Pl.'s Opp'n, Ex. 5, Smith Mem. to Brin, Status of Pending Projects, Jan. 24, 2003, at 5.)

Plaintiff does not allege any acts of a sexual nature by Mr. Brin during his tenure as Executive Director, which began on January 1, 2003.  However, she does allege that he called her at home at 10:00 p.m. on January 19, 2003, to ask if they could meet outside of regular working hours to discuss her resignation, which she had submitted on January 13, 2003.  (Id. at 5.)  She states that she found this telephone call to be highly suspicious and irregular.  (Id.)

She stated that he never offered her a quid pro quo.  (Defs.' Supplement, Ex. 24, Smith Dep. Vol. II at 114.)  Rather, she alleges that, "[s]hortly before [Mr. Brin] assumed the position of Executive Director," he stopped supporting her legal pursuits against VIPA and his attitude toward her changed when he realized she was not interested in an intimate relationship with him.  (Defs.' Supplement, Ex. 22, Smith Dep. Vol. II at 90.)  Plaintiff advances a belief that Mr. Brin used his authority as Executive Director to retaliate against her for rejecting his earlier sexual advances.  (2d Am. Compl. ¶¶ 53-55; Defs.' Supplement, Ex. 21, Smith Dep. Vol. II at 87.)   She alleges that he made her work conditions difficult by keeping her "out of the loop" about important matters and by disconnecting the internet service on her company issued laptop, which she alleges had been a VIPA agreed upon accommodation of her speech disability.  (2d Am. Compl. ¶ 55; Pl.'s Opp'n, Ex. 4, Smith Mem. to Brin, Jan. 9, 2003.)

Plaintiff's Reports of Sexual Harassment to VIPA Officials

According to VIPA's personnel policy, employees are to report sexual harassment complaints to their supervisor.  (Defs.' Supplement, Ex. 33, Smith Dep. Vol. II at 51; Pl.'s

Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.33.)

Plaintiff reported Mr. Lee to Mr. Finch a few days after the alleged June 5, 1999, incident.  (3d Am. Compl. ¶ 44; Pl.'s Opp'n, Ex. L, Finch Dep. at 55-56 (stating that Plaintiff complained about Mr. Lee after the opening event for the Lindbergh Bay Park).)  She alleges that Mr. Finch told Mr. Lee to "cease and desist."  (Defs.' Mem., Ex. 18, Smith Dep. Vol. II at 35-37.)

Plaintiff did not report any other incident involving Mr. Lee to any VIPA official prior to filing her EEOC Charge.  (Defs.' Mem., Ex. 19, Smith Dep. Vol. II at 42.)  Plaintiff stated that she was scared to go to Mr. Finch with anything else about Mr. Lee "[b]ecause Mr. Lee is the boss."  (Defs.' Supp. Ex. 25, Smith Dep. at 42.)

Mr. Finch stated that he discussed Plaintiff's complaints about Mr. Lee with VIPA's Legal Counsel, Attorney Don Mills, and that he thought Plaintiff's complaints about Mr. Lee were serious enough to take to the Governing Board and did so at a formal Board meeting in front of all Board members.  (Pl.'s Opp'n, Ex. L, Finch Dep. at 55-57, 59.)  Mr. Finch stated that Mr. Lee, who was "pushing [age] 80" at the time of Plaintiff's complaints, responded at the Governing Board meeting that he had intended to kiss Plaintiff on the cheek but that he tripped on his way to the podium at the Lindbergh Bay Park event and mistakenly contacted Plaintiff on her lips.  (Id. at 57-58.)  Mr. Finch conveyed that response to Plaintiff.  (Id.  See also Defs.' Mem., Ex. 18, Smith Dep. Vol. II at 36 ("Mr. Lee came up to me and told me . . . he's getting up in age and sometimes he tips over and he doesn't mean anything.").)  Mr. Finch stated that Plaintiff never complained to him about any other incidents, advances, or comments involving Mr. Lee, (Pl.'s Opp'n, Ex. L, Finch Dep. at 57), and that the only other statement that he received

about Mr. Lee was from Barbara Donastorg, who told him that Mr. Lee was "kind of touchy, feely" and that she put him in his place.  (Id. at 58, 64.)[6]

The VIPA Personnel Manager was a member of the Governing Board and was present at the Board meeting during which Mr. Finch brought up Plaintiff's complaints about Mr. Lee.  (Id. at 61-62.)  Mr. Finch did not ask the Personnel Manager to investigate the complaints.  (Id. at 61.)  He testified that he thought the proper procedure was to confront Mr. Lee in front of the other Governing Board members.  (Id.)  Plaintiff was not informed that her complaints would be discussed at the Governing Board meeting, and she did not attend that meeting.  (Id. at 62-63.)

Mr. Finch testified that he considered his discussions with Plaintiff and his inquiries of Mr. Lee during the Governing Board meeting to be his investigation. (Id. at 62-63.)  Neither Plaintiff nor Mr. Lee provided witnesses.  (Id.)  Mr. Finch testified that he had no reason to doubt the veracity of Plaintiff's complaints about Mr. Lee or Mr. Peguero but that he also had no reason to doubt their responses.  (Id. at 66-67.)  He testified that "no side presented any more evidence than the other, no witnesses or . . . other evidence that would cause me to doubt one more than the other."  (Id. at 67.)

Plaintiff alleges that she was afraid, for reasons unstated, to report a second Governing Board member to Mr. Finch, so she discussed the Peguero situation with VIPA's legal counsel, Don Mills.  (Defs.' Supplement, Ex. 33, Smith Dep. Vol. II at 55; 2d Am. Compl. ¶ 45.)  She does not allege the date of that conversation.

Mr. Finch became aware of her concerns about Mr. Peguero through a December 22, 2002, letter from her attorney, Vincent Frazer.  (Defs.' Supplement, Ex. 31, Smith Dep. Vol. II at

---

[6] Mr. Finch opined that Ms. Donastorg's statement "really wasn't a complaint."  (Pl.'s Opp'n, Ex. L, Finch Dep. at 58.)

78; Plaintiff's Retaliation Court-Allowed Supplemental Pleas on Plaintiff's Retaliation Claim

(Doc. No. 336) (hereinafter "Pl.'s Retaliation Supplement"), Ex. I, Frazer Letter to Finch, Dec.

22, 2000.)  Attorney Frazer wrote a letter to Mr. Finch, referencing Plaintiff's claims of sexual

harassment and suggesting that such claims may have affected her opportunities for advancement

at VIPA.  (Id.)  He wrote,

> Over the past twenty months, Ms. Smith has [] encountered several
> episodes of sexual harassment.  Two members of the Governing
> Board seem to have trouble understanding the respect to which Ms.
> Smith is entitled.  We believe that several of those episodes have
> been brought to your attention.  However, those are not exclusive;
> there have been several attempts to proposition Ms. Smith.  She
> has not reported every single one to you because it is not good to
> feel that one is a nuisance, especially when you are complaining
> about your superiors in the workplace.  However, Ms. Smith has
> delicately tried to ward off the propositions up to this point.  After
> her presentation to the Board on November 22, 2000, Ms. Smith
> has been left to wonder what effect her repulsion of the sexual
> advancements may have had on the decision to deny her request for
> a raise.  This possibility becomes apparent, considering the actions
> of certain Board Members during the presentation.

(Id. at 2.)  Mr. Frazer did not elaborate on "the actions of certain Board Members during the

presentation."  In that letter, Plaintiff did not provide any details regarding the alleged incidents

involving Mr. Lee and Mr. Peguero.  (Id.; Defs.' Supplement, Ex. 25, Smith Dep. Vol. II at 43;

Pl.'s Opp'n, Ex. L, Finch Dep. at 64-65.)

Mr. Finch testified that he discussed Plaintiff's complaint about Mr. Peguero with

Attorney Mills and Chris Plaskett, VIPA's Personnel Manager, and he asked Mr. Peguero about

the complaint at a Governing Board meeting.  (Id. at 65-66.)  Mr. Peguero responded that he did

not know why Plaintiff would make such a complaint.  (Id. at 66.)  Mr. Finch related that

response to Plaintiff.  (Id.)  Plaintiff was not invited to participate in the Governing Board

meeting where her complaints about Mr. Peguero were made known.  (Id. at 67.)

On January 18, 2001, Don C. Mills, legal counsel at VIPA, wrote a letter to Attorney Frazer, advising of a Governing Board response.  (Defs.' Mem., Ex. 11, Mills Letter to Frazer, Jan. 18, 2001.)  In that letter, Mr. Mills stated that the Governing Board had met the previous day to discuss Attorney Frazer's December 22, 2000, letter, and that

> [t]he Board did . . . express serious concern regarding the allegations of sexual harassment, particularly as they related to members of the Board as stated in your letter.  The Board has requested that this matter be fully investigated, and has asked that Ms. Smith submit a written account of the allegations to the Executive Director that are only thinly alluded to in your letter.

(Id. (emphasis added).)  Mr. Mills also wrote that the Executive Director was directed to "carry out an investigation as contemplated by the Port Authority's Sexual Harassment Policy."  (Id.) This response must be interpreted as a Governing Board decision to investigate fully all complaints Plaintiff was advancing, including those as to Mr. Lee and Mr. Peguero, pursuant to its policy whereunder Plaintiff was required to provide specifics as to each complaint and person.

Plaintiff admits that the Governing Board requested more information from her about the sexual harassment alleged in the December 2000 letter from her attorney, and she now contends that she was ill at the time of the request and that her health caused a delay in her response. (EEOC Statement at 13; Defs.' Mem., Ex. 14, Smith Dep. Vol. II at 45.)  Plaintiff posits in her deposition that she responded to one of the Governing Board's requests for information about her sexual harassment allegations by sending Attorney Mills a copy of her Public Employee Review Board ("PERB") and EEOC charges, which were filed on December 3, 2001,[7] and January 15,

_____

[7] On November 30, 2001, Plaintiff, through her attorney Ronald E. Russell, filed a PERB appeal of her suspension of employment and a charge of unfair labor practice pursuant to Sections 530 and 531 of the Virgin Islands Code.  (Pl.'s Opp'n to Defs.' Mot. to Strike and/or

2002, respectively.  (Defs.' Mem., Ex. 14, Smith Dep. Vol. II at 45.)  However, she knowingly, if not purposely, failed to give the VIPA, her employer, required specifics regarding her allegations for its investigation purposes before she went to the PERB and the EEOC.  (Id.)

Plaintiff reported alleged sexual harassment by Chief Moolenaar to VIPA by letter on July 10, 2001.  In that letter, which was primarily about the disciplinary action she received for her role in a May 15, 2001, physical altercation with her coworker, Barbara Donastorg, Plaintiff wrote the following:

> Mr. Moolenaar is obviously bias [sic].  Even though witnesses at the hearing testified that there was a crowd of people at the scene of the incident on May 15, he selectively took police statements from a handful of witnesses.
>
> I also have received reports of witness tampering as it regards to Mr. Moolenaar's handling of the incident on May 15.  And, Mr. Moolenaar has also sexually harassed me in the past, so I do not consider him impartial either.

(Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001.)[8]

---

Dismiss Pl's Claim of Sexual Harassment, (Doc. No. 232), Ex. A, PERB Appeal Letter, Nov. 30, 2001.)  That original appeal did not include any allegation of sexual harassment.  On December 3, 2001, Plaintiff amended her appeal and included an allegation of sexual harassment by VIPA employees.  (PERB Amendment.)  Therefore, the Governing Board could not have become aware of the specifics of her sexual harassment complaints until December 3, 2001.

[8] Plaintiff's Statement in Support of Charges to the EEOC states that she reported Chief Moolenaar to Mr. Finch on July 10, 2000.  (EEOC Statement at 13.)  In her deposition, Plaintiff stated that the year was a typo and that she reported Chief Moolenaar to Mr. Finch on July 10, 2001.  (Defs.' Supplement, Ex. 34, Smith Dep. Vol. II at 59.)  One of Plaintiff's exhibits confirms that testimony.  (See Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001.)  In another pleading, Plaintiff alleges that, after she reported Chief Moolenaar to Mr. Finch and then returned to work after a period of sick leave, Chief Moolenaar ceased to harass her but "later retaliated by trying to get another employee to falsely state that [she] had assaulted Mr. Finch's secretary on May 15, 2001."  (2d Am. Compl. ¶ 52.  See also Defs.' Supplement, Ex. 36, Smith Dep. Vol. II at 86.)  However, Plaintiff provides no evidence that she reported Chief Moolenaar to Mr. Finch until July 10, 2001.

On July 16, 2001, Mr. Finch, wrote to Plaintiff regarding her July 10, 2001, letter to him. (Defs.' Mem., Ex. 12, Finch Letter to Smith, July 16, 2001.)  He wrote to her that her letter raised allegations of sexual harassment by Chief Moolenaar, and told her that "the Port Authority has a specific Sexual Harassment policy set out at Section 2.33 of the Personnel Rules and Regulations."  (Id.)  Mr. Finch directed Plaintiff to report to his office on July 18, 2001, at 2:00 p.m. "to provide information related to these allegations so that the Port Authority can commence a formal investigation for the purpose of determinating whether a disciplinary hearing should be convened."  (Id.)  Plaintiff cancelled the July 18, 2001, meeting due to her illness.  (Pl.'s Opp'n ¶ 160.)  As of January 15, 2002, the date of Plaintiff's EEOC Charge, Plaintiff had not sought to reschedule the meeting.  (EEOC Statement at 13; Defs.' Supplement, Ex. 34, Smith Dep. Vol. II at 57-58.)

Plaintiff did not report any alleged sexual harassment by Mr. Brin to any VIPA officials prior to filing her EEOC Charge on January 15, 2002, and she did not include Mr. Brin in her EEOC Charge.  (Pl.'s Opp'n ¶ 163 ("I admit that I did not inform the Governing Board about Mr. Brin's sexual harassment until after I resigned.").  See also EEOC Statement.)  Her first report of sexual harassment by Mr. Brin was in a memorandum addressed to Mr. Brin and dated January 24, 2003 – the effective date of her resignation.  (Pl.'s Opp'n, Ex. 5, Smith Mem. to Brin, Status of Pending Projects, Jan. 24, 2003, at 5.)  In that memorandum, she wrote, "Your attitude towards me completely turned around after I rejected your sexual advances and made it clear that I had no interest in having any other relationship with you other than a friendship. . . . and you have done nothing but try to antagonize me since you assumed the position of executive director on Jan. 1, 2003."  (Id.)

On January 31, 2003, Henry V. Carr, III, a senior staff attorney at VIPA, wrote to Plaintiff regarding the allegations of sexual harassment in her January 24, 2003, memorandum to Mr. Brin.  (Defs.' Mem., Ex. 13, Carr Letter to Smith, Jan. 31, 2003.)  He stated that VIPA Commissioner Pamela Richards "has directed the Legal Division to follow up on the allegations raised in your memorandum of January 24, 2003, to Mr. Darlan Brin" and that "[t]he very last paragraph of the subject memorandum implies that Mr. Brin retaliated against you in his capacity as Executive Director as a result of your having rejected his earlier sexual advances.").)  (Id.)  He referenced Section 2.33 of the Personnel Rules and Regulations (the sexual harassment policy), and advised her that an investigation must be conducted whenever an employee complains of sexual harassment.  (Id.)  He included the following:

> The very last paragraph of the subject memorandum implies that Mr. Brin retaliated against you in his capacity as Executive Director as a result of your having rejected his earlier sexual advances.  To that end, I ask that you provide me with a written statement specifically outlining: (1) the nature of the conduct complained of; (2) dates, times and places of the conduct complained of; (3) names, addresses and telephone numbers of persons who witnessed said conduct or have knowledge of same; (4) any written or electronic documentation related to such conduct.

(Id.)  Mr. Carr stated that the requested information was needed in order to commence an investigation as required by the sexual harassment policy.  (Id.)  Plaintiff never provided the requested information.  At some later point, Attorney Mills called her and said the Governing Board was concerned about her allegations regarding Mr. Brin, and she told him she would not participate in the investigation.  (Defs.' Supplement, Ex. 33, Smith Dep. Vol. II at 51-56.)

The May 15, 2001, Incident.

On May 15, 2001, Plaintiff was involved in a physical altercation with Executive Director

Finch's secretary, Barbara Donastorg.  (2d Am. Compl. ¶ 59; EEOC Statement at 6.)  An administrative hearing regarding the incident was scheduled for May 17, 2001.  (Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 15, 2001 (advising Plaintiff of the May 17, 2001, hearing).) Plaintiff claims that several persons on the hearing committee were biased against her, including Chief Moolenaar, Assistant Executive Director David Mapp, and Attorney Mills.  (EEOC Statement at 8-9.)  After appearing at the start of the hearing, Plaintiff refused to attend or otherwise participate without her attorney of choice being present.[9]  (Id.; Pl.'s Opp'n, Ex. U, Smith Mem. to Mapp, May 16, 2001.)  On May 18, 2001, Plaintiff was suspended without pay for thirty days for insubordination for refusing to participate in the May 17 administrative hearing.  (EEOC Statement at 9; Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 18, 2001.) Plaintiff appealed the suspension for insubordination to the Governing Board who scheduled a hearing about that suspension for June 7, 2001.  (EEOC Statement at 9.)  After the hearing, where Plaintiff was present and where she had the opportunity to provide her version of events, the Governing Board[10] upheld the suspension for insubordination.  (Id. at 10; Pl.'s Opp'n, Ex. V, Governing Board Meeting Minutes, July 18, 2001, at 205-06.)  Plaintiff was out of work on suspension from May 17, 2001, through June 21, 2001.  (EEOC Statement at 9.)

