# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| SHIRLEY L. SMITH | : | CIVIL ACTION |
| | : | |
| | : | No. 02-227 |
| v. | : | |
| | : | |
| VIRGIN ISLANDS PORT AUTHORITY, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                    **March 31, 2010**

Defendants Virgin Islands Port Authority (VIPA), the Virgin Islands Port Authority Governing Board, former Executive Directors Gordon A. Finch and Darlan Brin, and Assistant Executive Director David Mapp move for summary judgment on all remaining claims of pro se Plaintiff Shirley L. Smith. Smith's pending claims are negligent misrepresentation, breach of contract, violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, violations of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (FMLA), and defamation.[1] Smith opposes summary judgment. Because there is no genuine dispute over any material issue of fact, the Court will grant summary judgment in favor of Defendants on all of Smith's remaining claims.

---

[1] Smith filed a complaint on December 19, 2002, asserting multiple counts against Defendants. Smith moved for leave to file her first amended complaint on February 21, 2003 (Docs. 18 and 19), and she was granted leave on January 2, 2005 (Docs. 131 and 132). Smith moved for leave to file her second amended complaint on August 5, 2003 (Doc. 77) and she was granted leave on May 18, 2005 (Doc. 156). Smith was granted leave to file her third amended complaint on August 29, 2008 (Doc. 384), which she filed on September 2, 2008 (Doc. 390).

During the course of this litigation, which has spanned nearly a decade, Smith has alleged a multitude of wide-ranging claims against Defendants. This dispute has called upon no less than five judges, who have rendered pretrial rulings disposing of some of Smith's claims at different times over the years. The Court's rulings on the instant motion resolve all of Smith's remaining claims in favor of Defendants.

1

**FACTUAL AND PROCEDURAL BACKGROUND**[2]

VIPA employed Smith as its Public Information Officer from April 12, 1999, through January 24, 2003. Smith filed her original complaint on December 19, 2002. On January 13, 2003, Smith notified VIPA she was resigning effective on January 24, 2003, because she could not resolve her "grievances" and VIPA's "management does not comprehend the role of public relations." Darlan Brin Dep., Ex. J, Aug. 6, 2009.

Smith alleges she suffered from "spasmodic dysphonia" and "undifferentiated connective

---

[2] In opposition to the instant motion for summary judgment, Smith did not submit a counter-statement of material facts as required by Local Rule of Civil Procedure 56.1(b). The Court concludes the facts identified by Defendants in their Statement of Facts is undisputed. *See* LRCi 56.1(d) (stating the "[f]ailure to respond to a movant's statement of material facts . . . as provided by these Rules may result in a finding that the asserted facts are not disputed for the purposes of summary judgment"); *White v. Cmty Care, Inc.*, No. 07-1507, 2008 WL 5216569, at *1 (W.D. Pa. Dec. 11, 2008) (holding a party's stated facts were deemed admitted where the opposing party violated local court rules by not specifically denying or otherwise controverting those facts in a concise statement). The Court hereby adopts Defendants' Statement of Facts (Doc. 497), with all references therein to relevant portions of the record.

Smith also failed to comply with the requirement of Local Rule 56.1(b) to reference in her opposition papers the "precise portions of the record relied upon as evidence of each material fact." Instead, Smith attached to her brief a copy of her complaint, stating "I offer it as a sworn affidavit." Pl.'s Br. at 1. She also attached to her brief voluminous documents, making little or no reference in her brief to specific portions of the documents she relies on to support her assertions. Moreover, Smith filed a Motion for Leave to Supplement (Doc. 513, Ex. U-3) on September 25, 2009, and a Second Motion for Leave to Supplement (Doc. 515, Ex. Z-8) on October 1, 2009, attaching additional documentation in opposition to summary judgment. By separate Orders of November 13, 2009, this Court granted Smith's motions to supplement only to the extent the Court would take Smith's supplementary Exhibits U-3 and Z-8 under consideration. At the conclusion of oral argument on the instant motion on November 6, 2009, the Court granted Smith's request to submit for the Court's consideration additional documentation. On November 9, 2009, Smith delivered to the clerk's office additional deposition testimony of Monifa Marrero, taken on July 29, 2009, marked as Ex. E-3.

The documents Smith submitted, but did not specifically reference in her brief, are not part of the record for summary judgment because Smith failed to follow this Court's procedural rules. *See* Order of Sept. 21, 2009, at 1-2.

tissue disorder" which caused her to lose her voice for prolonged periods when she was employed at VIPA.[3] Smith was absent from work during the following periods of time: (1) for roughly four months and three weeks from November 29, 2000, through April 23, 2001, during which time she used accrued compensatory time, sick leave, annual leave, and donated leave; (2) for just over a month from May 17, 2001, through June 21, 2001, during which time Smith was suspended; and (3) for roughly ten months and two weeks from mid-July 2001, to June 3, 2002, during which time she served a thirty-day suspension, and for the remainder of the period, took sick leave, unpaid leave of absence, and FMLA leave.

Smith complains VIPA's former Executive Director Finch negligently misrepresented the job during one of her two interviews for the position of Public Information Officer. Smith claims

---

[3] *See* Pl.'s Br. at 5. The Court makes no finding of whether Smith suffered from the alleged conditions. Smith attached to her brief numerous documents purporting to be communications from the many doctors from whom she claims she sought treatment. The health problems described in these documents include voice loss, hoarseness, muscle tension dysphonia, reflux, spasmodic dysphonia, and undifferentiated connective tissue disease. Those documents are unauthenticated and are hearsay. *See* Fed. R. Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). VIPA personnel, however, testified they received two documents purportedly from Ira H. Buchalter, M.D.: a July 19, 2001 note, stating Smith could not return to work until "fully recovered," *see* Defs.' SOF ¶ 67, Smith Dep., Ex. 23, Aug. 17, 2009 and an October 8, 2001 letter, stating "[t]he duration of her illness is unknown, and she will not be able to perform any work that requires communicative ability until her voice returns," *see* Defs.' SOF ¶ 76, Smith Dep., Ex. 27, Aug. 17, 2009. The July 19, 2001 note and October 8, 2001 letter are admissible to prove notice to VIPA and VIPA's reasonable beliefs. *See Brokenbaugh v. Exel Logistics N. Am., Inc.*, 174 Fed. Appx. 39, 42-43 (3d Cir. 2006) (holding documents from an employee's personnel file, chronicling his history of workplace misconduct, were admissible to show the employer's state of mind). The documents are not admissible to prove the truth about Smith's alleged medical condition for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e) (instructing that affidavits supporting and opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence"); *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (holding hearsay statements can be considered on a motion for summary judgment only if they are capable of admission at trial).

Finch told her she would have a capable assistant, which she believes she never had. Smith also claims Finch told her she could expect a promotion, but her expectations were not met. Smith further claims Finch told her the job description was antiquated, but the description would be updated and her position would be upgraded in accordance with the actual duties of the job. Smith was again disappointed.

By letter dated March 26, 1999, Finch told Smith VIPA had selected her to serve as its Public Information Officer. VIPA offered Smith employment at a starting salary of $46,673.12 and a start date of April 12, 1999, with a $2,000.00 contribution to Smith's relocation expenses. The offer letter identified no other terms of Smith's employment. Smith was not asked to sign, and did not sign, the offer letter. Smith began her first day on the job on April 12, 1999, and was paid her starting salary as set forth in VIPA's offer letter.