Following the completion of this suspension, Plaintiff returned to work.  On June 25, 2001, Mr. Finch chaired the rescheduled hearing about the Smith/Donastorg physical altercation.

_____

[9] Attorney Robert Leycock, who appeared on behalf of Plaintiff's attorney, Arturo Watlington, attended the hearing with Plaintiff, but Plaintiff requested a continuance until Mr. Watlington was available and refused to proceed with Mr. Leycock as her attorney.  The request was denied.  (EEOC Statement at 8.)

[10] Plaintiff alleges that Mr. Peguero and former Attorney General Iver Stridiron served on the four-member Personnel Committee that voted to uphold her suspension for insubordination. (Pl.'s Opp'n ¶ 75.)

(EEOC Statement at 10.)  Plaintiff attended with her attorney, and several witnesses testified.

(See, e.g., Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001 (giving Plaintiff's opinion of

the witness statements given at the June 25, 2001, administrative hearing).)  Mr. Finch concluded

that Plaintiff had initiated the altercation by striking Ms. Donastorg first in VIPA's

administrative building.  (EEOC Statement at 10; Pl.'s Opp'n, Ex. V, Finch Mem. to Smith, June

29, 2001.)  He also found that she had used profane language during the altercation.  (Pl.'s

Opp'n, Ex. V, Finch Mem. to Smith, June 29, 2001.)  As a result, he informed her that she would

either have to take an anger management course or be suspended for 30 days without pay as

punishment for her misconduct.  (Id.)  In his memorandum to Plaintiff about the disciplinary

action, Mr. Finch wrote the following:

> I need to tell you that I consider you to be one of the Authority's
> most capable employees, and it is my earnest hope that you will
> take advantage of this opportunity to put this unfortunate incident
> behind you, and that you will return to being a key member of the
> Authority's Executive Staff.  I am aware that stress exists in all of
> our jobs. . . .  Be aware, however, that you can count on my
> support.

(Id.)  Plaintiff elected not to take the anger management course alternative and became suspended

for another thirty days without pay.  (EEOC Statement at 10.)  She appealed to the Governing

Board, which voted on July 18, 2001, to uphold the second suspension.  (Id. at 11; Pl.'s Opp'n,

Ex. V, Governing Board Meeting Minutes, July 18, 2001, at 206.)  Plaintiff was out of work on

suspension from July 23, 2001, through August 22, 2001.  (EEOC Statement at 11.)

        Retaliation Allegations

        Plaintiff claims that Mr. Finch retaliated against her in December 1999 by eliminating the

position of assistant public information officer after the person holding that position, Melanie

Francis, retired.  (Pl.'s Retaliation Supplement ¶ 9.)  Plaintiff claims this act was in retaliation for her claims of hostile work environment.  (Id.)

She alleges that in October 2000 Mr. Finch denied her request for a promotion and, in a move Plaintiff alleges was unprecedented, told her she had to take her request to the Governing Board.  (Id. ¶ 10.)  She did.  On November 22, 2000, the Governing Board denied her request. (Id. ¶ 11.)  Plaintiff alleges that the Governing Board later announced and published the denial verbally and in an internal bulletin to VIPA staff.  (Id. ¶ 11.)  Plaintiff alleges these were acts of retaliation by Mr. Finch, Ms. Donastorg, and VIPA, through the Governing Board, and that these acts were intended to embarrass and humiliate her.  (Id.)  Plaintiff further alleges that the Governing Board later promoted several male employees.  (Id. ¶ 11.)

Plaintiff also alleges that Mr. Finch intentionally, as an act of retaliation, reneged on his pre-employment interview promise to update the job description and upgrade the position of public information officer.  (Id. ¶ 12.)

On November 22, 2000, upon the recommendation of Mr. Finch, the Governing Board eliminated the benefit of compensatory leave for non-union managers.  (Id. ¶ 13.)   It is undisputed that compensatory leave was eliminated for all management employees, not just for Plaintiff.  Nonetheless, Plaintiff asserts that compensatory leave had been a contentious issue between her and Mr. Finch and that he recommended termination of that benefit for all managers because he knew it would hurt her and make things more difficult for her at VIPA.  (Id.)  She asserts that the aforementioned Defendants were "so intent on ousting [her] that they did not care if they hurt other employees in the process."  (Id.)

Plaintiff alleges that, in 1999 and 2000, after she had complained of sexual harassment to

Mr. Finch and Attorney Mills, various Defendants failed to inform her of meetings, events, and crisis situations and attempted to undermine her professional authority.  (Id. ¶ 16.)

Plaintiff alleges that a number of events surrounding her suspension following the physical altercation on May 15, 2001, were retaliatory.  (Id. ¶¶ 17-22.)  In support of those claims, she alleges that male employees who had committed similar or more egregious offenses were given lesser punishments.  (Id. ¶ 22.)

Plaintiff alleges that Defendants retaliated against her from August 2001 through June 2002 by denying or interfering with her attempts to obtain paid leave through VIPA's Donated Leave Program.  (Id. ¶¶ 24-27.)  She also alleges that Defendants retaliated against her on November 30, 2001, by interfering with her attempts to secure leave pursuant to the Family Medical Leave Act ("FMLA").  (Id. ¶ 28.)

Plaintiff alleges that, between June and August 2002, Defendants refused to provide cost-effective, reasonable accommodations for her speech disability in an effort to frustrate her into resigning.  (Id. ¶ 29.)  She also alleges that, between October and November 2002, in an act of retaliation, Defendants arbitrarily placed her in a lower salary grade than other members of the executive staff when the Governing Board implemented a new management pay plan.  (Id. ¶ 31.)

After Mr. Brin became Executive Director on January 1, 2003, Plaintiff alleges that he used his authority over her to retaliate against her for rejecting his earlier sexual advances.  (Id. ¶¶ 33-37.)  She alleges that Mr. Brin took a number of retaliatory actions, including restricting his communication with her to memos; not informing her of meetings; insisting that she contact him only through his secretary, Ms. Donastorg; disconnecting internet service on her company-issued laptop; and reassigning the company vehicle that had been assigned to her.  (Id.)

The Remainder of Plaintiff's Tenure at VIPA

Plaintiff took a series of extended leaves of absence from work due to illness – chiefly, loss of voice.  The first absence was four months of sick leave from January 23, 2001, to April 23, 2001.  (2d Am. Compl. ¶ 23.)  She alleges that she was subjected to nondescript hostility and provocation when she returned to work on April 23, 2001.  (Id. ¶¶ 23, 59.)  She alleges that several employees, not defendants, refused to speak to her; that she was not invited to important meetings; and that she was otherwise "kept out of the loop."  (Id. ¶ 59; EEOC Statement at 6-8.)  She alleges that her frustrations with these situations led to a confrontation with Ms. Donastorg on May 15, 2001.  (2d Am. Compl. ¶ 59.)

Plaintiff did not return to work following the completion of her second suspension, on August 22, 2001, until June 3, 2002.  (Id. ¶ 26.)  She alleges that the "continuous harassment and stress precipitated by the wrongful suspension" caused a second relapse of her medical condition on July 18, 2001.  (Id. ¶ 24.)  She alleges that she was compelled to take ten months of sick leave without pay due to Mr. Finch and the Governing Board's refusal to allow her to participate in VIPA's Donated Leave Program.  (Id.)  She alleges that the harassment continued during her sick leave when VIPA's personnel manager sent a police officer to her home to deliver a letter from Mr. Finch – an action Plaintiff claims was intended to intimidate her.  (Id. ¶ 25.)

Plaintiff alleges that she returned to work, still with a speech disability, on June 3, 2002. (Id. ¶ 26.)  Upon her return, she alleges she "endured harassment and extreme insensitivity from several coworkers who were not fazed by [her] disability" and who were "uncooperative and refused to work with [her]."  (Id.)  She alleges that Mr. Brin, who became her supervisor after he succeeded Mr. Finch as Executive Director in January 2003, "continued to condone and promote

the hostile work environment."  (Id. ¶ 27.)

On January 13, 2003, Plaintiff submitted her letter of resignation from her position at

VIPA, effective January 24, 2003.  (Defs.' Mem., Ex. 3, Smith Resignation Letter to Brin, Jan.

13, 2003.)  Her letter of resignation reads as follows:

> Dear Mr. Brin:
>
> It is with great regret that I resign my position as public
> information officer of the Virgin Islands Port Authority.
>
> During my tenure at the Port Authority, I have been compelled to
> work in a hostile work environment which has taken a toll on my
> emotional and physical health.  I have tried to resolve my
> grievances, on several occasions, with the agency to no avail.  In
> addition to the hostile work environment, management does not
> comprehend the role of public relations, and my efforts to educate
> staff and management have been fruitless.  This situation continues
> to make my job unnecessarily difficult.
>
> I have no reason to believe that the working conditions or the
> culture of the agency will change in the near future.  Thus, I am
> resigning under duress, for I feel that if I were to continue working
> under such intolerable conditions, it would lead to the further
> deterioration of my health.
>
> I believe that it is time for me to explore employment opportunities
> with a company that would appreciate the diversity of skills and
> experience I have to offer.
>
> Please consider my resignation effective on Jan. 24, 2003 at 5 p.m.
>
> Sincerely,
>
> Shirley L. Smith

(Id.)

Plaintiff's Administrative Charges

On November 30, 2001, Plaintiff, through her attorney, Ronald Russell, Esquire, filed a

PERB appeal of her suspension of employment and a charge of unfair labor practice pursuant to

Sections 530 and 531 of the Virgin Islands Code.  (Pl.'s Opp'n to Defs.' Mot. to Strike and/or

Dismiss (Doc. No. 232) (hereinafter "Pl.'s Opp'n to Mot. to Strike"), Ex. A, PERB Appeal

Letter, Nov. 31, 2001 (hereinafter "PERB Appeal").)  On December 3, 2001, Plaintiff amended

her charge and included an allegation of sexual harassment by VIPA employees.  (Pl.'s Opp'n to

Mot. to Strike, Ex. B, Smith Letter to Lee, Dec. 3, 2001 (hereinafter "PERB Amendment").)  A

PERB Decision and Order dated January 18, 2002, dismissed as untimely Plaintiff's Section 530

complaint regarding her suspension.  (Pl.'s Opp'n to Mot. to Strike, Ex. D, PERB Decision and

Order, Nov. 31, 2001.)   On February 20, 2002, Plaintiff wrote to the PERB and withdrew her

Section 531 charge regarding employment discrimination.  (Pl.'s Opp'n to Mot. to Strike, Ex. E,

Smith Letter to Lee, Feb. 20, 2002.)   PERB issued a dismissal order on February 28, 2002.

(Pl.'s Opp'n to Mot. to Strike, Ex. E, PERB Decision and Order, Feb. 28, 2002.)  On January 15,

2002, Plaintiff filed a Charge of Discrimination with the EEOC.  (Pl.'s Retaliation Supplement,

Ex. A1, Charge of Discrimination, Jan. 15, 2002 (hereinafter "EEOC Charge").)   The EEOC

issued a right to sue letter on September 26, 2002.  (Pl.'s Opp'n to Mot. to Strike, Ex. G, EEOC

Dismissal and Notice of Rights.)


## Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a summary judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must

be both (1) material, meaning concerning facts that will affect the outcome of the issue under

substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex, 477 U.S. at 322-23.  An issue is genuine if the fact

finder could reasonably return a verdict in favor of the non-moving party with respect to that

issue.  Anderson, 477 U.S. at 248.

"In an employment discrimination case, the burden of persuasion on summary judgment

remains unalterably with the employer as movant.  The employer must persuade [the court] that,

even if all of the inferences which could reasonably be drawn from the evidentiary materials of

record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in

the plaintiff's favor."  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008)

(citations omitted).  In reviewing a motion for summary judgment, the court "does not make

credibility determinations and must view facts and inferences in the light most favorable to the

party opposing the motion."  Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127

(3d Cir. 1995).

## Discussion

As an initial matter, Plaintiff asserts that Defendants' Motion for Partial Summary

Judgment regarding her sexual harassment claims is premature in that she is still awaiting

discovery responses.  However, insofar as the court's review of Defendants' Motion for Partial

Summary Judgment relies upon what Plaintiff alleges occurred and inasmuch as Plaintiff has

taken the depositions of VIPA Executive Directors and other staff persons, the court finds that

additional discovery is not necessary for the court's review of Defendants' Motion.

I.      **Timeliness of Plaintiff's Title VII claims.**

Section 706(e) of Title VII, 42 U.S.C. § 2000e-5(e), requires the filing of administrative

complaints with the EEOC within 180 days of the alleged unlawful employment practice unless

the charge of discrimination is filed with a state or local agency with the power to adjudicate

claims of employment discrimination and grant remedies, thus extending the EEOC filing

deadline to within 300 days of the alleged unlawful employment practice.  42 U.S.C. §

2000e-5(e).

Plaintiff filed her claim with the EEOC on January 15, 2002.  (EEOC Charge.)  She had

previously filed her claims with a Virgin Islands territorial agency.  (See PERB Appeal; PERB

Amendment.)  Consequently, the limitations period bars claims for events that occurred more

than 300 days before she filed her EEOC claim.  The court calculates that the limitations period

began to run on March 23, 2001, i.e., 300 days before January 15, 2002.

Discrete acts of discrimination include termination, failure to promote, denial of transfer,

or refusal to hire.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  "Each

incident of discrimination and each retaliatory adverse employment decision constitutes a

separate actionable 'unlawful employment practice.'"  Id.  EEOC charges for discrete acts must

be timely filed and "are not actionable if time barred, even when they are related to acts alleged

in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges

alleging that act."  Id.  "A discrete retaliatory or discriminatory act 'occurred' on the day that it

'happened.'  A party, therefore, must file a charge within either 180 or 300 days of the date of the

act or lose the ability to recover for it."  Id. at 110.

In the case of discrete discriminatory acts, the act that is timely charged must be

independently discriminatory.  Id.  Any discrete discriminatory acts that occurred before the 300-

day time period are no longer actionable, but an employee may use prior acts as background

evidence in support of a timely claim.  Id. at 113, 115.

A series of discrete discriminatory acts does not constitute a continuing violation.  Id. at

114.  Even when an employee suffers from numerous discrete discriminatory and retaliatory acts,

only incidents that occurred within the timely filing period are actionable.  Id.

Hostile work environment claims differ from discrete act claims.  A hostile work

environment claim is composed of a series of separate acts that collectively constitute one

unlawful employment practice.  Id. at 117; 42 U.S.C. § 2000e-5(e)(1).  A hostile work

environment involves repeated conduct.  Morgan, 536 U.S. at 115.  Hostile work environments

develop over a series of days, months, or years, or perhaps years, and they are the collective

result of individual acts that may not be actionable on their own.  Id.

Sexual harassment claims based on hostile work environment also must be filed within

the same 180 or 300 day filing period as discrete act claims.  However, unlike with discrete acts,

"[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile

work environment fall outside the statutory time period.  Provided that an act contributing to the

claim occurs within the filing period, the entire time period of the hostile environment may be

considered by a court for the purposes of determining liability."  Morgan, 536 U.S. at 117.  See

<u>also</u> <u>id.</u> ("Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim.  In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.").

      A.      <u>Some of Plaintiff's Retaliation Claims are Time-Barred.</u>

The United States Supreme Court has made it clear that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" under Title VII.  <u>Morgan</u>, 536 U.S. at 113.  Therefore, Plaintiff cannot claim a continuing violation because of multiple discrete acts of retaliation.  <u>Id.</u> at 114 (holding that a series of discrete discriminatory acts does not constitute a continuing violation.)

Plaintiff alleges several discrete acts of retaliation.  Claims regarding acts that allegedly occurred prior to March 23, 2001, are time barred.  These include the following:

    i.    Mr. Finch's elimination of the position of assistant public information officer in December 1999, (<u>see</u> Pl.'s Retaliation Supplement ¶ 9);

    ii.    Mr. Finch's October 2000 denial of Plaintiff's request for a position upgrade and salary increase and his instruction that Plaintiff take her request to the Governing Board, (<u>see</u> <u>id.</u> ¶ 10);

    iii.    The Governing Board's November 22, 2000, denial of Plaintiff's request for a promotion and the Governing Board's announcement and publication of that denial, (<u>see</u> <u>id.</u> ¶ 11);

    iv.    Mr. Finch's reneging of his pre-employment interview promise to update the description of and upgrade the position of public information officer,

(see id. ¶ 12);[11]

    v.    The Governing Board's elimination of compensatory leave for non-union

        managers on November 22, 2000 (see id. ¶ 13);

    vi.    Defendants' failure to inform her of meetings, events, and crisis situations

        and attempts to undermine her professional authority in 1999 and 2000,

        (see id. ¶ 16).

Although these claims are time-barred, the court includes them in its discussion of Plaintiff's

Title VII claims.  The Supreme Court has ruled that prior acts of discrimination for which no

timely EEOC charge was filed may be considered as background evidence in support of a timely

Title VII claim.  Morgan, 536 U.S. at 113 ("Nor does the statute bar an employee from using the

prior acts as background evidence in support of a timely claim.")