As early as April 12, 1999, and no later than May 2000, Smith knew her assistant was not capable of meeting Smith's requirements. Smith contends she learned on her first day of work, April 12, 1999, that her assistant was not capable. Smith complained she was overworked because she had no capable assistance. Smith and Finch discussed Smith's concerns about her assistant's productivity. By letter dated July 15, 1999, Smith wrote to Finch, complaining about her assistant's lack of productivity. When her assistant retired in December 1999, Smith learned there would be no successor assistant because Finch had eliminated the position. At Smith's request, VIPA agreed to provide her with an administrative assistant, who began working for Smith in April or May 2000. Smith's new assistant did not have any prior experience in public relations or journalism, and she was a union employee who could not be expected to work after hours without compensation. Smith believed she often needed assistance after hours, but she could not authorize overtime compensation.

Smith complained she had to train and give specific instructions to her new assistant, which Smith found time consuming. Although Smith had recommended and selected the individual VIPA hired as her administrative assistant, Smith had hoped for a better assistant.

As early as June or July 1999, and no later than November 2000, Smith knew the lack of an assistant capable of meeting her requirements had affected her well-being and health. *See* Pl.'s Br. at 4 (stating, "I endured enormous stress from having to do the job of two people for a year. . . . [T]his eventually affected my emotional and physical health. . . . Hence, I 'cashed-in' on the compensatory time I had accrued in November 2000 and took some much-needed time off to rest and recuperate.").

During Smith's interview for the job, Finch indicated to Smith the job description was antiquated and needed to be updated, but he did not tell her when the job description would be updated. Finch also told Smith she could expect salary increases, but he made no representations about specific salary increases she could expect. Finch made no representations to her about any salary increase accompanying an upgrade in her position. Smith hoped for an upgrade in her position, testifying: "I assumed that once it would be upgraded that it would go — I would get adequate compensation for it." Smith Dep. 146:19-20, May 14, 2003.

Smith asked for an upgrade in her position in mid-October 1999, and made another request for an upgrade in October 2000, but her requests were denied. Thus, Smith knew no later than October 2000 that her position would not be upgraded and she would not be promoted in the time frame she had expected.

There is no evidence VIPA ever promised any increases in salary to accompany any contemplated upgrade in Smith's position. Smith's position was upgraded in November 2002, when

VIPA adopted a new management pay plan, which replaced the management pay plan then in place. The new plan increased Smith's salary by 7.01% to $55,078.40 and reclassified Smith's position from MS-04 to MS-05. Smith believes she deserved a higher pay classification. There is no evidence Smith suffered any pecuniary loss due to the lack of a capable assistant or lack of an upgrade in her position. Although Smith contends she was required to "work an inordinate amount of overtime to meet the demands of the job," she later "cashed in" on accrued compensatory time in November 2000. Pl.'s Br. at 4. VIPA paid Smith the starting salary stated in the offer letter and annual salary raises until she resigned.

There is no evidence VIPA entered into any employment contract, express or implied, written or verbal, with Smith. The undisputed facts show Smith was VIPA's at-will employee at all relevant times.

VIPA gave Smith a handbook entitled, "Virgin Islands Port Authority Personnel Rules and Regulations," at the beginning of her employment, as VIPA typically did with its new employees. Smith did not sign the handbook, nor was she asked to sign it. The handbook does not bear a signature by any VIPA representative. From time to time, VIPA modified the personnel rules, regulations, requirements, and other provisions set forth in the handbook as circumstances warranted. There is no evidence Smith, or any other employee, negotiated with VIPA about anything set forth or later modified in the handbook. There is no evidence either VIPA or Smith intended the handbook to address all aspects of Smith's employment. The handbook did not set forth Smith's job description or salary. There is no evidence VIPA intended to be bound by contract to the terms set forth in the handbook.

The Governing Board of VIPA voted to eliminate compensatory leave benefits for all

employees in November 2000. Smith was informed of the Board's decision. Despite the Board's elimination of the benefit, Smith asked on November 23, 2000, to use her then-accrued compensatory leave, starting on November 29, 2000, in accordance with VIPA's former policies on compensatory leave. Finch approved Smith's request. Furthermore, Finch allowed Smith to use her then-accrued compensatory leave from November 29, 2000 through January 23, 2001, even though VIPA's former policy required compensatory time to be taken in the calendar year in which it was earned.

Smith remained on leave from January to April 23, 2001. Smith reported to VIPA she had lost her voice in late December 2000, which condition she reported persisted until late March 2001. On March 24, 2001, after she had exhausted all of her compensatory, annual, and sick leave, Smith applied to participate in VIPA's donated leave program through mid-April 2001. Finch approved her request. Smith used donated leave from late March 2001 until she returned to work on April 23, 2001.

On May 15, 2001, three weeks after Smith had returned to work, she had a workplace altercation with another VIPA employee. Although Smith usually reported directly to Finch, on May 15, 2001, she reported to David Mapp, who served as Acting Executive Director in Finch's absence from the territory. Mapp scheduled an administrative hearing regarding the incident for May 17, 2001. Smith appeared at the hearing, refused to participate, and left despite Mapp's order to remain at the hearing. Mapp suspended Smith for insubordination for thirty days without pay, effective May 17, 2001, through June 21, 2001.

Smith appealed her suspension to the Governing Board of VIPA. On or about June 6, 2001, one of the Board's standing committees, the Personnel Committee, conducted a hearing on Smith's

appeal and made recommendations to the Board. The Board upheld the suspension imposed by Mapp. Smith was advised of her right to appeal her suspension to the Public Employees Relations Board (PERB).[4] Smith, however, did not appeal her suspension for insubordination in a timely manner. Smith served her suspension from May 17 through June 21, 2001.

VIPA conducted another administrative hearing regarding Smith's altercation on June 25, 2001. At the hearing, Finch informed Smith she would be suspended for another thirty days unless she completed anger-management courses, for which VIPA would pay. Finch told Smith if she successfully completed six months of the counseling, her suspension would be vacated. After the hearing, Smith rejected counseling and appealed both of her suspensions to the Board. On July 19, 2001, Finch gave Smith another opportunity to avoid suspension by attending anger-management sessions. On July 22, 2001, Smith again rejected Finch's offer. Smith was suspended for the second time, effective July 23 through August 21, 2001.

The Board ultimately affirmed both of Smith's suspensions, approving Finch's decision to offer Smith anger-management counseling in lieu of her second suspension. Smith did not timely appeal the Board's decisions to the PERB.[5]

Smith made charges of sexual harassment against VIPA personnel on a number of occasions. In his letter dated December 22, 2000, addressed to Finch, Smith's counsel asserted Smith had encountered several episodes of sexual harassment involving two Board members. VIPA's counsel

---

[4] VIPA employees may appeal a dismissal, demotion, or suspension to the PERB. *See* V.I. Code Ann. tit. 5 § 3/503(a). The PERB's decisions are subject to review by the Superior Court of the Virgin Islands. *See* V.I. Code Ann. tit. 3 § 3/530a.