      Claims regarding the following alleged acts are timely filed because they allegedly

occurred after or continued beyond March 23, 2001:

    i.    The events surrounding Plaintiff's suspension following the May 15, 2001,

        physical altercation, (see Pl.'s Retaliation Supplement ¶¶ 17-22);

    ii.    Defendants' denial or interference with her attempts to obtain leave from

        VIPA's Donated Leave Program from August 2001 through June 2002,

        (see id. ¶¶ 24-27);

    iii.    Defendants' interference with her attempts to secure leave pursuant to the

        FMLA on November 30, 2001, (see id. ¶ 28);

---

[11] Plaintiff does not allege the date of Mr. Finch's alleged action.  However, the court finds that Mr. Finch chose not to update the position on October 2000, when he denied Plaintiff's request for a position upgrade and salary increase.  Therefore, this claim is also time-barred.

    iv.    Defendants' refusal to provide cost-effective, reasonable accommodations for her speech disability between June and August 2002, (see id. ¶ 29);

    v.    Defendants' placement of Plaintiff in a lower salary grade than other members of the executive staff when the Governing Board implemented a new management pay play between October and November 2002, (see id. ¶ 31); and

    vi.    Mr. Brin's detrimental actions toward Plaintiff in his role as Executive Director beginning on January 1, 2003, (see id. ¶¶ 33-37).

The court addresses these claims in the Retaliation section below.  See infra, Section III.

"To demonstrate a continuing violation, the plaintiff first must show that at least one discriminatory act occurred within the 300-day period.  Second, the plaintiff must show that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination, and instead must demonstrate a continuing pattern of discrimination.  Rush v. Scott Speciality Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (internal quotations and citations omitted).  Several factors are relevant in determinating whether a plaintiff has demonstrated a continuing violation: 1) subject matter, i.e., whether the acts involve the same type of discrimination; 2) frequency; 3) the degree of permanence.  Id. at 481-82.

The acts alleged in Plaintiff's timely claims do not constitute a continuing violation of Title VII.  The retaliatory acts she alleges are discrete acts; they are of a variety of types, they occurred sporadically, and they were perpetrated by different persons.  See Morgan, 536 U.S. at 120.  Therefore, the continuous violation doctrine does not apply to make all Plaintiff's retaliation claims timely.

B.      Plaintiff's Hostile Work Environment Claim is Partially Time-Barred

Plaintiff claims a continuing violation of Title VII via hostile work environment sexual harassment that continued throughout her tenure at VIPA, from April 12, 1999, to January 24, 2003.  (See, e.g., 2d Am. Compl.¶ 16.)  "In order for [a hostile work environment] charge to be timely, the employee need only file [an EEOC] charge within 180 or 300 days of any act that is part of the hostile work environment."  Morgan, 536 U.S. at 118.  However, in order for a court to consider acts that occurred outside of the timely EEOC filing period, those acts must be related to the acts that occurred without the filing period.  Id.  The Supreme Court has illustrated this point as follows:

> (1) Acts on days 1-400 create a hostile work environment.  The employee files the charge on day 401.  Can the employee recover for that part of the hostile work environment that occurred in the first 100 days?  (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400.  Can the act occurring on day 401 pull the other acts in for the purposes of liability?  In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole.  Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.  On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

Id. (emphasis added).

Mr. Lee's alleged sexual harassment on June 5, 1999, clearly falls outside of the limitations period.  Although Plaintiff alleges that Mr. Lee "continued to act inappropriately"

after she reported his behavior to Mr. Finch in June 1999, (2d Am. Compl. ¶ 44), Plaintiff provides no evidence that Mr. Lee sexually harassed her on or after March 23, 2001, i.e., within 300 days of the date she filed her EEOC Charge. Therefore the alleged harassment by Mr. Lee is time-barred unless it is related to harassment that occurred within the timely filing period.

Mr. Peguero's alleged sexual harassment between July 1999 and October 2000 also falls outside of the limitations period. Plaintiff provides no evidence that Mr. Peguero sexually harassed her within 300 days of the date she filed her EEOC Charge. Therefore, Mr. Peguero's alleged harassment is likewise time-barred unless it is related to harassment that occurred within the timely filing period.

Chief Moolenaar's alleged sexual harassment occurred between September and November 2000. Plaintiff provides no evidence that Chief Moolenaar sexually harassed her within 300 days of the date she filed her EEOC Charge. Once again, Chief Moolenaar's alleged harassment is time-barred unless it is related to harassment that occurred within the timely filing period.

To the extent that Plaintiff alleges that Mr. Brin made sexual advances toward her one night between April and June 2001, (see Defs.' Supplement, Ex. 22, Smith Dep. Vol. II at 102-05), which falls within the timely EEOC filing period, and to the extent that Plaintiff claims those advances contributed to a hostile work environment, Plaintiff's hostile work environment claim involving Mr. Brin is timely.[12] However, Plaintiff has provided no evidence that Mr.

---

[12] Defendants argue that Plaintiff's claim of sexual harassment involving Mr. Brin is time-barred because she did not include Mr. Brin in her EEOC charge, which was never amended. (Defs.' Supplement at 7.) According to the Third Circuit, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976). See also Taylor v. Brandywine Sch. Dist., 202

Brin's alleged conduct was related to the alleged conduct of Mr. Lee, Mr. Peguero, or Chief Moolenaar.  The evidence shows that each of these men acted in isolation from one another, and there was no continuing pattern.  See Rush, 113 F.3d at 481.  Thus, the court finds that Plaintiff has not demonstrated a continuing violation, and the alleged harassment by Mr. Lee, Mr. Peguero, and Chief Moolenaar is time-barred and is not part of Plaintiff's sexual harassment claim before this court.

The court addresses the merits of Plaintiff's sexual harassment claim below.

      C.      Plaintiff's Quid Pro Quo Sexual Harassment Claim is Time-Barred.

Construing the facts in a light most favorable to Plaintiff, Plaintiff also claims quid pro quo sexual harassment.  She alleges that Mr. Peguero sexually harassed her and implied that he could make things happen for her if she responded favorably to his sexual advances.  (Defs.' Supplement, Ex. 30, Smith Dep. Vol. II at 50; Defs.' Supplement, Ex. 31, Smith Dep. Vol. II at 74-75, 79; Defs.' Supplement, Ex. 24, Smith Dep. Vol. II at 114.)  She alleges this occurred sometime between July 1999 and October 2000.  (See 2d Am. Compl. ¶¶ 45-48 (alleging that Mr.

---

Fed. Appx. 570, 574 n.1 (3d Cir. Sept. 29, 2006) (holding that all plaintiff's Title VII claims "are fairly within the scope of the EEOC charge" although some claims, including constructive discharge, were not specifically asserted therein).  Other circuits have also held that EEOC charges are to be interpreted liberally.  See, e.g., EEOC v. Bailey Co., 563 F.2d 439, 446 (6th Cir. 1977) (noting that a complaint asserting Title VII claims is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination"); Dollis v. Rubin, 77 F.3d 777, 781 (5th Cir. 1995) ("A Title VII cause of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.") (internal citations and quotations omitted); Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (holding that a Title VII action is limited to claims that are "like or reasonably related to the allegations of the charge and growing out of" the allegations in an EEOC charge) (internal quotations omitted).  The court finds that Plaintiff's allegations involving Mr. Brin are reasonably related to the allegations in her EEOC charge and are properly before this court.

Peguero sexually harassed her between July 1999 and October 2000).)  Mr. Peguero's alleged

quid pro quo harassment took place more than 300 days prior to Plaintiff's filing of an EEOC

charge.  Furthermore, Plaintiff does not claim she was subject to any adverse employment action

for refusing Mr. Peguero's advances.  Plaintiff's quid pro quo claim is time-barred, and Plaintiff

fails to make a prima facie case.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-82 (3d

Cir. 2000) ("[A] plaintiff may prove a claim of quid pro quo sexual harassment by showing that

his or her response to unwelcome advances was subsequently used as a basis for a decision about

compensation, terms, conditions, or privileges of employment.") (internal quotation, citation, and

alteration omitted).

> D.      The Court Considers the Merits of Plaintiff's Disparate Treatment Claim, as if it
>         were Timely Filed.

Plaintiff claims that she was "subjected to disparate treatment and a hostile work

environment based on [her] gender and disability."[13]  (Pl.'s Resp. to Defs.' Written Supplement

to Oral Args. (Doc. No. 335), at 2.)  Plaintiff sets forth only one allegation of disparate treatment.

She alleges that, after the Governing Board's November 22, 2000, denial of her request for a

promotion, the Governing Board later promoted several male employees.  (Pl.'s Retaliation

Supplement ¶ 11.)  Plaintiff does not name these male employees, but Mr. Finch's deposition

testimony indicates that one male employee, Wendell Hanley, was promoted from maintenance

manager to maintenance director between 1999 and 2003.  (Defs.' Resp. to Court-Allowed

Supplemental Pleas on Pl.'s Retaliation Claim (Doc. No. 345) (hereinafter "Defs.' Retaliation

Resp."), at 5-6; Defs.' Retaliation Resp., Ex. 4, Finch Dep. at 87.)  Plaintiff alleges that Attorney

---

[13] The court does not address Plaintiff's disability claims here because the disabled are
not a protected class under Title VII.

Mills, Attorney Carr, and Chief Moolenaar's positions were upgraded subsequent to the Defendants' denial of her request.  (Pl.'s Opp'n ¶ 185.)

The court proceeds as if Plaintiff's disparate treatment claim were timely filed.  Although the adverse employment action occurred on November 22, 2000, when the Governing Board denied her request for a promotion, Plaintiff's cause of action did not accrue until Plaintiff realized other male employees were being more favorably treated.  <u>Disable in Action of Pennsylvania v. Southeastern Pennsylvania Transp.</u>, --- F.3d ----, 2008 WL 3842937, *7 (3d Cir., Aug. 19, 2008) ("In the absence of a contrary directive from Congress, we apply the federal discovery rule, which dictates that a federal cause of action accrues when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.") (internal quotations, citations, and alterations omitted.)  Plaintiff does not plead the dates on which male VIPA employees were promoted.  Taking all facts in the light most favorable to <u>pro se</u> Plaintiff, it is possible that the cause of action accrued within 300 days of Plaintiff's EEOC charge.  Thus, the court considers the merits of her disparate treatment claim as if the claim were timely filed.


## II.     Disparate Treatment

Even if Plaintiff's disparate treatment claim is timely, it still fails as a matter of law because Plaintiff fails to establish that comparable male VIPA employees were treated more favorably or that and Defendants' reasons for denying her request for a salary increase and position upgrade were related to her sex.

A plaintiff may prove disparate treatment discrimination under Title VII either with direct

evidence of intent to discriminate or indirect evidence from which a court could infer intent to discriminate.  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 368 (3d Cir. 2008).  Disparate treatment claims based on circumstantial evidence are governed by the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  Under this burden-shifting framework, a plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802.

Here, Plaintiff presents circumstantial evidence but no direct evidence of disparate treatment based on sex.  Therefore, the McDonnell Douglas framework governs.

To establish a prima facie case of individual disparate treatment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably or other circumstances are present that give rise to an inference of unlawful discrimination.  Jones, 198 F.3d at 410-11; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the prohibited conduct.  Id. "When the defendant meets this burden, the court's 'factual inquiry then proceeds to a new level of specificity.'"  C.A.R.S. Protection Plus, 527 F.3d at 370 (quoting Burdine, 450 U.S. at 255). "The presumption of discrimination established by the prima facie showing 'simply drops out of the picture.'"  C.A.R.S. Protection Plus, 527 F.3d at 370 (quoting St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 511 (1993)).  Plaintiff must then persuade the court by a preponderance of the

evidence that the employer's reason is pretextual.  McDonnell Douglas, 411 U.S. at 802; Jones,

198 F.3d at 410.  "In order to show pretext, a plaintiff must submit evidence which (1) casts

doubt upon the legitimate reason proffered by the employer such that a fact-finder could

reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer

that discrimination was more likely than not a motivating or determinative cause of the

employee's [adverse employment action]."  C.A.R.S. Protection Plus, 527 F.3d at 370 (citations

omitted).  In other words, a plaintiff must show "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence."

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  In the Third Circuit, a plaintiff may also

defeat a motion for summary judgment by "adducing evidence, whether circumstantial or direct,

that discrimination was more likely than not a motivating or determinative cause of the adverse

employment action."  Id. at 764.  If the plaintiff opts to provide additional evidence "to show that

discrimination was more likely than not a cause for the employer's action, the plaintiff must

point to evidence with sufficient probative force that a fact finder could conclude by a

preponderance of the evidence that [a protected characteristic] was a motivating or determinative

factor in the employment decision."  Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir.

1998).  However, "[i]f the plaintiff has pointed to evidence sufficiently to discredit the

defendant's proffered reasons, to survive summary judgment the plaintiff need not also come

forward with additional evidence of discrimination beyond his or her prima facie case."  Fuentes,

32 F.3d at 764.

Plaintiff claims that she was subjected to disparate treatment based on her sex when, on November 22, 2000, the Governing Board denied her request for a promotion and later promoted several male employees. (Pl.'s Retaliation Supplement ¶ 11.) Taking all facts in a light most favorable to Plaintiff, Plaintiff succeeds in establishing a prima facie case of disparate treatment. First, as a female, Plaintiff is a member of a protected class. Second, taking all facts in the light most favorable to Plaintiff, Plaintiff was qualified for a promotion. Third, Plaintiff suffered an adverse employment action when her request for a promotion was denied. Fourth, Plaintiff alleges that male VIPA employees were granted promotions after her request for a promotion was denied. Plaintiff alleges that Attorney Mills, Attorney Carr, and Chief Moolenaar's positions were upgraded subsequent to the Defendants' denial of her request, (Pl.'s Opp'n ¶ 185,) and that Mr. Hanley was promoted sometime during her tenure at VIPA, (Pl.'s Opp'n ¶ 182).[14] [15]  Plaintiff contends that she "had an outstanding record of performance despite being forced to do the job of two people for over a year," and that her predecessor had also complained to Mr. Finch about the need for a raise and restructuring of her position. (Pl.'s Opp'n ¶ 183; Pl.'s Opp'n, Ex. 9, Nielson Mems. to Finch, July 7, 1995, and Mar. 30, 1995.)

Plaintiff seems to allege that because men were promoted and she was not, there must

---

[14] Plaintiff has the burden of proving her prima facie case of discrimination by a preponderance of the evidence. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 252-53; McDonnell Douglas, 411 U.S. at 802. Defendants do not deny that these male employees were promoted during Plaintiff's tenure at VIPA.

[15] Plaintiff further alleges that, after her alleged constructive discharge, Defendants upgraded the position of public information officer and gave her replacement a salary on par with the other senior managers. Plaintiff provides no affidavit or other evidence of that allegation. She does not indicate whether her successor was male or female or what her successors qualifications were.

have been sex discrimination.  However, Defendants point out that the male VIPA employees who were given promotions were not similarly situated to Plaintiff.  They point out that Wendell Hanley was a maintenance manager who was later promoted to maintenance director on St. Croix, thus there is no basis for comparison to Plaintiff's role as Public Information Officer on St. Thomas.  (Defs.' Retaliation Resp. at 5-6; Defs.' Retaliation Resp., Ex. 4, Finch Dep. at 87.)  In addition, Mr. Mapp's deposition testimony shows that Mr. Hanley's female secretary was promoted at the same time as Mr. Hanley was promoted, (Pl.'s Retaliation Supplement, Ex. F, Mapp Dep. at 119), and additional evidence in the record shows that another female employee, Carol Martinez, was promoted the same day Plaintiff's request was denied, (Pl.'s Opp'n, Ex. M, VIPA Governing Board Actions List, Nov. 22, 2000).  That rebuts Plaintiff's broad contention that men were treated more favorably than she was treated as a woman.  Mr. Mapp's deposition testimony further notes that "Oneal Moolenaar and McKinley Welsh's position was changed from Safety and Security Officer to Police Chief / Safety and Security Officer once the police unit was implemented."  (Pl.'s Retaliation Supplement, Ex. F, Mapp Dep. at 121.)  This shows that Chief Moolenaar and Chief Welsh's positions were not comparable to Plaintiff's, thus they were not similarly situated.

Defendants successfully articulate legitimate, non-discriminatory reasons for denying Plaintiff's request for a promotion.  Defendants allege that Plaintiff's supervisor, Mr. Finch, denied Plaintiff's request because he did not think she deserved it and the request was not justifiable.  (Defs.' Retaliation Resp. at 3-5; Pl.'s Opp'n, Ex. L, Finch Dep. at 54.)  They further allege that Plaintiff's job did not entail the level of responsibility, expertise, or supervision required of a manager, which Plaintiff sought to become.  (Defs.' Retaliation Resp. at 4.)  They

also point out that, on January 30, 2001, after Mr. Finch and the Governing Board had denied

Plaintiff's request for a promotion, Mr. Finch gave Plaintiff an "outstanding" overall evaluation

rating, showing that he did not arbitrarily and capriciously deny her a promotion.  (Id. at 5-6;

Pl.'s Opp'n, Ex. D, Smith Employee Performance Report, Jan. 30, 2001.)  Lastly, Defendants

allege that Plaintiff received several salary increases during her tenure with VIPA.  (Defs.'

Retaliation Resp. at 6.)

Plaintiff has not established that similarly situated employees were treated more

favorably, or that any adverse employment actions she suffered gave rise to an inference of sex

discrimination.  In addition, Plaintiff fails to present any evidence to demonstrate that

Defendants' proffered legitimate, nondiscriminatory reasons for denying her promotion were

pretextual or unworthy of credence or that would demonstrate that her sex was more likely than

not a determinative factor underlying the decision.  Therefore, Plaintiff's disparate treatment

claim fails as a matter of law.


**III.    Retaliation**

Title VII provides as follows:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because he has
> opposed any practice made an unlawful employment practice by
> this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Opposition to discrimination "can take the form of informal protests of

discriminatory employment practices, including making complaints to management."  Moore v.

City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (internal quotation and citation omitted).