[5] Smith filed an appeal to PERB, but acknowledges the appeal "was dismissed on a technicality because it was untimely filed by my former counsel." Pl. Br. at 10.

responded by letter dated January 18, 2001, stating the Board asked Smith to submit a written account of her allegations for a full investigation in accordance with VIPA's sexual harassment policy. Smith never provided the requested written account.

Smith also accused another employee of being a partial witness at her June 25, 2001 hearing because he had sexually harassed her in the past. *See* Letter from Smith to Finch (July 10, 2001). Finch responded in a July 16, 2001 letter, directing Smith to report to his office to provide information about her claims so VIPA could commence an investigation and determine whether a disciplinary hearing should be conducted. Smith did not appear before Finch and did not provide any written information concerning her claims.

After her second suspension period ended on August 21, 2001, Smith did not return to work as scheduled. By her counsel's letter dated August 21, 2001, Smith contended she could not do so because of "her continued and prolonged speech illness," and she requested donated leave for the indefinite future.[6] Smith Dep., Ex. 22, Aug. 17, 2009. During August through October 2001, Smith's counsel continued to demand Smith receive donated leave for the indefinite future, retroactive to August 22, 2001, stating "[o]ur position on this matter is not negotiable." Smith Dep., Ex. 29, Aug. 17, 2009; *see* Defs.' SOF ¶¶ 65-67. During this period, Smith did not request any other type of leave and she did not report to work.

In support of her request for donated leave in August-October 2001, Smith intended to use time other employees had donated during her prior leave of absence from late March to April 23, 2001, even though VIPA's rules did not allow her to use previously donated time. In further support

---

[6] Donated leave time is given by other employees to a coworker who undergoes a prolonged absence from work due to a serious health condition. By this point, Smith alleges she had exhausted all of her accrued sick, annual, and compensatory leave. *See* Compl. at 16 ¶ 85.

of her request for donated leave, Smith submitted a July 19, 2001 note from her physician, stating Smith had "muscle tension dysphonia (loss of voice)" and she would be unable to return to work until she was "fully recovered."[7]  Smith Dep., Exs. 23 & 26, Aug. 17, 2009.

On August 29, 2001, Finch denied Smith's request for donated leave, stating, "[t]he medical verification dated July 19, 2001 does not provide for the anticipated duration of disability, nor did it indicate that the disability resulted from a serious health condition" and the "donor leave forms provided are inapplicable to this period of illness which began on August 22, 2001."  Smith Dep., Ex. 24, Aug. 17, 2009.  Smith was not eligible for donated leave under VIPA's governing rules and regulations.  *See* Smith Dep., Ex. 11, Aug. 17, 2009 (VIPA Rules and Regulations, Section 2.26A (A), (C), (E)).  Smith did not return to work.

On October 8, 2001, Smith's physician wrote to Finch, stating "[t]he duration of her illness is unknown, and she will not be able to perform any work that requires communicative ability until her voice returns."  Smith Dep., Ex. 27, Aug. 17, 2009.  On October 31, 2001, VIPA's counsel responded to Smith's counsel, explaining VIPA's decision to deny Smith donated leave and stating:

> Mr. Finch and the Port's Personnel Manager have advised that Ms. Smith's job description entails activities of a non-voice communicative nature that Ms. Smith can and should be performing regularly.  Employers are daily expected to make accommodations for employees in analogous situations and the Port Authority is

---

[7] Smith alleges she "became seriously ill again on July 16, 2001," from "a serious flare up of my connective tissue disease."  Pl.'s Br. at 8, 19.  Smith also claims Defendants were "put on notice in July 2001 that I had a relapse of this condition."  Pl.'s Br. at 21.  There is no evidence in the summary judgment record to support her claims.  The July 19, 2001 note from Ira H. Buchalter, M.D. describes only "muscle tension dysphonia (loss of voice)," and appears to have been received by VIPA on or after August 27, 2001.  There is no evidence VIPA was put on notice Smith might be suffering from a serious health problem at any time during the period from April 23, 2001, until January 2, 2002, when Smith notified VIPA she intended to travel for medical treatment with "a team of specialists at Johns Hopkins in Baltimore, Maryland on January 25, 2002."  *See* Defs.'s SOF ¶¶ 87-91.

prepared to do so in this instance.

Smith Dep., Ex. 30, Aug. 17, 2009. Thus, VIPA denied Smith's request for donated leave in part because VIPA reasonably believed, based on the available information, Smith could perform many of her job duties, despite her inability to use her voice. Smith did not return to work.

Smith claims she became eligible for FMLA leave as of August 29, 2001, however, she did not request unpaid FMLA leave at that time. Instead, she continued to demand and negotiate through her counsel exclusively for paid donated leave in September and October 2001. *See* Defs.' SOF ¶¶ 71-78. In November 2001, Smith decided not to further challenge VIPA's denial of her request for donated leave. On November 6, 2001, Smith made her first request for unpaid FMLA leave through her counsel's November 6, 2001 letter to VIPA's counsel, seeking unpaid FMLA leave for a period of 12 workweeks, retroactive to November 2, 2001. Smith Dep., Ex. 31, Aug. 17, 2009.

In a November 30, 2001 letter, VIPA's counsel informed Smith the Board had granted her an unpaid leave of absence for 12 weeks, commencing November 2, 2001, and ending January 25, 2002. VIPA granted this leave under VIPA's personnel rules and regulations concerning leaves of absence without pay.[8] VIPA's leave of absence policy did not require proof of a serious medical condition. *Id.* VIPA's counsel further informed Smith her request for FMLA leave could not be granted because "there was no indication that [her] absence for the period of time requested was necessitated by a serious medical condition." Smith Dep., Ex. 32, Aug. 17, 2009. Smith did not

---

[8] VIPA's Rules and Regulations allow leaves of absence without pay, with the right of reinstatement without loss of seniority, for employees who are "absent from work for an extended period because of personal educational advancement, emergencies and other extenuating circumstances." § 2.38(A). Such leaves of absence may exceed three months only when the Board grants an extension for good cause. § 2.38(C). When leave exceeds three months, medical and life insurance benefits end. *Id.*

return to work in November or December 2001.

On January 2, 2002, Smith made a second request for FMLA leave, negotiating for an extended leave of absence under the FMLA in order to seek treatment. On January 9, 2002, VIPA's counsel wrote to Smith, advising her Finch intended to recommend an extension of her leave of absence without pay "for a period sufficient to cover [Smith's] travel and [medical] appointments." Smith Dep., Ex. 35, Aug. 17, 2009. On January 14, 2002, Smith wrote to VIPA's counsel, again requesting paid donated leave and unpaid leave under the FMLA. VIPA granted Smith an additional 12 weeks of leave without pay under the FMLA, commencing January 28, 2002 (the Monday following the expiration of her unpaid leave of absence), through April 19, 2002. *See* Defs.' SOF ¶¶ 87-91. Smith did not report to work until June 3, 2002.