Under the McDonnell Douglas burden-shifting paradigm, the employee bears the initial burden of establishing a prima facie case of retaliation under Title VII.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The employee must prove that (1) she engaged in a protected employment activity under Title VII; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity.  Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007); Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).  If the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Marra, 497 F.3d at 300 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  If the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  Marra, 497 F.3d at 300 (citations omitted.).

To satisfy the adverse employment action requirement for a prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quotations and citation omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" that often occur in the workplace do not normally constitute materially adverse employment actions.  Id.  "Context matters" in determining whether a challenged act would have dissuaded a reasonable employee from making or supporting a

charge of discrimination, and an "act that would be immaterial in some situations is material in others." Id. at 69 (quotation omitted).

"When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly anymore. But what the statute proscribes is retaliation, not loyalty to an accused coworker or a desire to avoid entanglement in workplace controversy." Jensen v. Potter, 435 F.3d 444, 452 (3d Cir. 2006) (citations omitted), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

To show a causal connection between the employee's protected activity and the employer's adverse action, a plaintiff may rely on a "broad array of evidence." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). An "unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection," but "the mere passage of time is not legally conclusive proof against retaliation." Marra, 497 F.3d at 302 (quotations, citations, and alterations omitted). See also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n. 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.") The Third Circuit has explained:

> Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, . . . or other types of circumstantial evidence, such as inconsistent reasons given by the

> employer for terminating the employee or the employer's treatment
> of other employees, that give rise to an inference of causation when
> considered as a whole.

Marra, 497 F.3d at 302 (citations omitted).

If a plaintiff has made a prima facie case, and if the employer has responded with legitimate, non-retaliatory reasons for its actions, the plaintiff must next establish pretext.  To establish pretext, the plaintiff must show by a preponderance of the evidence that the employer's articulated reasons are false and that the discrimination or retaliation was the "real reason for the adverse employment action."  Marra, 497 F.3d at 300-01 (quotation omitted).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" or retaliated Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000); Marra, 497 F.3d at 306.  A plaintiff may show pretext by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Marra, 497 F.3d at 306 (quotation omitted).  It is not enough to show that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer."  Fuentes v. Perskie, 32 F.3d at 764.

Here, Plaintiff engaged in activities protected by Title VII by bringing her allegations of sexual harassment to VIPA supervisors, filing a charge of discrimination with the PERB and the EEOC, and filing suit in this court.  In her Second Amended Complaint and her briefs, she seems to allege the following adverse employment actions:

(1)      denial of employment benefits, compensation, conditions, and privileges,

(see 2d. Am. Compl. ¶¶ 2, 20, 24, 38, 40, 55, 59, 75);

(2)     denial of a promotion, (see id. ¶¶ 19, 76);

(3)     wrongful suspension, (see id. ¶¶ 60, 65, 72, 77); and

(4)     constructive discharge, (see id. ¶¶ 101-02).

The court addresses each of Plaintiff's factual allegations, individually and collectively, along with VIPA's responses to them.


A.     Plaintiff's Time-Barred Retaliation Allegations.

The court has found that the following claims are time-barred.  The court discusses these allegations only insofar as they may support Plaintiff's timely claims.

1.     *Mr. Finch's Elimination of the Assistant Public Information Officer Position in December 1999.*

Plaintiff claims that in December 1999 Mr. Finch retaliated against her by eliminating the position of assistant public information officer after the person holding that position, Melanie Francis, retired.  (Pl.'s Retaliation Supplement ¶ 9.)  Plaintiff also claims that she and Mr. Finch knew Ms. Francis was incapable of performing her job because of a medical condition but that Mr. Finch insisted Plaintiff keep giving assignments to Ms. Francis, thus denying Plaintiff's request for adequate assistance.  (Id.)  Plaintiff provides evidence that Ms. Francis was given unsatisfactory evaluations and was recommended for termination by Plaintiff's predecessor since as early as 1992.  (See, e.g., Pl.'s Retaliation Supplement, Ex. E1, Francis Employee Performance Report, Oct. 7, 1992.)  Plaintiff concedes that she was eventually allowed to hire an administrative assistant after Ms. Francis' retirement.  (Pl.'s Retaliation Supplement ¶ 9; Pl.'s Retaliation Supplement, Ex. E1, Finch Mem. to Smith.  See also Pl.'s Opp'n, Ex. K, Smith Mem.

to VIPA Empoyees, May 15, 2000 (announcing new administrative officer in the Public

Relations Department under her supervision, effective May 15, 2000).)  Defendants respond that

Mr. Finch did not fire Ms. Francis because she was suffering from a "catastrophic illness."

(Defs.' Retaliation Resp. at 2-3.  <u>See also</u> Defs.' Retaliation Resp., Ex. 1, Finch Dep. at 99-100.)

They also respond that Mr. Finch had seven to eight meetings with Plaintiff in order to resolve

her complaints about Ms. Francis.  (<u>Id.</u>)

In addition to being untimely filed, Plaintiff's claim about elimination of the assistant

public information officer position does not involve an adverse employment action.  Although

Plaintiff may have been forced to work with an unsatisfactory assistant, her predecessor had been

as well.  Ms. Francis had been performing her job unsatisfactorily for years before Plaintiff

assumed the position of public information officer at VIPA.  Plaintiff alleges that she ran the

Public Relations Division singlehandedly even when Ms. Francis was employed as assistant

public information officer, (Pl.'s Retaliation Supplement, Ex. E1, Smith Mem. to Finch, Oct. 10,

2000), so Mr. Finch's failure to provide Plaintiff with an assistant promptly upon Ms. Francis'

retirement could hardly be considered an adverse employment action.  Furthermore, Plaintiff was

allowed to hire an administrative assistant who began work on May 15, 2000, which further

indicates that Defendants actions related to the assistant public information officer position were

not retaliatory.

2.   *Defendants' Denial of Plaintiff's Request for a Salary Increase and
Position Upgrade.*

Plaintiff alleges that in October 2000 Mr. Finch retaliated against her by denying her

request for a promotion and directing her to take her request to the Governing Board.  (Pl.'s

Retaliation Supplement ¶ 10.  <u>See also</u> Pl.'s Retaliation Supplement, Ex. E1, Smith Mem. to

Page 43 of  91

Finch, Oct. 10, 2000 (requesting position upgrade and salary increase).)  She also alleges that the Governing Board retaliated against her on November 22, 2000, by denying her request and later by announcing and publishing the denial.  (Pl.'s Retaliation Supplement ¶ 11.)  The court has addressed these allegations in the context of Plaintiff's disparate treatment claim.  See supra, Section II.

Even if Plaintiff's claim regarding Mr. Finch's denial of her request for a salary increase and position upgrade were timely filed, Defendants proffer legitimate, non-retaliatory reasons for denying Plaintiff's request for a promotion, and Plaintiff fails to present any supported evidence that Defendants' proffered legitimate, non-retaliatory reasons are pretextual.  No reasonable factfinder could rationally find Defendants' reasons unworthy of credence.  Marra, 497 F.3d at 306.

3.      *Mr. Finch's Failure to Keep his Pre-employment Interview Promise to Update the Description and Upgrade the Position of VIPA's Public Information Officer.*

Plaintiff alleges that Mr. Finch retaliated against her by intentionally reneging on his pre-employment interview promise to update the description and upgrade the position of VIPA's public information officer.  (Pl.'s Retaliation Supplement ¶ 12.)  Defendants deny that Mr. Finch promised anything other than what was included in her offer letter, and they point out that Plaintiff received several salary increases during her tenure with VIPA.  (Defs.' Retaliation Resp. at 6.)

In a December 22, 2000, letter to Mr. Finch, Plaintiff's attorney wrote the following:

> As you are well aware, Shirley Smith has been working for the Port Authority for Twenty (20) months now.  At the time Ms. Smith was interviewed for the job, she expressed her belief that the title "Public Information Officer" was a misnomer, in light of the job

> specifications which were explained to her.  At that interview, <u>you indicated that you will consider the matter</u>.  Shortly after she started the job, she again expressed her concern that the position title was not commensurate with the job responsibilities.  While it is accepted that VIPA's management has the right to set position titles as it sees fit; but Ms. Smith simply felt misled by VIPA's advertising.

(Pl.'s Retaliation Supplement, Ex. I, Frazer Letter to Finch, Dec. 22, 2000, at 1 (emphasis added).)

If this claim were timely, it would still fail as a matter of law.  Plaintiff has failed to establish an adverse employment action.  In her attorney's December 22, 2000, letter, she claims that Mr. Finch simply indicated that he would consider a new title for the Public Information Officer.  (Pl.'s Retaliation Supplement, Ex. I, Frazer Letter to Finch, Dec. 22, 2000.)  Failure to do so cannot be construed as an adverse employment action.  Furthermore, Plaintiff has presented no evidence of an actual promise to upgrade her position.

4.      *The Governing Board's Elimination of Compensatory Leave.*

Plaintiff alleges that Defendants retaliated against her on November 22, 2000, when the Governing Board eliminated the benefit of compensatory leave for non-union managers upon the recommendation of Mr. Finch.  (Pl.'s Retaliation Supplement ¶ 13.)  Defendants respond that compensatory leave was eliminated for all management employees of VIPA, not just for Plaintiff.  (Defs.' Retaliation Resp. at 6.)  They also respond that Mr. Finch never thought the benefit should have been given in the first place, (<u>id.</u> at 7; Defs.' Retaliation Resp., Ex. 6, Finch Dep. at 103), and that Mr. Finch thought Plaintiff had been working excessive amounts of overtime, (Defs.' Retaliation Resp. 7 ("Smith's apparent abuse of the compensatory leave may have been the straw that broke the camel's back"); Defs.' Retaliation Resp., Ex. 5, Finch Dep. at 96 (stating

that Plaintiff worked far more overtime than he had ever asked her to work)).  Mr. Finch stated

that the former Public Information Officer never claimed so much compensatory time, and that

he believed Plaintiff was not using her 8:00 a.m. to 5:00 p.m. work hours as efficiently as

possible and that she could have reduced her "inordinate" amount of compensatory time had she

done so.  (Defs.' Retaliation Resp., Ex. 14, Finch Dep. at 107-08.)  Furthermore, Mr. Finch

approved Plaintiff's request to use up her compensatory leave after the leave benefit was

eliminated, even though he did not believe that compensation was warranted and even though he

thought Plaintiff's overtime hours were not consonant with the demands of her job.  (Defs.'

Retaliation Resp. at 14.)

Plaintiff responds that, between May 1999 and November 1999, she accumulated 322 ½

hours of compensatory leave but only used 56 hours of compensatory leave, thereby not abusing

the system.  (Pl.'s Opp'n ¶ 180.)  Mr. Finch allowed her to carry over her approved compensatory

time from 1999 to 2000, and Plaintiff accumulated an additional 160 hours of compensatory

leave between January and June 2000.  (Id.)  She contends she had nothing to gain monetarily

from working overtime.  (Id.)  However, on November 23, 2000, one day after the Governing

Board eliminated the compensatory leave benefit, she wrote to Mr. Finch and stated that she

intended to every day, hour, and minute of her compensatory leave balance – six weeks, three

days, and one and one-half hours – beginning the following week.  (Pl.'s Opp'n, Ex. O, Smith

Mem., Nov. 23, 2000.)  VIPA permitted her this extended leave.

Plaintiff has attached to her pleadings her time sheet for two in January 2000.  (Pl.'s

Opp'n, Ex. J, Smith Time and Attendance Sheet, Jan. 17-29, 2000.)  On this time sheet, Plaintiff

reports working, on her two shortest weekday entries, 10-hour days,[16] and also reports working,

for example, a 12-hour day, a 13 ½ -hour day, three 13-hour days, and one 16 ½-hour day, plus

she reports working from 9:30 a.m. on a Saturday until 4:30 a.m. the following day.  (Id.)  A

handwritten note from Mr. Finch to Plaintiff appears on that time sheet and reads as follow:

> Shirley: I'm tired [of] telling you that comp time must be approved
> in advance.  I will not allow you to continue doing this!!  Further,
> you have no preapproval to work any extra hours in the future
> without my written approval.
> [Signed] Gordon A. Finch
> 1/31/00

(Id.)  On that same time sheet, Mr. Finch also circles four lengthy time sheet entries and marks

them disapproved.  (Id.)

The court finds Plaintiff's claim regarding compensatory leave does not support her

timely claims of retaliation.  The change applied to all management employees, not just Plaintiff.

Cf. Keelan v. Majesco Software, Inc., 407 F.3d 332, 343 (5th Cir. 2005) (finding that across-the-

board requirements to work from the office and for all nonsupervisor salespersons to work from a

cubicle-type office space do not constitute hostility or harassment).  Plaintiff has no supporting

evidence linking this November 2000 change in benefits with her only prior complaint of sexual

harassment to Mr. Finch, about Mr. Lee, in June 1999.[17]  Finally, the court finds that Plaintiff's

large number of accrued compensatory leave hours, which were contemporaneously chastised by

her supervisor, lend credence to Defendants' legitimate nondiscriminatory reasons for

---

[16] The court assumes that the entry for Friday January 28, 2000, was supposed to read "12 a.m.," not "12 p.m."  (Id.)

[17] Plaintiff's next complaint of sexual harassment to Mr. Finch was about Chief Moolenaar in July 2001.  (EEOC Statement at 13.)

eliminating the compensatory leave benefit due to articulated managerial concerns about possible employee abuse throughout VIPA, which concerns have not been, and are not capable of being, rebutted.

      B.      Plaintiff's Timely Retaliation Allegations.

            1.      *Plaintiff Fails to Establish that Defendants' Actions after the May 15, 2001, Altercation Were Causally Connected to Her Protected Activities.*

Plaintiff alleges that a number of events surrounding her suspension following the physical altercation on May 15, 2001, were retaliatory.  (Pl.'s Retaliation Supplement ¶¶ 17-22.) The court addresses these allegations and Defendants' responses.

It is undisputed that Plaintiff was involved in a physical altercation with Ms. Donastorg on May 15, 2001, and that an investigation was made into the altercation.  A number of witnesses made statements to VIPA personnel during the investigation and the subsequent administrative hearing.  (See, e.g., Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001 (reviewing the witness statements given at the June 25, 2001, administrative hearing).)

Plaintiff objected to the investigation techniques.  (See, e.g., Pl.'s Opp'n, Ex. T1, Cecil Thomas Dep. at 74 (stating that he and four other witnesses were interviewed in one room, within the hearing of one another).)  She alleges that Chief Moolenaar tried to coerce a witness who had corroborate her version of the events to say that Plaintiff had struck Ms. Donastorg first, and she alleges that Chief Moolenaar was selective in the witnesses he interviewed. (EEOC Statement at 8.)  Plaintiff presents no evidence to support these allegations.

Plaintiff has placed evidence in this court's record that one witness saw Ms. Donastorg strike Plaintiff and did not see Plaintiff strike Ms. Donastorg.  (Pl.'s Opp'n, Ex. T1, Cecil Thomas Dep. at 62.)  However, at least two other witnesses provided contrary testimony at the

**Page 48 of  91**

Governing Board hearing.  (Id. at 75-77 (testifying that his witness statement was different from that of the other witnesses); Smith Mem. to Finch, July 10, 2001 (noting that Ulyn Marsham and Andrea Wallace-Penn stated that Plaintiff struck Ms. Donastorg first).)  Plaintiff's unsupported allegation that Chief Moolenaar attempted to tampered with one witness does not explain the two additional witnesses who testified at the Governing Board hearing that Plaintiff struck Ms. Donastorg first.  Crediting these two witnesses would have sufficed for the Governing Board to uphold the suspension.  Plaintiff cannot be heard, therefore, and no reviewing fact finder could reasonably conclude, that the suspension decision was not supportable.

Mr. Mapp was acting Executive Director at the time of the altercation.  (Pl.'s Retaliation Supplement, Ex. J., Mapp Dep. at 50.)  He called an administrative hearing about the altercation to be held on May 17, 2001.  (Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 15, 2001 (advising Plaintiff of the May 17, 2001, hearing).)  Mr. Mapp sent notice of the hearing to Plaintiff via memorandum delivered by Chief Moolenaar to Plaintiff's home at 10:00 a.m. on May 16, 2001. (See Pl.'s Opp'n, Ex. U, Mapp Dep. at 69 ("I believe Moolenaar was given the letter to give to you, to hand deliver to you."); Pl.'s Opp'n, Ex. U, Smith Mem. to Mapp, May 16, 2001.)  On that same day, Plaintiff informed Mr. Mapp that she would only attend the May 17 hearing if her attorney was present, and she requested a continuance of the hearing date in order to prepare for the hearing and make arrangements with her attorney.  (Pl.'s Opp'n, Ex. U, Smith Mem. to Mapp, May 16, 2001.)  On May 16, Mr. Mapp responded that VIPA did not object to Plaintiff's attorney's presence at the hearing, but that an attorney could attend only as an observer.  (Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 16, 2001.)  He stated that an employee's attorney is not required to be present at internal administrative hearings.  (Id.)  He denied Plaintiff's request

for a continuance, and he informed her that she was directed to attend and that failure to attend would "yield serious consequences."  (Id.)

Initially, Plaintiff appeared at the May 17 hearing with Attorney Robert Leycock, who was representing Plaintiff's attorney, Arturo Watlington.  (EEOC Statement at 8.)  Soon thereafter, Plaintiff refused to participate in the hearing and left the proceeding.  (EEOC Statement at 8-9.)  Because of her refusal to participate, Mr. Mapp suspended her without pay for 30 days.  (Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 18, 2001.)  That suspension was "solely for the charge of insubordination," and Plaintiff was advised of her right to appeal the suspension to the PERB.  (Id.)  She cannot deny that she refused a direct order from her supervisor, the acting Executive Director.