After Smith's FMLA leave expired on April 19, 2002, she wrote to VIPA, seeking clarification on when her leave expired and seeking additional leave as a reasonable accommodation based on her reported voice disability. By letter dated May 6, 2002, Finch advised Smith her FMLA leave had expired and directed her to report to work no later than June 3, 2002. In his letter, Finch also asked Smith "to schedule an appointment so that we can mutually discuss the accommodations that Port Authority can make regarding your voice disability." Smith Dep., Ex. 42, Aug. 17, 2009.

Smith returned to work as VIPA's Public Information Officer on June 3, 2002. From Smith's first day back at work until she resigned on January 24, 2003, VIPA made numerous accommodations for Smith. *See* Defs.' SOF ¶¶ 98-113, 119-120, 122. Within a few months after her return to work, Smith regained the use of her voice. *See* Pl.'s Br. at 23.

On December 27, 2002, Finch retired, and on January 1, 2003, Darlan Brin became VIPA's Executor Director. In January 2003, Brin instituted a number of cost-cutting measures intended to

address VIPA's reported financial shortfalls, some of which affected Smith. Smith no longer had a VIPA vehicle for her exclusive use and Internet usage on her company issued laptop was to be disconnected on January 31, 2003. In January 2003, however, Brin believed Smith was fully functional working on VIPA's premises.

Smith asserts many people at VIPA accused her of "faking" and "lying about [her] illness," causing others to believe she was "a person of poor character and low morals." Pl.'s Br. at 22. Nonetheless, Smith asked VIPA employees Lydia Cabret and Karen Fleming to act as references for prospective employers and also listed Finch as her supervisor on job applications. There is no evidence, however, any Defendant or person at VIPA published any statement about Smith capable of a defamatory meaning. *See* Defs.' SOF ¶¶ 143-154. There is no evidence Smith was damaged by anything said about her at VIPA or rumors circulated about her at VIPA or in the community.

**DISCUSSION**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate where the "nonmoving party has failed to make a sufficient showing on an essential element of her case, with respect to which she had the burden of proof." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 234 (3d Cir. 2001) (recognizing, "the mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way").

Smith first complains VIPA negligently misrepresented her job during one of her two

interviews for the position of Public Information Officer.[9] Smith has no actionable claims or triable disputes of fact based on VIPA's alleged negligent misrepresentations.

Under Virgin Islands law, negligent misrepresentation is a tort claim subject to a two-year statute of limitations. *See* V.I. Code Ann. tit. 5 § 31(5)(A) (providing a two-year limitations period for an action for "any injury to the person or rights of another not arising on contract and not herein especially enumerated"); *see also Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir. 1989) (holding an asbestos personal injury claim subject to Section 31(5)(A), where the injury or its cause is not immediately evident to the victim, accrues when "(1) a plaintiff knows that he has an asbestos-related injury and its cause by virtue of the physical manifestation of the effects of the disease; or (2) the plaintiff has reason to know of his asbestos injury and its cause through the exercise of reasonable diligence") (citation and internal quotation marks omitted). "[W]here the facts are so clear that reasonable minds cannot differ, the commencement [of the statutory limitations] period may be determined as a matter of law." *Debiec v. Cabot Corp.*, 352 F.3d 117, 128-29 (3d Cir. 2003).

Smith's negligent misrepresentation claims are barred by the statute of limitations as a matter of law. It is undisputed the alleged misrepresentations were made before March 26, 1999, during one of her job interviews. For the following reasons, moreover, a reasonable jury could only conclude Smith's claims accrued more than two years before she filed her original complaint on December 19, 2002, after the limitations period expired.

Smith's claims of negligent misrepresentation about the lack of a capable assistant are time-

_____

[9] Smith first pled this claim against all Defendants in her second amended complaint on May 18, 2005; however, this Court ruled Smith was permitted to assert a claim in her Third Amended Complaint for negligent misrepresentation against Defendant VIPA only, dismissing her claims as to the other Defendants. *See* Order of Aug. 29, 2008 (Doc. 384), at 2 ¶¶ 1, 9.

barred. As early as April 12, 1999, and no later than May 2000, Smith knew she did not have an assistant capable of meeting her requirements. As early as June or July 1999, and no later than November 2000, Smith knew the lack of an assistant, who was capable of providing her with the level of assistance she expected, had affected her well-being and health.

Smith's claims for negligent misrepresentation about updating her job description, upgrading her position, and promoting her are also time-barred. Smith knew by October 1999, or at the latest, by October 2000, her position would not be upgraded and she would not be promoted in the time frame she had expected or to the level she believed she deserved.

Even if Smith's claims were not time-barred, no reasonable jury could find in her favor. Smith fails to make a sufficient showing on essential elements of her claim, with respect to which she bears the burden of proof at trial. To prevail on her claim for negligent misrepresentation, Smith must demonstrate: (1) VIPA made a representation that was false; (2) VIPA should have known the representation was false; (3) Smith relied on the representation; (4) Smith suffered pecuniary loss due to her justifiable reliance upon the information; and (5) VIPA failed to exercise reasonable care or competence in obtaining or communicating the information contained in the misrepresentation. *In re Tutu Water Wells Containment Litig.*, 32 F. Supp. 2d 800, 807 (D.V.I. 1998) (citing Restatement (Second) of Torts § 552 (1977)); *Addie v. Kjaer*, No. 2004-135, 2009 WL 453352, at *2 (D.V.I. Feb. 23, 2009).

Negligent misrepresentation "requires an *express* representation which is false or misleading at the time it is made." *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 568 (D.V.I. 2004) (quoting *L.E.B. Enters., Inc. v. Barclays Bank, P.L.C.*, 33 V.I. 42, 46 (V.I. Terr. Ct. 1995)). "That is, an alleged misrepresentation must be factual in nature and not promissory or

relating to future events that might never come to fruition." *Addie*, 2009 WL 453352, at *2 (quoting *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) (citations and internal quotation marks omitted)).

Smith provides no evidence VIPA made any express representation of fact which was false or misleading at the time it was made. Although during Smith's interviews, Finch may have indicated he would provide her in the future with a capable assistant, update her job description, upgrade her position, and promote her, his intentions are not statements of fact. Moreover, whether an individual is "capable" is a qualitative label, not an objective fact. Although Smith hoped to be promoted, and assumed she would receive a salary increase once her position was upgraded, Finch did not guarantee these results. Finch merely indicated Smith could expect salary increases, which she did, in fact, receive annually. Smith has offered no evidence Finch purposefully intended not to perform in good faith on any of the topics he discussed with Smith during her interviews. Moreover, Smith offers no evidence she suffered any pecuniary or economic damage as a result of VIPA's alleged misrepresentations.

As a second ground pled for relief, Smith alleges VIPA breached her employment contract.[10] To prevail on her breach of contract claims, Smith must show: (1) a contract existed; (2) the contract imposed a duty on one party; (3) one party to the contract breached the duty imposed by the contract; and (4) damages resulted from the breach. *See, e.g.*, *Stallworth Timber Co. v. Triad Bldg. Supply*, 968 F. Supp. 279, 282 (D.V.I. 1997) (stating elements of a material breach of contract); *see also* Restatement (Second) of Contracts §§ 235, 237, 240 (defining a breach of contract). "Where there

---

[10] *See* Order of Aug. 29, 2008 (Doc. 384), at 2 ¶ 1, 9 (ruling Smith is permitted to assert a claim in her Third Amended Complaint for breach of contract against Defendant VIPA only).

is no mutual assent, or no meeting of the minds, there is no contract." *V. I. Water & Power Auth. v. Gen. Elec. Int'l, Inc.*, No. 2006-131, 2009 WL 1918238, at *2 (D.V.I. June 20, 2009).