Plaintiff appealed her suspension by Mr. Mapp to the Governing Board.  It upheld her suspension.  (EEOC Statement at 10.)  However, Plaintiff failed to appeal that suspension for insubordination to the PERB in a timely manner.  (See Pl.'s Opp'n, Ex. U1, Finch Letter to Russell, Oct. 31, 2001.)  Thus, the suspension became final under law.  (Id.)  Plaintiff served her 30-day suspension from May 17, 2001, through June 21, 2001.  (EEOC Statement at 10.)

Plaintiff objects to Mr. Mapp chairing the May 17, 2001, administrative hearing because she alleges he witnessed the May 15, altercation.  (See, e.g., Pl.'s Opp'n, Ex. U, Watlington Letter to Governing Board, May 21, 2001.)  She also claims she was not given sufficient time to prepare for that hearing.  (See, e.g., id.)  However, she had a hearing before the Governing Board, which heard her side of the story.

As to the May 15, 2001, altercation, Mr. Mapp testified at his deposition that he heard voices, ran down the stairs, and saw Cecil Thomas helping Plaintiff get up.  (Pl.'s Retaliation

Supplement, Ex. K, Mapp Dep. at 62.)  He testified that he then heard Plaintiff and Ms.

Donastorg "continue[] in loud aggressive tones," and that Plaintiff came back a few minutes later

and "tried to go after Barbara [Donastorg]" but that he "put [his] hands out to prevent [Plaintiff

and Ms. Donastorg] from making contact."  (Id. at 62-63.  See also id. at 64.)  He testified that he

thought two days was sufficient time to schedule an administrative hearing regarding the May 15,

2001, altercation between "two senior management people."  (Pl.'s Retaliation Supplement, Ex.

K, Mapp Dep. at 72.)  He also testified that he believed that it was appropriate for him to chair

the May 17 hearing because he was Acting Executive Director and had not witnessed either party

to the incident strike the other.  (Id. at 72-73.)  Attorney Mills and Christian Plaskett, VIPA's

Personnel Manager, were also present at the May 17, 2001, hearing.  (Id. at 74.)

     The administrative hearing regarding the physical altercation of May 15 was rescheduled

to June 25, 2001.  (Pl.'s Opp'n, Ex. U, Mapp Mem. to Smith, May 18, 2001.)  Mr. Finch

presided, and Plaintiff attended.  (See Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001.)

     On June 29, 2001, Mr. Finch notified Plaintiff that, based on the evidence presented at the

June 25 hearing, he found that she had initiated the May 15 altercation by striking Ms.

Donastorg. (Pl.'s Opp'n, Ex. U1, Finch Mem. to Smith, June 29, 2001.)  As a result, Mr. Finch

suspended Plaintiff for thirty days without pay.  (Id.)  He informed her that, because of her illness

and other circumstances, he would hold her suspension in abeyance for six months so that

Plaintiff could attend anger management counseling, at VIPA's expense; if she successfully

completed that counseling, her suspension would be vacated.  (Id.)  Plaintiff notified Mr. Finch

that she considered that punishment to be unfair and extreme; that she believed Ms. Donastorg

should also have been  punished per VIPA's Rules and Regulations, and that she intended to

appeal the administrative decision to the Governing Board.  (Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001.)  She also noted her objections to the statements provided by witnesses to the incident and to the investigation of the incident.  (Id.)  On July 11, 2001, Plaintiff's attorney, Ronald Russell, notified Mr. Finch that Plaintiff "rejects the option of counseling and/or attending anger management classes.  Therefore, your decision to suspend her is the only option available."  (Pl.'s Opp'n, Ex. U1, Russell Letter to Finch, July 11, 2001.)   He also requested that Mr. Finch stay Plaintiff's suspension until she had exhausted all of her administrative remedies. (Id.)  Mr. Finch responded that he found no basis for staying the suspension, and that, because Plaintiff rejected the option of attending anger management counseling, the suspension would be effective from July 23, 2001, through August 22, 2001.  (Pl.'s Opp'n, Ex. U1, Finch Letter to Russell, July 12, 2001.)   The Governing Board voted to uphold the original 30-day suspension for insubordination, and it voted not to stay imposition of the suspension for the altercation.  (See Pl.'s Opp'n, Ex. U1, Finch Mem. to Smith, July 19, 2001.)  By memorandum dated July 19, 2001, Plaintiff was offered until July 23, 2001, to consent to the option of attending anger management sessions in lieu of the suspension.  (Id.)  She did not consent to the anger management counseling, and she served a second 30-day suspension from July 23, 2001, through August 22, 2001.  (EEOC Statement at 10.)

Plaintiff alleges that Mr. Mapp and Chief Moolenaar were retaliating against her when they arranged for Chief Moolenaar to deliver the May 16 letter of suspension to her home.  (Pl.'s Retaliation Supplement ¶ 17.)  She also alleges that Defendants were harassing her, invading her privacy, and attempting to intimidate her into resigning when a VIPA police officer knocked on the door of her home at 9:00 a.m. on July 20, left Mr. Finch's July 19 memorandum at the door,

and drove away in a VIPA police vehicle.  (Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 22, 2001; EEOC Statement at 11.)  Plaintiff contends that VIPA should have used a messenger to deliver any urgent correspondence, and that VIPA employees should not know where she lives.  (Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 22, 2001.)

Mr. Mapp stated that he gave Chief Moolenaar the memorandum regarding the May 17, 2001, hearing to deliver to Plaintiff because she was at her home and Chief Moolenaar told Mr. Mapp that he either knew where she lived or that she lived somewhere close to him and on his way.  (Pl.'s Retaliation Supplement, Ex. K, Mapp Dep. at 69-70.)  Mr. Mapp stated that "[i]t was a subjective call" to ask Chief Moolenaar to deliver the memorandum rather than send it with a messenger.  (Id. at 70.)  Mr. Finch stated that he asked Chief Moolenaar to deliver the July 19, 2001, memorandum because he wanted to ensure Plaintiff received it.  (Defs.' Retaliation Resp., Ex. 11, Finch Dep. at 70.)  He stated that he did not have any particular reason to send Chief Moolenaar rather than a VIPA messenger, but that he trusted the safety and security officer to deliver the memorandum.  (Id. at 70-71.)  He pointed out that Chief Moolenaar is not a police officer; he is a safety and security officer.  (Id. at 71.)  There is no evidence that the letter delivery involved personal contact with Plaintiff as the letter was left outside her residence door.  Indeed, Plaintiff alleges that VIPA Officer Ray Chesterfield, not Chief Moolenaar, delivered the letter to her door.  (EEOC Statement at 11.)

Plaintiff objects to Ms. Donastorg tape recording the June 25 hearing about the May 15 incident because Ms. Donastorg was a participant in the incident.  (See, e.g., Pl.'s Retaliation Supplement, Ex. M, Finch Dep. at 47-48.)  Mr. Finch stated that he saw nothing wrong with Ms. Donastorg tape recording the hearing in her capacity as his secretary, and he stated that VIPA

never uses a professional stenographer to record administrative hearings regarding disciplinary action.  (Id. at 48-49.)

Plaintiff claimed that Mr. Finch should not have chaired the June 25 hearing because he supervised both participants in the altercation and worked more closely with Ms. Donastorg for many years.  (Pl.'s Opp'n, Ex. V, Smith Mem. to Finch, July 10, 2001).  Plaintiff also claimed that several persons who participated in the hearings regarding the May 15 incident were biased against her, including Chief Moolenaar, David Mapp, and Attorney Mills.  (EEOC Statement at 8-9.)  However, Plaintiff's contentions are unavailing because she exercised her right to review by the Governing Board, which concluded that her second suspension was appropriately imposed.  Her untimely PERB appeal regarding alleged procedural defects causes her claims here of procedural defects to fail, as they are concluded against her.  She has failed to show that the Governing Board was motivated by sex-based animus inasmuch as she must concede that the undisputed record shows there were witnesses who testified that she struck Ms. Donastorg.

Plaintiff alleges that male employees who had committed similar or more egregious offenses were given lesser punishments.  (Pl.'s Retaliation Supplement ¶ 22.)  She also argues that Ms. Donastorg should have been punished along with her.  (Pl.'s Opp'n, Ex. V, Smith Mem. to Finch, July 10, 2001).  She provides deposition testimony from Cecil Thomas, a VIPA engineer, who stated that, on one occasion, two VIPA maintenance employees were both suspended by Mr. Finch  for fighting with one another.  (Pl.'s Retaliation Supplement, Ex. N1, Thomas Dep. at 85.)  He also stated that, on another occasion, a mechanic and a firefighter were both suspended by Mr. Finch  for fighting with one another.  (Id. at 86.)  Plaintiff cannot thereby make out a claim of disparate treatment or retaliation because those fights are not comparators.

The maintenance and engineering personnel involved were not senior management level employees engaging in fisticuffs close to the Executive Director's public office.  Most importantly, the workers who were found to have been fighting were suspended.  Furthermore, VIPA's personnel rules state the following with regard to flighting: "Any employee guilty of misconduct, to include flighting and use of abusive language, on the Authority's premises may be subject to disciplinary action up to and including discharge by the Executive Director."  (Pl.'s Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.15(E).)  Plaintiff was found guilty of striking Ms. Donastorg and using profanity.  (Pl.'s Opp'n, Ex. V, Finch Mem. to Smith, June 29, 2001.)  Although Plaintiff claims she only struck Ms. Donastorg in self-defense, (Pl.'s Opp'n, Ex. U1, Smith Mem. to Finch, July 10, 2001, at 2), she admits that she used profanity, (id. at 1 ("I am being unduly punished for an isolated incident in which I used profanity, something that is totally uncharacteristic of me.").

There is no evidence that Ms. Donastorg was found guilty of misconduct.  The personnel rules also state that "[t]he Executive Director shall make the final decision to take disciplinary action against any employee."  (Pl.'s Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.15(D).)

Plaintiff also presents testimony from Mr. Finch that two VIPA employees were subject to an internal investigation and a referral to the attorney general regarding suspected drug activity.  (Pl.'s Opp'n, Ex. U3, Finch Dep. at 74-77.)  Mr. Finch testified that he believed those employees were suspended without pay pending the outcome of the criminal investigation.  (Id.) He testified that their situation was different from Plaintiff's because of the criminal investigation.  (Id.)  The court agrees.

Defendants respond that Plaintiff has no evidence that any of the Governing Board members who participated in her appeals acted with animus toward her, or that her appeals would have been successful without their participation.  (See, e.g., Defs.' Retaliation Resp. at 9-12.)  Mr. Lee and Mr. Peguero were both off the Governing Board by this time.  (See Pl.'s Opp'n, Ex. R., Resp. to Interrog. No. 4 (stating that Mr. Lee and Mr. Peguero both left the board on April 27, 2001.).)  Defendants further respond that Plaintiff waived any challenge to the hearings and related proceedings when she failed to timely file and appeal to the PERB.  (Defs.' Retaliation Resp. at 10.)

The court finds that Plaintiff has not made a prima facie case of retaliation based on the events following the May 15, 2001, incident, collectively or individually.  Although Plaintiff was subject to adverse employment actions during that period – namely, her two suspensions – Plaintiff has offered no evidence that these actions or the other related events were causally connected to her protected activities.  Plaintiff complained of sexual harassment by Mr. Lee nearly a year before the May 15, 2001, incident, and she made no other complaints in the intervening period.  Thus, the timing of the events is insufficient to suggest causation, and Plaintiff presents no other circumstantial evidence to give rise to an inference of causation.  See Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).  For instance, she presents no evidence that her prior sexual harassment allegation was even discussed by Defendants during the investigation or hearings about the May 15, 2001, incident.

Even if Plaintiff had established a prima facie case of retaliation as to the events following to the May 15, 2001, incident, Defendants have proffered legitimate, nondiscriminatory reasons for each of alleged retaliatory actions.  Most significantly, Defendants

have produced evidence demonstrating that Plaintiff had violated VIPA policies by her role in the May 15, 2001, incident and that she failed to participate in the Acting Executive Director's hearing about the incident.  Plaintiff has not satisfied her burden to prove that these legitimate reasons are pretextual.

2.   *Plaintiff Fails to Establish that The Governing Board Retaliated Against Her by Undermining her Professional Responsibilities and Authority.*

Plaintiff alleges that, after she had complained of sexual harassment to Mr. Finch and Attorney Mills, various Defendants failed to inform her of meetings, events, and crisis situations and attempted to undermine her professional authority.  (2d Am. Compl. ¶ 16.)  Although Plaintiff alleges there were "blatant attempts to undermine [her] authority as public information officer, sabotage [her] work, and to discredit, provoke, embarrass, and intimidate [her]," (id.), she gives very few examples of such behavior.  In one example, Plaintiff alleges that Mr. Mapp did not inform her of a July 8, 2002, fire that affected airport operations in St. Croix.  (Pl.'s Opp'n ¶ 96.)  In a second example, she alleges that Attorney Mills insisted on holding a meeting in his office where he smoked cigarettes, despite knowing that she could not tolerate smoke. (Pl.'s Opp'n ¶ 97.)  In a third example, Plaintiff points out that Mr. Mapp that admitted he chaired a meeting on May 15, 2001, the subject of which was a public relations function, and that he did not invite Plaintiff the meeting.  (Pl.'s Retaliation Supplement, Ex. J., Mapp Dep. at 51-53.)  She claims that these actions made her unable to do her job adequately.  The court presumes, for purposes of the Motion to for Summary Judgment, that Plaintiff's allegations related to the May 15, 2001, physical altercation are also incorporated in this claim.  (See supra, Section III(B)(1).)

The court has already reviewed Defendants' responses regarding the events following the

May 15, 2001, incident.  In response to Plaintiff's claim about not being invited to a May 15, 2001, meeting, Defendants state that the meeting was held among VIPA managers and directors, and that Plaintiff was not a manager.  (Defs.' Retaliation Resp. at 9.)  Furthermore, Mr. Mapp stated that, although a VIPA memorandum stated that the May 15, 2001, meeting was had been held "with all Directors and Managers," that was misleading because not all the directors attended and some non-managers attended.  (Pl.'s Retaliation Supplement, Ex. J, Mapp Dep. at 49-52.  See also id. (stating that the meeting attendees "[were] more like people from different departments").)  Defendants also respond that Mr. Finch was away on that date, left Mr. Mapp in charge, and left instructions that another VIPA employee should handle the public relations event, but that what occurred was not personal or an attack on Plaintiff's professionalism.  (Id. at 50-51, 60.)

Regarding the meeting scheduled to be held in Attorney Mills' allegedly smoke-filled office, Defendants have provided a non-retaliatory reason why Attorney Mills wanted to hold the meeting in that location.  In a June 18, 2002, e-mail to Plaintiff, Attorney Mills wrote,

> First, as you are aware, all of the legal files are on the 3rd floor, along with the offices of both attorneys.  There may be occasion to refer to specific files or documents in my office or Attorney Carr's during the meeting so that having the meeting in my office is far more reasonable than both attorneys coming downstairs and having to periodically run back up to procure documents and/or files.

(Pl.'s Opp'n, Ex. 1, Mills E-mail to Smith, June 18, 2002.)  He also wrote that there was "absolutely no smoke or 'smoke fumes'" in his office.  (Id.)  Upon further protest from Plaintiff about meeting in his office, he later offered to hold the meeting in Attorney Carr's office, and wrote, "I truly hope that we can get beyond this point so that we can work effectively together." (Pl.'s Opp'n, Ex. 1, Mills E-mail to Smith, June 20, 2002.)

Taking all facts in the light most favorable to Plaintiff, the court cannot conclude the Governing Board's general actions were not adverse employment actions.  However, Plaintiff once again fails to make a prima facie case of retaliation because she has offered no evidence that the Defendants' actions were causally connected to her protected activities.  Plaintiff presents no circumstantial evidence to give rise to an inference of causation, and the timing of Plaintiff's only previous complaint of sexual harassment, in June 1999, is insufficient to suggest causation.  Therefore Plaintiff's claim fails as a matter of law.

Even if Plaintiff had established a prima facie case of retaliation by the Governing Board, Defendants have proffered legitimate, nondiscriminatory reasons for the alleged retaliatory actions.  They provide evidence that Plaintiff was not invited to the May 15, 2001, meeting because of a business decision made by Mr. Finch.  To rebut Defendants' response, Plaintiff presents evidence that the May 15, 2001, meeting was about a public relations event and that it was unusual for her not to be invited.  (Pl.'s Retaliation Supplement, Ex. J, Mapp Dep. at 49-54.)

To establish pretext, the plaintiff must show by a preponderance of the evidence that the employer's articulated reasons are false and that retaliation was the "real reason for the adverse employment action."  Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300-01 (3d Cir. 2007) (quotation omitted).  The court has addressed Plaintiff's evidence of pretext regarding the physical altercation with Ms. Donastorg and the resulting personnel actions, and the court will not review that evidence here.  Plaintiff has also presented some evidence of weakness in Defendants' non-retaliatory reason for failing to invite Plaintiff to the May 15, 2001, meeting.  But, looking at the sum total of Plaintiff's prima facie case and her additional evidence of pretext, the court finds that she has not shown "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Marra, 497 F.3d at 306 (quotation omitted).  She has not shown by a preponderance of the evidence that discriminatory animus motivated any members of the Governing Board to take adverse employment actions against her.  See Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Thus, Plaintiff's claim fails as a matter of law.