Smith argues her negligent misrepresentation claim also should be understood to be part of her claim for breach of employment contract. In so doing, Smith seeks to recast her negligent misrepresentation tort claim to avail herself of the six-year statute of limitations applicable to contracts, V.I. Code Ann. tit. 5 § 31(3)(A). Even reading Smith's allegations as sounding in contract, however, she has no claim for breach of contract. There is no evidence VIPA entered into any agreement, express or implied, written or oral, to provide Smith with a capable assistant, update her job description, upgrade her position, or promote her.

In support of the rest of her claim for breach of employment contract, Smith offers no evidence VIPA entered into any contract with Smith on any terms of employment. In any event, a verbal employment contract would be barred by the Statute of Frauds. V.I. Code Ann. tit. 28 § 244; *see Cooper v. Vitraco*, 320 F. Supp. 239, 240 (D.V.I. 1970) (ruling the Statute of Frauds applies to employment contracts for a duration of one year or more).

Smith contends she and VIPA entered into a binding contract based on the terms of the employee handbook she was given when she began her employment with VIPA. VIPA's distribution of its handbook to new employees, including Smith, is insufficient to show a meeting of the minds between Smith and VIPA to be bound by contract to the terms set forth in the handbook. *See In re James v. West Indian Burgers, Inc.*, No. 722/1988, 24 V.I. 67, 70 (V.I. Terr. Ct. Nov. 29, 1988) (holding "a company's general personnel practices embodied in a policy manual do not automatically become legally binding terms and conditions of employment"). VIPA's handbook is not a contract.

17

There is also no evidence VIPA breached any implied covenant of good faith and fair dealing with Smith. To prevail on this claim, Smith must show circumstances of VIPA's "fraud, deceit, or misrepresentation." *See Marcano v. Cowpet Beach Resort, Inc.*, No. 570/1990, 1995 WL 217600, at *4 (V.I. Terr. Ct. Mar. 9, 1995) (holding breach of good faith and fair dealing in the context of an at-will employment relationship requires facts showing the defendant's acts amount to fraud, deceit, or misrepresentation); *see also* Restatement (Second) of Contracts § 205 (1981) (stating "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement"). The record shows VIPA changed its rules and regulations from time to time, without consulting its employees, which modifications VIPA followed and expected its employees to follow. Without further negotiation and mutual assent, Smith could not reasonably expect her initial copy of the handbook to bind VIPA forever simply because she was an employee of VIPA.

Even if the handbook were treated as a contract, Smith has not shown any breach of the handbook's terms, rules, or regulations. Smith specifically complains VIPA breached her employment contract by eliminating compensatory leave for employees in November 2000. As of December 2000, however, Smith apparently had not read, or at least, had not understood the compensatory leave provisions set forth in the handbook. *See* Defs.' SOF ¶ 58; *see also James*, 24 V.I. at 71 (holding an employee manual was not binding because "[e]mployment contracts, like other binding agreements, should be the product of informed understanding and mutual assent as to the subject matter covered"). Smith thus provides no evidence she had a reasonable expectation, or she and VIPA had a meeting of the minds, which bound VIPA to offer her compensatory leave, at any time during her employment, under any circumstances.

Furthermore, there is no evidence Smith was damaged by VIPA's elimination of

compensatory leave. Despite the Board's elimination of compensatory leave, Smith was allowed to use her then-accrued compensatory leave, starting on November 29, 2000, in accordance with VIPA's former policies on compensatory leave set forth in the handbook. Smith was allowed to use then-accrued compensatory leave through January 23, 2001, even though the regulations required compensatory time to be taken in the calendar year in which the time was earned.[11] Although Smith complains she was not compensated for working overtime, she provides no evidence she worked overtime or made any requests for compensatory leave after November 2000.

Smith also complains VIPA breached her employment contract by refusing her donated leave benefits as outlined in the handbook. VIPA's handbook did not provide Smith with any unconditional right to use donated leave. VIPA's Rules and Regulations, § 2.26A established criteria for a grant of donated leave, including: the employee must be "suffering from a serious health condition or injury which is expected to require a prolonged absence from work by the employee," and the employee must have "exhausted all accrued sick, annual and administrative leave and compensatory time off." Smith Dep., Ex. 11 at 17, Aug. 17, 2009. Smith did not qualify for donated leave. Although, in August 2001, Smith provided VIPA with a July 19, 2001 note from her physician, the note described Smith's condition as voice loss and stated she was not able to return to work until fully recovered. Although, in October 2001, Smith provided VIPA with another letter from her physician, the letter stated the anticipated duration of her disability was "unknown" and "beyond [his] expertise." Smith Dep., Ex. 27, Aug. 17, 2001. Smith's doctor did not indicate her

---

[11] Smith also complains Finch refused to grant several unspecified requests she made for compensatory time between April 1999 and October 2000, which allegedly resulted in her loss of some unspecified portion of her accrued compensatory time. Pl.'s Br. at 7, 8. Smith provides no evidence to support her assertion she was not allowed to use some unspecified portion of her accrued compensatory time.

disability resulted from a serious health condition which made her unable to perform the functions of her position.[12] Smith did not comply with VIPA's prerequisites for donated leave. VIPA had no obligation to change its rules for Smith's benefit.

Smith also complains VIPA breached her employment contract by adopting a new management pay plan in November 2002, allegedly in violation of VIPA's policy and in breach of the covenant of good faith and fair dealing. There is no evidence VIPA ever agreed to refrain from instituting new pay plans or modifying pay plans already in place. The handbook does not contain any terms which would preclude VIPA's adoption of a new pay plan. There is no evidence the new pay plan violated any of VIPA's policies or the terms of VIPA's handbook.

There is no evidence Smith was damaged by VIPA's adoption of the new pay plan. As a result of the new pay plan, Smith's position, which was formerly classified as an MS 4 salary grade, was reclassified as an MS 5 salary grade. Smith benefitted from the new pay plan, which increased her salary from $51,469.02 to $55,078.40. There is no evidence VIPA agreed to upgrade Smith's position to MS 7 or MS 8, as Smith alone believes she deserved based on her education, credentials, and accomplishments. *See* Pl. Br. at 9.

Smith also complains VIPA breached her employment contract by refusing to follow procedures set forth in its handbook for the investigation of sexual harassment and disciplinary actions. There is no evidence VIPA and Smith ever reached an agreement on how VIPA would conduct any investigation or disciplinary action. There is also no evidence VIPA failed to follow any of its policies or the terms in its handbook regarding such investigations and disciplinary actions.

---

[12] Indeed, the record shows Smith performed the functions of her job when she had lost her voice from June 3, 2001, until August 30, 2002, when she regained her voice.

Finally, there is no evidence VIPA's alleged failure to comply with its handbook in this regard caused Smith any damages.