3. *Plaintiff Fails to Establish that Defendants Interfered with her Donated Leave and FMLA Leave Requests as Pretext for Retaliation.*

Plaintiff alleges that Defendants retaliated against her from August 2001 through June 2002 by denying or interfering with her attempts to obtain leave from VIPA's Donated Leave Program.  (Pl.'s Retaliation Supplement ¶¶ 24-27.)  She also alleges that Defendants retaliated against her on Nov. 30, 2001, by interfering with her attempts to secure leave pursuant to the Family Medical Leave Act.  (Id. ¶ 28.)

In an unaddressed note dated January 22, 2001, Plaintiff's on-island doctor, Dr. Ira A. Buchalter, M.D., stated that Plaintiff had sinusitis and hoarseness and could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot. for Partial Summ. J. (Doc.  No. 151) (hereinafter "Pl.'s Cross-Mot."), Ex. J., Buchalter Note, Jan. 22, 2001.)  On January 26, 2001, Mr. Finch, the Executive Director of VIPA at the time, acknowledged receipt of this note.  (Defs.' Supplement ¶ 4(e), Ex. 1.)

On February 21, 2001, Dr. Buchalter sent a letter to Mr. Finch stating that Plaintiff was being treated by him for "sinusitis and hoarseness (muscle tension dysphonia)," that he recommended she see a specialist off-island, and that Plaintiff could not return to work until her hoarseness resolved.  (Pl.'s Cross-Mot., Ex. J., Buchalter Letter to Finch, Feb. 21, 2001.)

On March 24, 2001, Plaintiff wrote to Mr. Finch to inform him that she would be undergoing evaluation at the Wake Forest University Voice Clinic in North Carolina for her voice condition and to request authorization to participate in VIPA's Donated Leave Program. (Pl.'s Opp'n, Ex. P, Smith Mem. to Finch, Mar. 24, 2001.)  Mr. Finch marked Plaintiff's request "Approved" and signed off on the request.  (Id.)  From about March 25 to 28, 2001, Plaintiff was treated at the Center for Voice Disorders of Wake Forest University in North Carolina for "bilateral vocal fold paresis and laryngopharyngeal reflux."[18]  (Pl.'s Cross-Mot., Ex. J., two unaddressed Letters from Dr. James A. Koufman, Mar. 28, 2001.)

On April 23, 2001, Plaintiff returned to work.  (Pl.'s Cross-Mot. ¶ 23.)

On or about July 16, 2001, Plaintiff alleges that she suffered a second relapse of spasmodic dysphonia and a first relapse of another pre-existing condition, connective tissue disorder.  (Pl.'s Cross-Mot. ¶ 27.)  She alleges that, on or about July 19, 2001, she went on sick leave and submitted a medical certification from Dr. Buchalter, stating that she had "muscle tension dysphonia (loss of voice)" and would be unable to return to work until she was "fully recovered."  (Id. ¶ 27-28, Ex. J, Dr. Buchalter Certification, July 19, 2001.)

Plaintiff was out of work on her second 30-day suspension from July 23, 2001, through August 22, 2001.  (EEOC Statement at 10.)  On August 21, 2001, Plaintiff's attorney, Ronald E. Russell, wrote to Mr. Finch and notified him that Plaintiff would not be able to return to work the following day as scheduled because of her continuing speech illness.  (Pl.'s Retaliation

---

[18]  There also is an unaddressed letter dated April 26, 2001 from Dr. Paul G. Sutej, at Wake Forest School of Medicine, confirming that Plaintiff was his patient and needed to see him in several months for follow-up.  (Pl.'s Cross-Mot., Ex. J., Letter from Sutej, Apr. 26, 2001.) There is no indication in the record whether this letter was given to VIPA.

Supplement, Ex. C2, Russell Letter to Finch, Aug. 21, 2001.)  In that letter, Plaintiff stated that

she had available donated sick leave and requested to use the donated leave at that time.  (Id.)

Mr. Russell wrote to Mr. Finch again on August 27, 2001, noting that Plaintiff had received from

VIPA employees 600 hours of donated leave pursuant to her March 24, 2001, request.  (Pl.'s

Retaliation Supplement, Ex. C2, Russell Letter to Finch, Aug. 27, 2001.)  Mr. Russell stated that

Plaintiff had returned to work on April 23, 2001, and therefore had "a large number of hours

remaining for Ms. Smith to reapply for donated sick leave."  (Id.)  He asked for donated sick

leave, retroactive to August 22, 2001.  (Id.)  He informed Mr. Finch that Plaintiff had to go off

island again for treatment, he noted that "[a]ttached is the required note from her doctor

submitted before her suspension and previous request for sick leave."  (Id.)

On August 29, 2001, Mr. Finch responded to Attorney Russell by letter.  (Pl.'s Retaliation

Supplement, Ex. C2, Finch Letter to Russell, Aug. 29, 2001.)  Mr. Finch stated that Plaintiff's

request must be denied for two reasons: 1) the medical verification dated July 19, 2001, did not

provide for the anticipated duration of the disability nor indicate that the disability resulted from

a serious health condition, as required by the Rules and Regulations, and 2) the donor leave

forms provided were inapplicable to that period of illness, which began August 22, 2001.  (Id.

(emphasis added).)  Mr. Finch also quoted the following sections of VIPA's Rules and

Regulations:

- VIPA Personnel Rules and Regulations § 2.26A(A)(2):
  "Any employee of the Virgin Islands Port Authority shall
  be eligible to receive donated sick or annual leave if the
  employee . . . is suffering from a serious health condition or
  injury which is expected to require a prolonged absence
  from work by the employee. . . ."

- VIPA Personnel Rules and Regulations § 2.26A(C)(1):

"The employee or supervisor requesting the employee's acceptance as a leave recipient shall submit to the Executive Director <u>medical verification from a physician concerning the nature and anticipated duration of the disability resulting from serious health condition or injury</u>."

- VIPA Personnel Rules and Regulations § 2.26A(D)(1): "A leave recipient shall receive not more than 180 sick days or annual days, or any combination thereof, <u>no part of which may be applied retroactively</u>."

- VIPA Personnel Rules and Regulations § 2.26A(E)(1): "<u>Any unused donated leave shall be returned to the leave donors on a prorated basis upon the leave recipient's return to work</u>. . . ."

(<u>Id</u>..  <u>See also</u> Pl.'s Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.26A.)

On September 5, 2001, Plaintiff responded in writing to Mr. Finch, stating that her doctor was on vacation and would not be able to provide any information until September 30, 2001. (Pl.'s Retaliation Supplement, Ex. C2, Smith Letter to Finch, Sept. 5, 2001.)  She wrote that her doctor could not provide a duration of her illness because he did not know.  (<u>Id</u>.)  She also wrote that she had "numerous medical documentation from several doctors, but they contain personal medical information that is, frankly, not for public examination," and that she would provide another letter from a specialist after she had been examined.  (<u>Id</u>.)  She wrote that Mr. Finch "seem[ed] to question the seriousness of [her] disability," so she attached some general information about muscle tensions disorders – specifically, an internet article from the Voice Center at Eastern Virginia Medical School, entitled "Laryngeal Muscle Tension Disorders: Voice Manifestations."  (<u>Id</u>.)  Finally, she requested that Mr. Finch reconsider his decision.  (<u>Id</u>.)

On September 7, 2001, Attorney Russell again wrote to Mr. Finch.  He wrote, "I think you would agree that Shirley Smith's illness, loss of the inability [sic] to speak, is serious.  The

length of time she has been unable to speak requires a prolonged absence from work.  Therefore, Shirley Smith complies with § 2.26A(A)(2)."  (Pl.'s Retaliation Supplement, Ex. C2, Russell Letter to Finch, Sept. 7, 2001.)  He did not attach any new medical verification, but he resubmitted a July 19, 2001, certification from Dr. Ira H. Buchalter, which stated that Plaintiff was under his care for muscle tension dipphonia and was "not able to return [to] work until fully recovered."  (Id.; Pl.'s Retaliation Supplement, Ex. C2, Dr. Buchalter Certification, July 19, 2001.)  Attorney Russell attached new four donated leave forms, dated September 5, 2001.  (Pl.'s Retaliation Supplement, Ex. C2, four Donated Leave Forms, Sept. 5, 2001.)  Mr. Russell wrote that Mr. Finch's denial of Plaintiff's request "can be viewed as continued harassment and promotion of a hostile work environment."  (Russell Letter to Finch, Sept. 7, 2001.)  He again requested reconsideration of the denial of Plaintiff's donated leave request.  (Id.)

On September 27, 2001, Anival Vasquez, Jr., a Disability Representative at the Social Security Administration, wrote to Finch, verifying that Plaintiff had been found to be disabled under the Social Security regulations and that she was still disabled.  (Pl.'s Cross-Mot., Ex. J, Vasquez Letter to Finch, Sept. 27, 2001.)

On October 8, 2001, Dr. Buchalter wrote to Mr. Finch and stated, for the first time, that she was suffering from a serious health condition with an unknown duration.  (Pl.'s Retaliation Supplement, Ex. C2, Buchalter Letter to Finch, Oct. 8, 2001.)  Dr. Buchalter stated that he again referred Plaintiff to off-island specialists, that there had been no improvement in her voice since he examined her on July 19, 2001, and that "[t]he duration of her illness is unknown, and she will not be able to perform any work that requires communicative ability until her voice returns." (Id.)

On October 25, 2001, Attorney Russell wrote to Pamela Richards, Chairperson of the Governing Board, and alleged that VIPA's denial of Plaintiff's donated leave request was a violation of the Americans with Disabilities Act. (Pl.'s Retaliation Supplement, Ex. C2, Russell Letter to Richards, Oct. 25, 2001.) Attorney Russell advocated that "Gordon Finch's insistence that Ms. Smith provide a letter from a doctor indicating how long she will be ill is completely unreasonable," and he alleged that Mr. Finch's position on the donated leave issue was retaliation against Plaintiff for her complaints of hostile work environment and harassment. (Id.) Attorney Russell again wrote to Ms. Richards on October 26, 2001, indicating that Plaintiff had 355 hours of donated leave available. (Pl.'s Retaliation Supplement, Ex. C2, Buchalter Letter to Richards, Oct. 26, 2001.)

On October 31, 2001, Attorney Mills, VIPA's Legal Counsel, responded to Attorney Russell by letter. (Pl.'s Retaliation Supplement, Ex. C2, Mills Letter to Russell, Oct. 31, 2001.) He reiterated that the Personnel Rules and Regulations required a doctor's verification of the anticipated duration of the disability, and he noted several ways in which Plaintiff's request for donated leave did not meet the requirements of the Rules and Regulations, including the rule that no leave may be applied retroactively. (Id.)

Attorney Russell responded on November 6, 2001, stating, inter alia, that "[t]his entire matter reeks of dirty politics, which has taken precedence over morality, decency and the laws of the Territory and the United States." (Pl.'s Retaliation Supplement, Ex. C2, Mills Letter to Russell, Oct. 31, 2001.) He again alleged discrimination and harassment. (Id.) Finally, he requested unpaid leave for twelve work weeks pursuant to the Family and Medical Leave Act of 1993 ("FMLA"). (Id.)

On November 28, 2001, the Governing Board voted to authorize Plaintiff a twelve-week leave of absence – from November 2, 2001, through January 25, 2002 – pursuant to Section 2.38 of the VIPA Personnel Rules and Regulations.  (See Pl.'s Retaliation Supplement, Ex. C2, Mills Letter to Russell, Nov. 30, 2001.  See also VIPA Personnel Rules and Regulations § 2.38, Leave of Absence.)  Attorney Mills informed Plaintiff, via her attorney, that her FMLA request could not be granted because there was no medical proof that the extensive leave time requested was necessitated by a serious medical condition, but that the Leave of Absence provision of VIPA's Rules and Regulations allowed for broader application.  (Pl.'s Retaliation Supplement, Ex. C2, Mills Letter to Russell, Nov. 30, 2001.)

On January 2, 2002, Plaintiff submitted a second request for FMLA leave.  (Pl.'s Cross-Mot. ¶ 33, Ex. J, Smith Letter to Finch, Jan. 2, 2002; Defs.' Supplement ¶ 4(o), Ex. 13.)  She notified Mr. Finch that she had an appointment with specialists at Johns Hopkins Hospital in Baltimore, Maryland on January 25, 2002, and included documentation confirming this.  (Id.)

On January 9, 2002, Mr. Mills notified Plaintiff that her leave of absence would be extended to cover her travel to Baltimore and her return.  (Pl.'s Cross-Mot., Ex. J, Mills Letter to Smith, Jan. 9, 2002,)  The leave of absence was extended until Friday, January 25, 2002.  (Pl.'s Cross-Mot., Ex. J, Mills Letter to Smith, Jan. 16, 2002.)  On January 14, 2002, Plaintiff wrote to Mr. Mills, reiterating her requests for paid donated sick leave under the Donated Leave Program and twelve weeks of unpaid leave under the FMLA.  (Pl.'s Cross-Mot., Ex. J, Smith Letter to Mills, Jan. 14, 2002; Defs.' Supplement ¶ 4(q), Ex. 15.)  On January 16, 2002, Mr. Mills informed Plaintiff that Mr. Finch had granted her request for FMLA leave.  (Pl.'s Cross-Mot. ¶ 33, Ex. J, Mills Letter to Smith, Jan. 16, 2002.)  The FMLA leave commenced on Monday,

January 28, 2002.  (Id.)  Mr. Mills advised Plaintiff that her FMLA leave was for a period up to twelve weeks, and that she would "need to keep the Executive Director apprised of the status of [her] situation as it relates to required or necessary time off for evaluation and/or treatment." (Id.)

On February 25, 2002, Plaintiff provided Mr. Finch with an update on her medical evaluation and treatment for spasmodic dysphonia and undifferentiated connective tissue disorder.  (Pl.'s Cross-Mot., Ex. J, Smith Letter to Finch, Feb. 25, 2002.)  She attached a letter, dated January 30, 2002, from Dr. Paul W. Flint, M.D., an otolaryngologist at Johns Hopkins. (Id.; Pl.'s Cross-Mot., Ex. J, Letter from Flint, Jan. 30, 2002.)  Dr. Flint stated that Plaintiff had spasmodic dysphonia, which he characterized as a "longstanding voice disorder . . . manifested by a strained voice quality, which fluctuates in severity and at times, may in fact be normal." (Pl.'s Cross-Mot., Ex. J, Letter from Flint, Jan. 30, 2002.)  He described the recommended treatment as botulinum toxin ("botox") injections to the laryngeal muscles, which required follow-up at three to six month intervals.  (Id.)

Mr. Finch stated that he considered the letter from Dr. Flint, dated January 30, 2002, to be the first evidence that Plaintiff's medical condition was severe enough to impair her ability to work.  (Pl.'s Retaliation Supplement, Ex. O, Finch Dep. at 117-18.)  He stated that he did not interpret local physician Dr. Buchalter's statement that Plaintiff's problem was beyond his expertise to mean that her condition was serious enough for her to receive donated leave.  (Id. at 118.)

On March 26, 2002, Plaintiff informed Finch that her treatment at Johns Hopkins was not successful, her voice had not returned, and that she had another appointment with Dr. Flint on

April 3, 2002.  (Pl.'s Cross-Mot., Ex. J, Smith Letter to Finch, Mar. 26, 2002.)  On April 18,

2002, Dr. Flint informed Mr. Finch that Plaintiff's treatment was ongoing and that "she is

disabled with respect to her voice indefinitely."  (Pl.'s Cross-Mot., Ex. J, Flint Letter to Finch,

Apr. 18, 2002.)  On April 29, 2002, Plaintiff requested that Mr. Finch grant her additional leave

from work and claimed that she was unclear as to when her FMLA leave expired because VIPA

had not provided her with a date.  (Pl.'s Cross-Mot., Ex. J, Smith Letter to Finch, Apr. 29, 2002.)

On May 6, 2002, Mr. Finch notified Plaintiff that her FMLA leave had already expired on

April 19, 2002, and required her to report to work no later than June 3, 2002.  (Pl.'s Cross-Mot.,

Ex. J, Finch Letter to Smith, May 6, 2002.)  On May 21, 2002, Plaintiff informed Finch that her

treatment was not effective and that further treatment at Johns Hopkins was required, but that she

would return to work if accommodations were made for her voice disability.  (Pl.'s Cross-Mot.,

Ex. J, Smith Letter to Finch, May 21, 2002.)  She attached a letter from Dr. Don R. Martin, M.D.,

a rheumatologist at Johns Hopkins, which stated that Plaintiff had been evaluated for

undifferentiated connective tissue disease and that she was "medically fit to return to work,

though schedule flexibility will be required based upon the activity of her underlying disease."

(Id.; Pl.'s Cross-Mot., Ex. J, Letter from Martin, May 9, 2002.)

Defendants respond that VIPA had been audited for suspected violations of the donated

leave program.  (Pl.'s Retaliation Supplement, Ex. O, Finch Dep. at 141; Pl.'s Opp'n, Ex. Y,

Audit Report, Donated Leave Program, Nov. 20, 2002.)  Mr. Finch testified in his deposition that

the audit found an employee who had received donated leave in 1995 had not met the

requirements of the program because she had not submitted medical verifications from

physicians about the nature and anticipated duration of her disability resulting from a serious

health condition or injury, (Pl.'s Retaliation Supplement, Ex. O, Finch Dep. at 142-43), and that

said employee owed 901 hours of sick leave that she had received on January 9, 1996, in

violation of the donated leave program, (id. at143).  Mr. Finch also stated there were other audit

findings of donated leave violations.  (Id. at 141-45.)  He testified to Plaintiff that, because of the

audit, "when your time came around we had fine tuned the approval process, whereby, that

request for any kind of leave, donated, sick leave, or family leave had to go to personnel, and it

had to go to legal for interpretation.  Once it was written out by those two departments, it was

either approved or disapproved." (Id. at 146.)