Smith's complaints about the manner in which VIPA conducted its discipline of her are based on the same circumstances she previously litigated under other counts of her pleadings, which have been previously dismissed or adjudicated in favor of Defendants.[13] Smith is thus barred from relitigating those facts by recasting her claim as one for breach of contract.[14]

---

[13] This Court has already granted summary judgment in favor of Defendants on Smith's claim VIPA improperly suspended her in 2001. *See* Order of Aug. 28, 2006 (Doc. 304). *See also* Order of Aug. 29, 2008 (Doc. 384), at 4 ¶ 3 (noting summary judgment was granted in defendants' favor on Smith's claim for wrongful suspension); Order and Opinion of Aug. 29, 2008 (Doc. 397), at 48-57 (examining the circumstances surrounding Smith's suspensions when the Court dismissed her Title VII claims). As this Court previously found, "[Smith] cannot be heard, therefore, and no reviewing fact finder could reasonably conclude, that the suspension [based on the May 15, 2001 altercation] was not supportable." Opinion of Aug. 29, 2008 (Doc. 397), at 49. In regard to Smith's second suspension, VIPA offered her the option of taking anger-management courses at VIPA's expense in lieu of suspension, but Smith chose suspension. Any damages she allegedly suffered were the result of her own decision.

In regard to Smith's complaints of sexual harassment, this Court previously granted summary judgment in favor of Defendants on all claims under Title VII. *See* Order and Opinion of Aug. 29, 2008 (Doc. 397), at 91. Moreover, this Court previously found there was no evidence any of the Board members who participated in her appeals acted with discriminatory animus toward Smith, and there was no evidence Smith's appeals would have been successful without their participation. *See* Opinion of Aug. 29, 2008 (Doc. 397), at 56-57; *see id.* at 56: (finding Mr. Lee and Mr. Peguero had both left the Board on April 27, 2001, and "[Smith] waived any challenge to the hearings and related proceedings when she failed to timely file and appeal to the PERB").

[14] *See* Opinion of Aug. 29, 2008 (Doc. 397), at 51-52, 54 ("[Smith's] untimely PERB appeal regarding alleged procedural defects causes her claims here of procedural defects to fail, as they are concluded against her."); *see also* Order of Aug. 28, 2006 (Doc. 304), at 2 ("Plaintiff made an untimely appeal to PERB from all the disciplinary actions by [VIPA] about which she complained before the VIPA and, as such, the [ ] agency decision of VIPA became final, binding, and preclusive, as a matter of law."); *see also id.* at 2 ("[T]he undisputed evidence shows that . . . because the VIPA agency decision, adverse to Plaintiff was untimely appealed, its basis became established as factually accurate, the discipline dispensed became justified, and the untimely appeal constituted a waiver of any procedural defects in the VIPA proceedings.").

Smith complained VIPA breached an her employment contract, pleading "VIPA committed blatant acts of nepotism." Compl. ¶ 35.[15] Smith admitted her nepotism claim is not actionable, conceding this "was never intended as a separate cause of action." Pl.'s Br. at 10.

As a final theory for her breach of contract claims, Smith complains VIPA breached an express contract by failing to provide effective, reasonable accommodations for her voice disability in breach of a July 22, 2002 letter, which she authored and Finch signed and approved "as noted." *See* Compl. ¶ 33; Pl.'s Br. at 14 & Ex. Z-7. "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 198 (3d Cir. 1986); *see also* Restatement of Contracts (Second) § 79 (1981) (requiring consideration for the formation of contracts). Finch had written to Smith before she returned to work on June 3, 2002, suggesting they discuss "accommodations that Port Authority can make regarding your voice disability." Defs.' SOF ¶ 96. As the next step in Smith's negotiations for reasonable accommodations, Smith responded to Finch's suggestion with her July 22, 2002 letter. Smith provides evidence of negotiations for accommodations, but provides no evidence the July 22, 2002 letter was a contract.

Moreover, even if Smith's July 22, 2002 letter formed a contract, VIPA satisfied all reasonable requirements demanded by Smith in her letter, furnishing Smith with many accommodations on her return to work. There is no evidence the lack of any specific

---

[15] Defendants concede the record generally reflects some VIPA employees were related to others employed at VIPA. Nonetheless, there is no evidence VIPA ever agreed not to engage in nepotism. Smith produced no evidence she suffered damages resulting from nepotism. She was hired for the only position for which she applied and there is no evidence she ever sought any other open position.

accommodation prevented Smith from performing her job until she regained the use of her voice on August 30, 2002. Smith provides no evidence she suffered any damages due to any alleged breach by VIPA to provide accommodations; she was not suspended, demoted, or terminated after Finch approved accommodations she had demanded, and she received a pay increase effective October 1, 2002.

Therefore, summary judgment is granted in favor of VIPA on all of Smith's breach of contract claims.

As a third ground pled for relief, Smith complains VIPA violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[16] Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794; *see also Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 123 (3d Cir. 1998) (stating elements of a claim under section 504 of the Rehabilitation Act).

Even assuming Smith can prove she was handicapped and otherwise qualified for her position at VIPA, she cannot show show she was excluded from a position or program at VIPA solely by reason of her alleged speech disability. Smith may make a *prima facie* case of exclusion by showing she was "denied a benefit for which [she] was qualified 'and was rejected under circumstances indicating discrimination on the basis of an impermissible factor.'" *Menkowitz*, 154

---

[16] *See* Order of Aug. 29, 2008 (Doc. 384), at 5 ¶ 6, 9 (ruling Smith is permitted to assert a claim in her Third Amended Complaint under Section 504 of the Rehabilitation Act against Defendant VIPA only).

F.3d at 124 (quoting *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990)).

Smith was not excluded from any position she sought at VIPA. She never applied for any open position at VIPA other than Public Information Officer, for which position she was hired. When she returned from her many leaves of absence, she was fully reinstated in her position. Smith held her position despite two suspensions. On January 24, 2003, Smith quit her job.

Smith primarily complains VIPA denied her requests for donated leave solely because of her medical condition. Smith ignores undisputed facts which show her contention is without merit. VIPA granted her first request for donated leave in March-April 2001, based on her reported voice loss. Smith made a second request for donated leave in August-October 2001, based on the same handicap. Although VIPA denied her second request, Smith fails to provide any evidence VIPA's denial was motivated by discrimination based on her medical condition. At that time, Smith had not complied with the requirements for VIPA's donated leave program. Moreover, in October 2001, VIPA offered to provide her with reasonable workplace accommodations, which would have allowed her to perform her job functions, but Smith did not return to work. VIPA ultimately granted Smith leave from November 2, 2001, to January 25, 2002, pursuant to another policy for unpaid leaves of absence, and from January 28 to April 19, 2002, pursuant to the FMLA. Moreover, when that leave expired, VIPA granted Smith still more leave from April 19 through June 2, 2002. In addition to multiple, extended leaves of absence, the record is clear VIPA granted Smith numerous workplace accommodations after she returned to work on June 3, 2002.