Plaintiff claims that she took unpaid leave from August 29, 2001 to May 31, 2002.  (Pl.'s

Cross-Mot. ¶ 7.)  She claims she became eligible for FMLA leave on August 29, 2001, when her

unpaid leave allegedly commenced.  (Pl.'s Cross-Mot. ¶ 9.)  Defendants dispute that Plaintiff

became eligible for FMLA on this date and contend that she did not work 1,250 hours in the

preceding twelve months, as required by the FMLA.  (See Defs.' Mem. in Supp. of Defs.' Mot.

to Dismiss or, in the Alternative, Mot. for Summ. J. On Pl.'s FMLA Claim (Doc. No. 172).)

On June 3, 2002, Plaintiff returned to work.  (See 2d Am. Compl. ¶ 26.)

The court cannot conclude that Defendants' denial of Plaintiff's requests for Donated and

FMLA leave do not qualify as adverse employment actions.  However, Plaintiff fails to make a

prima facie case of retaliation based on these denials because she has offered no evidence that

these actions or the other related events were causally connected to her protected activities under

Title VII.  Timing of the events is insufficient to suggest causation.  Other than the fact that she

complained to VIPA officials about harassment by two Governing Board members, both of

whose memberships ceased as of April 27, 2001, Plaintiff presents no circumstantial evidence to

support her allegations of retaliation and give rise to an inference of causation.  Therefore, Plaintiff's claim fails as a matter of law.

Even if Plaintiff had established a prima facie case of retaliation as to the initial denial of FMLA and donated leave, Defendants have proffered legitimate, nondiscriminatory reasons for each of alleged retaliatory actions.  First, Defendants have produced clear evidence that Plaintiff failed to comply with the rules of the Donated Leave Program by failing to provide a physician's verification of the nature and anticipated duration of the disability; requesting retroactive application of donated leave; and attempting to use donated leave from a prior period of absence when the rules deemed that leave redistributed to the donors upon Plaintiff's return to work.  Second, Defendants have disputed the merits of Plaintiff's FMLA request.  Here, the court does not evaluate the merits of the FMLA request but finds only that Plaintiff has not satisfied her burden to prove that these non-discriminatory reasons are pretextual.

4. *Plaintiff Fails to Make a Prima Facie Case That Defendants Retaliated Against Her by Refusing Certain Disability Accommodations.*

Plaintiff alleges that, between June and August 2002, Defendants retaliated against her by refusing to provide cost-effective, reasonable accommodations for her speech disability in an effort to frustrate her into resigning.  (Pl.'s Retaliation Supplement ¶ 29.)  Specifically, she alleges that Mr. Finch refused her request to have a sign language instructor conduct free, voluntary sign language classes at for VIPA managers with whom Plaintiff interacted regularly; that Mr. Finch refused to get e-mail so Plaintiff could communicate with him directly; and that Mr. Finch refused to approve the installation of instant messaging on the computers of key VIPA managers.  (Id.)  Plaintiff alleges that Mr. Finch failed to reduce her workload, as he allegedly had promised.  (Id.)  She also alleges that Mr. Finch agreed to install internet service on her

company laptop and provide her with a flexible work schedule that allowed her to work from home on days when her vocal disorder flared up, but that Mr. Finch insisted she bring a note from her doctors each time she worked from home, which she alleges was impossible because her doctors are in Baltimore.  (Id.)  She admits that Mr. Finch allowed her to purchase about four text phones, but she alleges that the accommodation was ineffective because not all the managers had text phones.  (Id.)  She asserts that Mr. Finch did not want to accommodate her but wanted to give the appearance that he was trying to accommodate her.  (Id.)

Defendants respond that Plaintiff "expected both the reasonable and the unreasonable" when making requests for accommodation.  (Defs.' Retaliation Resp. at 14.)  They contend that Mr. Finch demonstrated concern and compassion for Plaintiff when he approved her request to use up her compensatory leave when the leave benefit was eliminated.  (Id.)  Defendants point out that, once Plaintiff's compensatory leave was exhausted, Mr. Finch approved Plaintiff's use of annual and sick leave and approved without hesitation her initial request for donated leave.  (Id.)  Finally, Defendants point out that Mr. Finch met with Plaintiff, at her request, to discuss what accommodations VIPA could afford her.  (Id.)  They provide a copy of a Letter of Agreement, signed by both Plaintiff and Mr. Finch, wherein both persons agree to a list of disability accommodations.  (Defs.' Retaliation Resp., Ex. 12, Letter of Agreement, July 22, 2002.)  These accommodations include restructuring of the public information officer position; promoting of Plaintiff's administrative officer; reducing the workload in Plaintiff's office whenever possible; giving Plaintiff a flexible work schedule while keeping working from home at a minimum; and providing Plaintiff with a variety of technological and electronic aids.  (Id. (emphasis added).)

In response to Plaintiff's allegation regarding instant messaging, Defendants provide a July 2002 memorandum from VIPA's Information Systems Coordinator, Curtis Garner, in which he opines that instant messaging is not a secure method of communicating, makes the network vulnerable to attack by hackers, and uses up valuable computer resources.  (Defs.' Retaliation Resp., Ex. 13, Garner Mem. to Finch, July 24, 2002.)  Mr. Garner also opines in his memorandum, whose subject line was "Instant Messaging Request by Public Information Officer," that he did not feel he could install software on all VIPA managers' computers just because Plaintiff asked him to do so.  (Id.)

Additionally, Defendants state that Mr. Finch accommodated Plaintiff's request to travel to the mainland United States for medical treatment in August 2002, despite a long history of absences from her job and performance of her duties, (Defs.' Retaliation Resp., Ex. 14, Finch Dep. at 107-08), and that Plaintiff was never terminated or demoted during her long periods of absence, (Defs.' Retaliation Resp. at 15).

The court notes that Section 2.24 of VIPA's Personnel Rules and Regulations, which attached as an exhibit to one of Plaintiff's briefs, requires employees to "submit proof of sickness for any absence from duty for which sick leave is requested, regardless of the length of such absence."  (Pl.'s Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.24(B).)  In addition, VIPA Rules require that "[p]roof of sickness [or] absence of two or more consecutive days . . . shall include a certificate from a practicing physician indicating that the employee has been under his or her case and specifying the dates upon which the employee was incapacitated for work." (Id. § 2.24(D)).

The court has dismissed Plaintiff's ADA claims.  Smith v. Virgin Islands Port Auth., Civ.

No. 2002-227, 2005 WL 15459, *9-11 (D.V.I. Jan. 2, 2005) (Moore, J.).  However, for purposes

of Plaintiff's Title VII retaliation claim, and taking facts in the light most favorable to Plaintiff,

the court cannot conclude that Defendants' alleged failure to provide reasonable disability

accommodations was not an adverse employment action.  Still, Plaintiff's claim fails, as a matter

of law, because Plaintiff has failed to present any evidence of a causal connection between her

protected acts and Defendants' alleged failure to provide reasonable disability accommodations.

Her claim rests solely on unsupported allegations.  Thus, Plaintiff has failed to establish a prima

facie case by a preponderance of the evidence.  Even if Plaintiff had made a prima facie case, she

presents no evidence that Defendants' proffered legitimate, non-retaliatory reasons for their

actions are pretextual.  Thus, no reasonable factfinder could rationally find Defendants' reasons

unworthy of credence.

> 5.    *Plaintiff Fails to Establish that Her 2002 Salary Grade Placement was an Adverse Employment Action.*

Plaintiff alleges that, between October and November 2002, in an act of retaliation,

Defendants arbitrarily placed her in a lower salary grade than other members of the executive

staff when the Governing Board implemented a new management pay play.  (Pl.'s Retaliation

Supplement ¶ 31.)  Defendants respond that the 2002 pay plan simply granted percentage

increases to the previous pay plan, and all percentage increases were the same.  (Defs.'

Retaliation Resp. 15; Defs.' Retaliation Resp., Ex. 16, Finch Dep. at 110-112.)  They also

respond that Plaintiff was not a manager, hence her salary was lower than that of managers, and

her position's pay grade had been an "MS5" since 1990 – long before Plaintiff joined VIPA.

(Defs.' Retaliation Resp. at 16.)

Taken individually, this claim fails as a matter of law because Plaintiff fails to establish

that she was subject to an adverse employment action related to her salary grade.  On November

2002, Plaintiff's position remained in the same salary grade as it had been in for several years.

The court finds that no reasonable employee would have found this challenged action materially

adverse and no the action would not have dissuaded a reasonable worker from making or

supporting a charge of discrimination.  See Burlington Northern & Santa Fe Ry, 548 U.S. at 68.

Furthermore, Plaintiff failed to present any evidence of a causal connection between her

protected acts and Defendants' actions regarding her salary grade.

> 6.   *Plaintiff Fails to Make a Prima Facie Case that Mr. Brin Retaliated
> Against Her in his Role as Executive Director.*

Plaintiff alleges that, after Mr. Brin became Executive Director on January 1, 2003, he

used his authority over her to retaliate against her for rejecting his sexual advances.  (Pl.'s

Retaliation Supplement ¶¶ 33-37.)  She alleges that Mr. Brin made sexual advances toward her in

March and April 2001, and that after he became Executive Director he became "aloof, curt, and

uncooperative."   (Id. ¶¶ 33-34.)  She alleges that Mr. Brin took a number of retaliatory actions,

including restricting his communication with her to memos, (id. ¶ 34); not informing her of

meetings and media appearances (id.); insisting that she contact him only through his secretary,

Ms. Donastorg, (id.); disconnecting internet service on her company-issued laptop on January 8,

2003, (Pl.'s Opp'n ¶ 110; Pl.'s Retaliation Supplement, Ex. T, Brin Mem. to Smith ("This

service will be discontinued after January 31, 2003.")); and, on January 10, 2003, reassigning the

company vehicle that had been assigned to her (Pl.'s Opp'n ¶ 111; Pl.'s Retaliation Supplement,

Ex. T, Brin Mem. to Smith, Jan. 10, 2003).  She also alleges that Mr. Brin directed several of her

coworkers to take over the "Seatrade" project, which she had managed, and cut the project

budget before a critical deadline, only to increase the budget on January 24, 2002, after she

resigned.  (Id. ¶ 37; Pl.'s Opp'n, Ex. 5, Smith Mem. to Brin, Status of Pending Projects, Jan. 24,

2003, at 2-3.)

Defendants respond that Plaintiff submitted her letter of resignation just two weeks into

Mr. Brin's tenure as Executive Director.  (Defs.' Retaliation Resp. 16; Defs.' Retaliation Resp.,

Ex. 17, Smith Resignation Letter to Brin, Jan. 13, 2003.)  They state that Plaintiff never

complained to anyone at VIPA about Mr. Brin's conduct or behavior, either before or after her

resignation.  (Defs.' Retaliation Resp. at 16.)  Regarding use of a company vehicle, Defendants

state that vehicle privileges were transferred to a pool, and Plaintiff was not denied the use of a

vehicle to perform company-related work.  (Id. at 18.  See also Pl.'s Retaliation Supplement, Ex.

T, Brin Mem. to Smith, Jan. 10, 2003 ("Henceforth, V.I. Port Authority automobile No. PA-2

will be made available for use by your office as well as those offices within the Administration

Building to which no automobile has been assigned.").)  They also respond that restrictions on

vehicle usage and internet services were in keeping with other budgetary restrictions Mr. Brin

implemented shortly after becoming Executive Director.  (Defs.' Retaliation Resp. at 18; Defs.'

Retaliation Resp., Ex. 19, Brin Mem. to VIPA Directors, Managers, Supervisors, and Officers,

Feb. 5, 2003 (listing a variety of budgetary cutbacks, effective immediately, due to consistent

revenue shortfalls); Defs.' Retaliation Resp., Ex. 20, Brin Mem. to VIPA Directors, Managers,

and Supervisors, Jan. 21, 2003 (stating that the agency is in a "cash crisis" and requesting that all

directors, managers, and supervisors contain expenditures within their respective areas).)

Plaintiff, however, provides some evidence, however speculative, that, after Mr. Brin became

Executive Director, other managers were permitted to retain exclusive use of their assigned

company vehicles and were permitted to take those vehicles home after working hours.  (Pl.'s

Retaliation Supplement, Ex. U, Thomas Dep. at 26-29)

Regarding the Seatrade project, the record shows that Mr. Brin reassigned that project to other VIPA personnel only upon receipt of Plaintiff's letter of resignation.  (Pl.'s Opp'n, Ex. 5, Smith Mem. to Brin, Status of Pending Projects, Jan. 24, 2003, at 3.)

Even if Plaintiff's allegations about Mr. Brin constitute adverse employment actions, Plaintiff fails to establish that these actions were causally connected to her protected activities under Title VII.  Plaintiff did not complain of sexual harassment by Mr. Brin until January 24, 2003 – her very last day of work at VIPA.  Thus, he could not have been retaliating against her for any complaints about him.  Plaintiff has presented no evidence that Mr. Brin even knew of her sexual harassment complaints involving Mr. Lee, Mr. Peguero, or Chief Moolenaar.  Plaintiff fails to present <u>any</u> evidence of a causal connection between her protected activities and Mr. Brin's alleged adverse employment actions.  Thus, this claim fails as a matter of law.

> 7.    *Collectively, Plaintiff Fails to Make a Prima Facie Case that Defendants Retaliated Against Her.*

After reviewing the evidence of record as a whole, including, as background evidence, the time-barred alleged acts of retaliation, and viewing the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff's collective retaliation claim fails as a matter of law. Even if the retaliatory acts Plaintiff alleges constitute adverse actions, individually or as a group, Plaintiff must still establish that one or more of the alleged adverse actions taken by her employer, or all the actions collectively, were causally connected to the protected employment activities in which she engaged.  <u>Andreoli v. Gates</u>, 482 F.3d 641, 650 (3d Cir. 2007).  Plaintiff fails to proffer evidence sufficient so that a reasonable juror could conclude or infer that Defendants' alleged adverse actions were causally connected to Plaintiff's protected employment

activities.

Furthermore, even if Plaintiff did make a prima facie case of retaliation, Defendants have

proffered legitimate, nondiscriminatory reasons to justify all the adverse employment actions

Plaintiff alleges and Plaintiff has failed to rebut those legitimate, non-retaliatory reasons or to

present any additional evidence or arguments to imply pretext.  See Marra v. Philadelphia Hous.

Auth., 497 F.3d 286, 300 (3d Cir. 2007).  Plaintiff's retaliation claim fails because she has not

met her burden of production.


**IV.      Hostile Work Environment and Constructive Discharge**

         A.      Hostile Work Environment

Title VII provides that "It shall be an unlawful employment practice for an employer . . .

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.A. §

2000e-2(a)(1).  Title VII covers more than the terms and conditions of employment in the narrow

contractual sense.  Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (quoting Oncale v.

Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998)).  See also Harris v. Forklift Systems,

Inc., 510 U.S. 17, 21 (1993) (stating that Title VII bars more than employment decisions of an

economic or tangible nature).  "The phrase 'terms, conditions, or privileges of employment'

evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and

women in employment, which includes requiring people to work in a discriminatorily hostile or

abusive environment.  When the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris, 510 U.S. at 21 (internal quotations and citations omitted).

"Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." Weston v. Pennsylvania, 251 F.3d 420, 425-26 (3d Cir. 2001) (citing Meritor Savs. Bank FSB v. Vinson, 477 U.S. 57, 65 (1986). However, "Title VII . . . does not provide a remedy for every epithet or offensive remark." Wilkie v. Robbins, 127 S.Ct. 2588, 2616 (2007) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). "For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." Weston, 251 F.3d at 426.

To establish a prima facie of hostile work environment sexual harassment, a plaintiff must demonstrate five elements:

> (1)    she suffered intentional discrimination because of her sex;
>
> (2)    the discrimination was severe or pervasive;
>
> (3)    the discrimination detrimentally affected her;
>
> (4)    the discrimination would have detrimentally affected a reasonable person in like circumstances; and
>
> (5)    a basis for employer liability is present.

See Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). The Third Circuit determined that the same framework applies to hostile work

environment claims arising from the actions of a co-worker.  Weston, 251 F.3d at 426 (citations omitted).

The hostile work environment inquiry is both objective and subjective.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  Harris, 510 U.S. at 21-22.

To determine whether an environment is hostile or abusive, a court "must look at numerous factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance."  Weston, 251 F.3d at 426 (citations omitted).  "[C]ourts should not consider each incident of harassment in isolation.  Rather, a court must evaluate the sum total of abuse over time."  Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir.1999) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).  See also Marra, 497 F.3d at 303 (holding that it does not matter "whether each piece of evidence of antagonistic conduct is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively." ); Woodson v. Scott Paper, 109 F.3d 913, 921 (1997) (holding that the court "must determine whether the evidence is sufficient based on the whole picture.").

Plaintiff's sexual harassment claim alleging a hostile work environment is timely only as related to Mr. Brin's conduct.  Plaintiff successfully makes a prima facie case for her hostile

work environment claim.  The court addresses each of the five elements in turn.

           1.     Intentional discrimination because of sex.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex."  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) (internal quotations, citations, and alterations omitted).

Insofar as Plaintiff's claims that Mr. Brin made sexual advances toward her, the conduct was sex-based.  Durham Life Ins., 166 F.3d 139, 148 (3d Cir. 1999) ("We generally presume that sexual advances . . . are sex-based.").  Thus, Plaintiff satisfies the first element of the inquiry.