Smith contends VIPA violated the Rehabilitation Act by unreasonably insisting she provide an anticipated duration for her absence from work, thereby unlawfully excluding her from VIPA's donated leave program. Smith offers no authority to support her contention VIPA was obligated to

satisfy her demands for donated leave for the indefinite future. *See, e.g.*, *Wood v. Greene*, 323 F.3d 1309, 1314 (11th Cir.), *cert. denied*, 540 U.S. 982 (2003) (holding a plaintiff who was requesting an accommodation of indefinite leaves of absence so he could work at some uncertain point in the future was not a qualified individual under the ADA). VIPA's generosity, in extending a donated leave of absence to Smith in March-April 2001, did not make her subsequent request in August-October 2001 reasonable. VIPA had no obligation to tailor its donated leave program to suit Smith's demands by eliminating VIPA's requirement of a stated, anticipated duration of absence.

Therefore, summary judgment is granted in favor of VIPA on all of Smith's claims under section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

As a fourth ground pled for relief, Smith complains VIPA denied her unpaid leave under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (FMLA).[17] Smith also complains VIPA interfered with her right to obtain FMLA leave.

VIPA is an employer subject to the FMLA's requirements.[18] Smith sues under the self-care provision of the FMLA, which provides: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA requires only unpaid leave. 29 U.S.C. § 2612(c), (d).

Under the FMLA, an eligible employee is "an employee who has been employed for at least twelve months by the employer with respect to whom the leave is requested" and who has logged

---

[17] *See* Order of Aug. 29, 2008 (Doc. 384), at 6 ¶ 7, 9 (ruling Smith is permitted to assert a claim in her Third Amended Complaint under the FMLA against VIPA only).

[18] *See* Order of Aug. 29, 2008 (Doc. 388), at 2 ¶ 4 and Opinion of Aug. 29, 2008 (Doc. 387), at 8-15 (ruling VIPA is subject to the FMLA).

at least 1,250 hours of service with the employer during the previous twelve-month period. 29 U.S.C. § 2611(2)(A). "The determination of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months . . . must be made as of the date leave commences." 29 C.F.R. § 825.110 (d) (2009). Thus, whether Smith is an employee eligible for FMLA benefits requires a determination of when her leave commenced and whether she logged at least 1,250 hours during the twelve-month period before her leave commenced.

The Court's determination of when Smith's FMLA leave commenced turns on when Smith provided legally sufficient notice, if any, of her need to take FMLA leave. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402-03 (3d Cir. 2007) (explaining simple verbal notice of the need for leave, and the anticipated timing and duration of leave, is sufficient). After Smith returned to work on April 23, 2001, she made her first request for leave related to her health on August 21, 2001, when she demanded, through her attorney, donated leave for a prolonged period extending into the indefinite future. On August 29, 2001, Finch denied Smith's request for donated leave because Smith had not submitted a medical verification from her physician reporting a serious health condition precluding her return to work or stating the anticipated duration of her disability. Smith's counsel continued to demand and negotiate for donated leave until November 6, 2001, when Smith abandoned her request for donated leave and made her first formal request for FMLA leave. The record is devoid of any evidence Smith ever requested or properly supported an application for intermittent leave. *See* 29 U.S.C. § 2612(b)(1) and 29 U.S.C. § 825.203(a).

Smith fails to show she notified VIPA of her possible need for FMLA leave earlier than January 2, 2002, at which time she was on administrative unpaid leave through Friday, January 25, 2002. The record shows Smith never provided VIPA with sufficient information about her health

to put VIPA on notice she might be eligible for FMLA until January 2002, when Smith notified

VIPA of her plans to travel to Baltimore, Maryland for treatment. Before January 2002, the medical

certification Smith provided to VIPA, Dr. Buchalter's July 19, 2001 note, did not indicate whether

she suffered from a serious health condition making Smith unable to perform the functions of Public

Information Officer or the anticipated duration of her illness. Dr. Buchalter's October 8, 2001 letter

did not cure any incompleteness in his prior certification, stating only the duration of her illness was

unknown, and she would not be able to perform any work requiring communicative ability until her

voice returned. Smith's FMLA leave thus commenced on Monday, January 28, 2008.

Smith, however, fails to show she logged at least 1,250 hours during the twelve-month period

before her FMLA leave commenced in January 2002 and therefore, Smith fails to show she was an

eligible employee entitled to FMLA benefits. In previous motion practice, Smith argued her FMLA

leave commenced on August 29, 2001, when Finch denied her request for donated leave. Her

reasons for selecting August 29, 2001, as the commencement date are not clear. In any event,

whether Smith's FMLA leave commenced as of August 29, 2001, on November 6, 2001, or on

January 28, 2002, she cannot show she was eligible for FMLA leave based on the hours-in-service

requirement. It is undisputed Smith logged no work-hours at VIPA after her second suspension

expired on August 21, 2001, until she returned to work on June 3, 2002. Moreover, on a previous

motion for summary judgment, this Court held the undisputed facts showed Smith did not work

1,250 hours in the twelve-month period preceding August 29, 2001. Opinion of Aug. 29, 2008 (Doc.

387), at 46. Also, this Court previously held the undisputed facts showed Smith did not work 1,250

hours in the twelve-month period preceding November 6, 2001. *Id.* at 47. Thus, this Court ruled

Smith could prevail on her claim of being an eligible employee under the FMLA only if she proved

her FMLA leave commenced "on a date earlier than August 29, 2001 and November 6, 2001, and she requested and was entitled to intermittent leave." *Id.* Smith is bound by this Court's August 29, 2008 rulings.[19] Smith has not met her burden of proof on an essential element of her claim, the hours-in-service requirement for FMLA benefits.

Smith fails to show VIPA illegitimately prevented her from obtaining FMLA benefits. The FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any rights provided under the [FMLA]." 29 U.S.C. § 2615(a). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Therefore, to prevail on her claim of interference, Smith must show: (1) she was an eligible employee entitled to FMLA leave; (2) she gave notice to VIPA of her intention to take FMLA leave; and (3) she was denied leave to which she was entitled under the FMLA. *See Sarnowski*, 510 F.3d at 401 (stating "an employee must show he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits"). Furthermore, Smith must show she has been prejudiced by the violation. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (stating the employer is liable only for compensation and benefits lost by reason of the violation, for other monetary losses sustained as a direct result of the violation, and appropriate equitable relief, including employment, reinstatement, and promotion).

---

[19] Although Smith argues VIPA cannot prove she did not work the requisite number of hours to be an eligible employee under the FMLA, this Court previously considered her charge of deficiencies in VIPA's records and found she had not worked the requisite hours. *See* Opinion of Aug. 29, 2008 (Doc. 387), at 46-47. Smith has produced no new evidence concerning the hours she worked, which might justify a reconsideration of these rulings. Moreover, Smith has not proved she requested and was entitled to intermittent leave. *See* Pl.'s Br. at 22 (Smith admits she did not request intermittent leave, asserting "I did not really comprehend what constituted intermittent leave or how it worked.").