           2.     Whether the Harassment was Severe or Pervasive.

The court must consider the totality of the circumstances to decide whether a plaintiff has presented evidence that an alleged hostile working environment was severe or pervasive. Andrews, 895 F.2d at 1482.  See also id. at 1485 ("What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.") (quoting Vance v. Southern Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1993), overruled on other grounds by Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)).  In addition to overt sex discrimination, the court may consider non-sexual and facially neutral mistreatment that contributes to a hostile work environment.  Durham Life Ins., 166 F.3d at 148; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).

The record reveals that there is a genuine issue of material fact as to whether the alleged sexual harassment by Mr. Brin was sufficiently severe or pervasive as to constitute a Title VII violation.

Plaintiff alleges that she and Mr. Brin were friends and socialized outside of work when he allegedly telephoned her at home at inappropriately late hours made sexual advances toward her. She stated that his advances stopped after one night, sometime between April and June 2001, when he told her he was interested in an intimate relationship with her and she responded that she wanted only a friendship with him. She admits that he never made a physical or sexual advance toward her after that occasion but that he continued to initiate conversations of a sexual nature with her and other colleagues. Other than her testimony that Mr. Brin "frequently" discussed matters of a sexual nature with colleagues, (Defs.' Supplement, Ex. 22, Smith Dep. Vol. II at 111), she does not providing evidence of the pervasiveness of those discussions. She does not provide evidence that she was threatened or humiliated by Mr. Brin's sexual advances or his conversations of a sexual nature, not does she testify that this conduct made her work environment abusive or hostile. See Weston, 251 F.3d at 426. Thus, a reasonable factfinder could not conclude that these alleged acts of harassment through June 2001 were sufficiently severe or pervasive as to constitute a Title VII violation.

Additionally, however, Plaintiff presents evidence regarding Mr. Brin's actions as Executive Director in January 2003. She alleges that, as Executive Director, he retaliated against her in a number of ways, including restricting his communication with her to memos, not informing her of meetings and media appearances, insisting that she contact him only through his secretary, disconnecting internet service on her company-issued laptop, and reassigning the company vehicle that had been assigned to her. The court has found Plaintiff does not demonstrate Mr. Brin's actions in January 2003 were based on her protected activities under Title

VII.[19]  However, the court cannot conclude that Mr. Brin's actions in January 2003 were not

based on Plaintiff's rejection of his advances over 18 months earlier.[20]

The sexual advances Mr. Brin allegedly made toward Plaintiff occurred over a year and a

half before Mr. Brin became Executive Director, thus timing alone does not support causation.

However, Plaintiff has presented additional circumstantial evidence such that a reasonable person

might find her work environment in January 2003 was hostile or abusive because of her sex.

Specifically, she has presented evidence that Mr. Brin insisted that she contact him through Ms.

Donastorg, the person with whom she had had a physical altercation.  She has also presented

evidence that Mr. Brin disconnected her internet service, which evidence shows was an

accommodation for her disability.  (Defs.' Retaliation Resp., Ex. 12, Letter of Agreement, July

22, 2002 (stating that Plaintiff would be provided with a laptop with access to the internet,

VIPA's Web site, and her VIPA e-mail account).)  Given the apparent severity of her illness, as

evidenced by her extended leaves of absence from work, such action could be found to be hostile

or abusive.  Thus, although Plaintiff was employed at VIPA for 24 days of Mr. Brin's tenure as

Executive Director, Plaintiff still has presented a genuine issue of material fact as to whether Mr.

---

[19] When Mr. Brin assumed his position as Executive Director, Plaintiff had not yet
complained of sexual harassment by him.  As of that point, she had complained of harassment
and/or retaliation by Mr. Lee, Mr. Peguero, and Chief Moolenaar.

[20] The court notes that, if in January 2003 Mr. Brin mistreated Plaintiff because of her
earlier rejection of his advances, that was not retaliation as defined by Title VII.  Plaintiff did not
report engage in any protected activity related to Mr. Brin's earlier advances until the effective
date of her resignation, January 24, 2003, when she brought those advances to the attention of
VIPA officials.  She had submitted her letter of resignation on January 13, 2003.  Thus, the
actions that Mr. Brin took in January 2003, which Plaintiff alleges contributed to her constructive
discharge, may be considered as part of her continuing violation sexual harassment claim but
those actions are retaliatory under Title VII.

Brin's conduct as Executive Director was discriminatory and sufficiently severe or pervasive to alter the conditions of her employment.  See Harris, 510 U.S. at 21.

        3.       Whether the Harassment Detrimentally Affected Plaintiff.

Plaintiff has not demonstrated that first phase of alleged sexual harassment by Mr. Brin, his conduct through June 2001, detrimentally affected her.  She stated that she thought his late night telephone calls were inappropriate, (Defs.' Supplement, Ex. 22, Smith Dep. Vol. II at 92), but not that they harmed her in any way or affected the circumstances of her employment. Furthermore, when Plaintiff told Mr. Brin she was not interested in an intimate relationship with him, his late night telephone calls and his sexual advances ended.

However, taking all facts in the light most beneficial to Plaintiff, she has presented evidence that Mr. Brin's alleged conduct in January 2003 detrimentally affected her.  In a January 24, 2003, memorandum to Mr. Brin, she alleged that he retaliated against her in his capacity as Executive Director as a result of her having rejected his earlier sexual advances, and her broad allegations consistently state that Mr. Brin promoted a hostile work environment when he became Executive Director.

        4.       Whether the Discrimination would have Detrimentally Affected a
                      Reasonable Person in Like Circumstances.

As with the third element of the hostile work environment inquiry, the court finds that a reasonable factfinder could determine that Mr. Brin's alleged actions in 2003 would detrimentally affected a reasonable person in Plaintiff's circumstances.

        5.       Whether A Basis for Employer Liability Is Present.

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority

over the employee." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).

Mr. Brin was not Plaintiff's supervisor during the period when he allegedly made sexual advances toward her, but he was her supervisor in January 2003, which Plaintiff alleges was a period of continued harassment because of sex. Thus, Plaintiff satisfies the fifth element of a prima facie case.

### B.    Constructive Discharge and Availability of an Affirmative Defense.

Generally, hostile work environment claims attributable to a supervisor fall into two categories:

(1)    harassment that culminates in a tangible employment action, for which employers are strictly liable; and

(2)    harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense.

<u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 143 (2004) (citing <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 808 (1998)).[21] The Supreme Court has summarized the <u>Ellerth</u>/<u>Faragher</u> affirmative defense as follows:

An employer may defend against [a hostile work environment] claim by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus.

<u>Suders</u>, 542 U.S. at 134. The burden to establish this defense by a preponderance of the evidence

---

[21] <u>See also</u> <u>Suders</u>, 542 U.S. at 143 n.6 ("<u>Ellerth</u> and <u>Faragher</u> expressed no view on the employer liability standard for co-worker harassment.").

falls on the employer.  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

Plaintiff claims she was constructively discharged in violation of Title VII.[22]  See Pennsylvania State Police v. Suders, 542 U.S. 129 (2004) (holding that Title VII encompasses employer liability for a constructive discharge).  "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."  Id. at 141.  In addition to meeting the hostile work environment standard, a plaintiff who claims constructive discharge "must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."  Id. at 134.  A court's constructive discharge inquiry is objective.  Id. at 141.  The court must determine whether "a reasonable person in the employee's position would have felt compelled to resign."  Id. (citation omitted).

In Pennsylvania State Police v. Suders, the Supreme Court established under what circumstances an employer may assert an affirmative defense to a claim of a hostile work environment created by a supervisor that culminates in a constructive discharge.  The Supreme Court held that the Ellerth/Faragher affirmative defense is not available where "the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."  Suders, 542 U.S.

_____

[22] Defendants assert that the court should not consider Plaintiff's constructive discharge claim because it was not part of her EEOC Charge and occurred after the filing of the charge.  The court rejects that assertion.  An EEOC investigation would include continuing and subsequent violations, including any wrongful discharge.  See Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) ("the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

at 134.  The court elaborated:

> [W]hen an official act does not underlie the constructive discharge, the Ellerth and Faragher analysis, we here hold, calls for extension of the affirmative defense to the employer.  As those leading decisions indicate, official directions and declarations are the acts most likely to be brought home to the employer, the measures over which the employer can exercise greatest control.  Absent an official act of the enterprise as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force.  And as Ellerth and Faragher further point out, an official act reflected in company records – a demotion or a reduction in compensation, for example – shows beyond question that the supervisor has used his managerial or controlling position to the employee's disadvantage.  Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation, as we earlier recounted, is less certain.  That uncertainty, our precedent establishes, justifies affording the employer the chance to establish, through the Ellerth/Faragher affirmative defense, that it should not be held vicariously liable.

Id. at 148-149 (internal quotations and citations omitted).

This court must now determine whether Plaintiff has established constructive discharge due to harassment by Mr. Brin.  The court concludes she has not.  Although Plaintiff has made a prima facie case of sexual harassment, the court finds that she has failed to make the additional showing that the allegedly abusive working environment became so intolerable that a reasonable person in her position would have felt compelled to resign.  In her letter of resignation, Plaintiff wrote,

> In addition to the hostile work environment, management does not comprehend the role of public relations, and my efforts to educate staff and management have been fruitless.  This situation continues to make my job unnecessarily difficult. . . . I believe that it is time for me to explore employment opportunities with a company that would appreciate the diversity of skills and experience I have to offer.

(Defs.' Mem., Ex. 3, Smith Resignation Letter to Brin, Jan. 13, 2003.)  This letter clearly shows that the alleged workplace hostility <u>alone</u> was not so unbearable as to cause her to resign, but that other factors contributed to her decision to resign, including her conclusion that she and VIPA had different visions of the role of Public Information Officer.  Furthermore, Plaintiff submitted her resignation on Monday, January 13, 2003, but continued working at VIPA through the following Thursday, January 24, 2003, at 5 p.m.  If the working environment at VIPA were so intolerable that a reasonable person in her position would have felt compelled to resign, that reasonable person would not have stayed on for nearly two additional work weeks.  Finally, Plaintiff states that, during this period when Mr. Brin was Executive Director, he was aloof and non-communicative, she he was not advancing any sexual activity toward her.

Because the court has found Plaintiff was not constructively discharged, Defendants may assert an affirmative defense to her sexual harassment claim.  They successfully do so.  (<u>See</u> Pl.'s Opp'n, Ex. F, VIPA Personnel Rules and Regulations § 2.33.)  Defendants clearly had a policy for reporting and resolving complaints of sexual harassment.  Plaintiff reported Mr. Brin to VIPA officials on the effective date of her resignation, eleven days after she submitted her letter of resignation.  Plaintiff does not challenge the accessibility or effectiveness of VIPA's sexual harassment policy or procedures.  Defendants have presented evidence that they complied with the sexual harassment policy by attempting to obtain information from Plaintiff so that they could commence an investigation.  (<u>See</u> Defs.' Mem., Ex. 13, Carr Letter to Smith, Jan. 31, 2003.) Plaintiff admits that she did not respond to the Governing Board's request.  Defendants made a second attempt to obtain information from Plaintiff about her allegations of harassment by Mr. Brin, and she responded that she "felt it was inappropriate for [VIPA's legal counsel] to call [her]

at home after [she had] resigned from the Port Authority and . . . while this case was in litigation to ask [her] to participate in an investigation."[23]  (Defs.' Supplement, Ex. 33, Smith Dep. Vol. II at 52-53.)  She stated that she thought the investigation was "a setup," (id. at 53), and that she did not believe that any VIPA committee would be impartial to investigate any of her grievances, (id. at 54-55).  She declined to participate in any investigation.  (Id. at 51-56.)

Defendants have demonstrated that Plaintiff unreasonably failed to avail herself of the employer-provided remedial apparatus, and Plaintiff's constructive discharge and sexual harassment claims fail as a matter of law.

C.      Plaintiff's Claims of General Hostility in the Workplace.

In addition to claiming sexual harassment by Mr. Lee, Mr. Peguero, Chief Moolenaar, and Mr. Brin, Plaintiff has also alleged retaliation and hostility by numerous VIPA employees throughout her employment at VIPA.  The court finds that Plaintiff has not demonstrated that the alleged hostility was due to her sex or her protected activities under Title VII, thus it is not actionable under Title VII.

Plaintiff argues, "there may have been motivating factors other than sex discrimination for some of the harassment and unreasonable working conditions I endured at VIPA.  However, I contend that the prevailing motivating factor for much of the adverse employment actions I suffered was discrimination based on my sex, which led to disability discrimination and retaliation."  (Pl.'s Opp'n ¶ 176.)  Although Plaintiff has alleged antagonism from her colleagues, see Woodson, 109 F.3d at 920-21 (holding that a plaintiff can establish a link between his or her

---

[23] Plaintiff commenced her litigation on December 19, 2002, before making any allegations of sexual harassment by Mr. Brin.

protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period), she has not satisfied her burden to show that her working conditions were unpleasant or difficult <u>because of her sex</u>.  She claims that the members of Governing Board never wanted her for the Public Information Officer job because "each of them had their own crony for the position" and because she did not fit into the culture of the agency, which included "political cronyism."  (Pl.'s Opp'n ¶ 174-75.)

Many of Plaintiff's allegations of hostility involve Ms. Donastorg.  Although Plaintiff alleges that Ms. Donastorg was part of the sexually hostile work environment, there is no support for such an allegation.  Plaintiff wrote the following in her police report regarding that May 15, 2001, incident: "I had an argument with Barbara Donastorg . . . about the constant harassment I have had to endure from her during my two-year tenure."  (Pl.'s Retaliation Supplement, Ex. S, Criminal Complaint Form, May 16, 2001.)  Plaintiff presents no evidence that the alleged hostility from Ms. Donastorg was due to her sex or her complaints about sexual harassment.  In addition, Plaintiff presents numerous examples that Ms. Donastorg was "hostile" to both male and female VIPA employees.  (<u>See, e.g.</u>, Pl.'s Retaliation Supplement, Ex. M, Finch Dep. at 25-32 (testifying that Ms. Donastorg was his Executive Secretary from 1995 until he retired in December 2002, and that she had conflicts with other employees); <u>id.</u> at 30 ("I have heard many complaints about Ms. Donastorg's attitude. . . ."); Pl.'s Retaliation Supplement, Ex. S, Arnold M. Golden Letter to Pamela Richards, Dec. 28, 2002 (referring to Ms. Donastorg as rude and insubordinate); Pl.'s Retaliation Supplement, Ex. S, Lydia Cabret Dep. at 22-23 (stating that Ms. Donastorg is hostile and difficult to work with and that two male VIPA employees had complained about her).)

Plaintiff alleges that hostility in the workplace intensified after her April 23, 2001, return to work.  (Pl.'s Opp'n ¶ 57.)   She states that rumors circulated that she was being demoted, and that the internal auditor refused to accept her orders for supplies.  (Id. ¶ 58.)  She presents no evidence that this conduct was because of her sex.  Additionally, when Plaintiff complained to Mr. Finch of her difficulties ordering supplies, he promptly addressed the problem.  (See Pl.'s Retaliation Supplement, Ex. S, Smith Mem. to Finch, May 7, 2001; Pl.'s Retaliation Supplement, Ex. S, Finch Mem. to Floyd Romeo, May 8, 2001.)  Plaintiff also alleges that the hostility from her coworkers intensified because they blamed her for the loss of the compensatory leave benefit, (Pl.'s Opp'n ¶ 48 ("[S]everal employees blamed me for the loss of this long-standing benefit, which intensified the hostility in the workplace.")), and that when she became ill her coworkers were insensitive and circulated rumors about her (id. ¶ 89).  There is no evidence that this alleged hostility was because of her sex.  Furthermore, the record shows that there were VIPA employees who complained about Plaintiff due to personality conflicts.  (See, e.g., Pl.'s Opp'n ¶ 100 ("On Oct. 7, 2002, I was summoned to a meeting in Mr. Finch's office by the union, because Ulyn Marsham, the receptionist, told Mr. Finch I was harassing her after I complained about her hostile attitude and failure to do her job.").)

The court has considered the record as a whole, as reviewed above, and the court determines that Plaintiff has not demonstrated that the hostility was because of antagonism due to her sex as contrasted to personality differences.

## V.      Constructive Discharge under 24 V.I.C. § 76

Count X of Plaintiff's Second Amended Complaint claims a violation of the Wrongful

Discharge Act ("WDA"), 24 V.I.C. § 76 (1986) (amended 1996).  The WDA establishes nine

grounds for which a private employer may discharge an employee.  24 V.I.C. § 76(a).  The court

has previously found that Plaintiff is an exempt employee under 3 V.I.C. § 451(a).  (Order, Aug.

28, 2006 (Doc. No. 304), at ¶ 2(a).)  Furthermore, the Third Circuit has held that the WDA, as

applied to supervisors, is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C.

§§ 151-69.  St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands, 257 F.3d 297, 302 (3d

Cir. 2004).  It is undisputed that Plaintiff worked as a supervisor at the time of the alleged

incidents that form the basis for her claim.  Because the NLRA preempts the WDA in its

application to supervisors, summary judgment is granted in favor of Defendants and against

Plaintiff as to Plaintiff's Count X claim of Wrongful Discharge.


## Conclusion

For the foregoing reasons, summary judgment is granted in favor of Defendants and

against Plaintiff on all Plaintiff's claims pursuant to Title VII of the Civil Rights Act and on

Plaintiff's claim pursuant to the Virgin Islands Wrongful Discharge Act.

An Order follows.