While Smith's interference claim is not actionable because she fails to show she was an eligible employee entitled to FMLA benefits, her claim also fails on the merits. Smith contends VIPA interfered with her FMLA rights by denying her leave under VIPA's donated leave program and the Virgin Islands Donated Leave Act, V.I. Ann. Code tit. 3 § 583b. Smith argues VIPA's donated leave policies are more generous than leave provided by the FMLA and therefore, VIPA was obligated to first offer her donated leave. Smith cites no authority to suggest the FMLA requires such a result. The FMLA allows employers to adopt leave policies more generous than those afforded under the statute. *See* 29 U.S.C. § 2653 ("Nothing in this Act . . . shall be construed to discourage employers from adopting or retaining leave policies more generous than any policies that comply with the requirement under this Act . . . ."). Furthermore, "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." *Id.*

Although Smith would have preferred paid donated leave to unpaid FMLA leave, Smith fails to show she was entitled to donated leave at any time from August 21, 2001, to June 3, 2002, when she returned to work. Moreover, Smith cannot maintain an FMLA claim based on VIPA's alleged violation of its donated leave program. *See Weidner v. Unity Health Plans Ins. Corp.*, 606 F. Supp. 2d 949, 956 (W.D. Wis. 2009) (agreeing with other jurisdictions "if an employer has a plan or program more generous than the FMLA, then the FMLA will not supersede or reduce those more generous benefits which the employer has chosen to provide") (citation omitted).

Even assuming Smith's charges had any merit, Smith has not shown she suffered any damages from VIPA's alleged interference with her FMLA rights. A violation of the FMLA does not alone entitle a plaintiff to damages. *Ragsdale*, 535 U.S. at 89; *see also Conoshenti v. Public*

*Serv. Elec. & Gas Co.*, 364 F.3d 135, 143-44 (3d Cir. 2004) (finding an employee had an actionable interference claim only if he was injured by the employer's failure to advise him of his rights under the FMLA); 29 U.S.C. § 2617(a) (limiting an employer's liability for violations to economic damages and equitable remedies).

Smith has suffered no damages due to anything VIPA did under the FMLA. Smith received more than twelve weeks of unpaid leave during the period, August 22, 2001, to January 25, 2002, receiving more leave than she would have been entitled under the FMLA. Moreover, Smith was not eligible for FMLA benefits as of January 25, 2002, because she had not logged at least 1,250 hours of service with VIPA during the previous twelve-month period due to her prolonged absences and because she had not provided an adequate medical certification. Despite her lack of eligibility under the FMLA, she benefitted from VIPA's grant of FMLA leave from January 28, 2002, through April 19, 2002. After her FMLA leave expired on April 19, 2002, VIPA gave her six more weeks of leave. When Smith returned to work on June 3, 2002, it is undisputed she was reinstated in the same position she held in August 2001, with no loss of seniority. While she was on unpaid leave, she received a salary increased, a benefit she received once she returned to work on June 3, 2002.

Therefore, summary judgment is granted in favor of VIPA on all of Smith's claims under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*

As a final ground for relief pled, Smith complains Defendants defamed her.[20] Specifically, Smith alleges:

> 93. Defendants committed defamation per se by making false statements that

---

[20] This Court permitted Smith to assert defamation claims in her Third Amended Complaint "only as to Paragraphs 93 and 97 as to non-specified Defendants." *See* Order of Aug. 29, 2008 (Doc. 384), at 6-7 ¶ 8.

my illness was not serious, which implied that I was lying about my medical condition. As a result, rumors circulated that I was faking my illness.

97. Defendants['] false statements have caused people to believe that I am a person of poor character and low morals. Consequently, I have suffered and continue to suffer severe mental anguish and anxiety, and irreparable damage to my good reputation, community standing and career.

Compl. ¶¶ 93, 97. Smith does not identify any individual who made these alleged statements. She does not indicate when, where, or how the alleged statements were made. She does not identify the specific content of any challenged statement.

The lack of detail in Smith's allegations alone would warrant dismissal of Smith's defamation claims. *See Ali v. Intertek Testing Serv. Caleb Brett*, 332 F. Supp. 2d 827, 831 (D.V.I. 2004) (holding the plaintiff employee's proposed amendment to state a defamation claim, which was based on alleged statements with an analogous lack of specificity, was futile because the amendment would not withstand a motion to dismiss); *Manns v. The Leather Shop Inc.*, 960 F. Supp. 925, 928-29 (D.V.I. 1997) (holding a well-pleaded cause of action for defamation "must, on its face, specifically identify what allegedly defamatory statements were made by whom and to whom"). Moreover, Smith's defamation claims cannot survive summary judgment because the record fails to support her deficient allegations.

Smith fails to make a sufficient showing on at least two essential elements of her claim, with respect to which she bears the burden of proof at trial. To prevail on her defamation claims, Smith must prove: (1) a false and defamatory statement concerning her; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; (4) either the actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 622 (D.V.I. 2003)

(citing Restatement (Second) of Torts § 558). In addition, Smith bears the burden of proof at trial of showing the alleged statements are either defamatory per se, which does not require proof of special damages, or showing the publication of defamatory statements caused her special harm. *Id.* at 622.

Smith fails to provide evidence any Defendant, or any person whose conduct could be imputed to VIPA, made a false and defamatory statement about her. Even if rumors about her circulated at VIPA and in the community, and affected her reputation and professional standing, she cannot hold VIPA liable for rumors generated by her co-workers. "[A]n employer cannot be held liable for the tort of a person who intentionally injures an employee when that person is merely a supervisor or manager and not the employer in person nor a person who is realistically the alter ego of the corporation." *Codgrington v. V.I. Port Auth.*, 911 F. Supp. 907, 915 (D.V.I. 1996); *see also Szot v. Allstate Ins. Co.*, 161 F. Supp. 2d 596, 608-09 (D. Md. 2001) (holding the plaintiff's references to the "rumor mill," generated among her co-workers about the grounds for her termination, without more, are insufficient to establish defamation against the employer); *Elicier v. Toys "R" Us, Inc.*, 130 F. Supp. 2d 307, 311 (D. Mass. 2001) (holding mere fact some employees heard or told others a rumor about the plaintiff being terminated for drug dealing does not prove the employer's reckless publication). Smith's evidence of rumors is not sufficient to proceed to trial on her defamation claim.

Smith also fails to provide any evidence she was economically damaged by anything said about her. Smith fails to identify any statements capable of a defamatory meaning. Smith's belief about the poor opinion others might have of her, and her "mental anguish and anxiety," do not satisfy the requirement for proof of special harm. Although Smith contends the alleged statements damaged

her career, there is no evidence her inability to secure employment was caused by rumors about her while she was at VIPA.

Smith also cannot show VIPA made any comments which would constitute defamation per se. "A disparaging remark tending to harm someone in his business or profession fits within the definition of slander per se," which does not require proof of special pecuniary or economic damages to recover. *Ross v. Bricker*, 770 F. Supp. 1039, 1042 (D.V.I. 1991). The record, however, fails to support Smith's speculation about VIPA personnel making false statements about her to prospective employers. Defendant Brin, VIPA legal counsel Mills, and Board members O'Connor and Richards each testified they did not say Smith was faking or lying about her illness or Smith's illness was not serious. *See* Defs.' SOF ¶¶ 152-154. Smith provides no evidence to the contrary. Smith has presented no triable issues of fact on her defamation claim. Therefore, summary judgment is granted on her defamation claim.

An appropriate order follows.

BY THE COURT:

March  31, 2010                          /s/ Juan R. Sánchez
                                         Juan R. Sánchez, Judge
                                         United States District Court